# EXHIBIT 1

1  G. Lynn Shumway (011714)
   shumway@carsafetylaw.com
2  **SHUMWAY LAW PLLC**
3  4647 N. 32nd Street, Suite 125
   Phoenix, Arizona 85018
4  Telephone : 602.795.3720
   Facsimile : 602.795.3728
5
6  E. Todd Tracy, Texas SBN 20178650 *(Pro Hav Vice pending)*
   Andrew G. Counts, Texas SBN 24036408 *(Pro Hac Vice pending)*
7  **THE TRACY LAW FIRM**
   4701 Bengal Street
8  Dallas, Texas 75235
   (214) 324-9000
9  Fax: (972) 387-2205
   etoddtracy@vehiclesafetyfirm.com
10 acounts@vehiclesafetyfirm.com
11
   *Attorneys for Plaintiff*



COPY



JAN 1 0 2020

CLERK OF THE SUPERIOR COURT
R. MERINO
DEPUTY CLERK

12

13          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

14              **IN AND FOR THE COUNTY OF MARICOPA**

15  MARK MYERS AND JENNI MYERS,

16                     Plaintiff,                      CV2020-000674

17                                            No. _____
    vs.
18

19  FCA US LLC,  a Delaware limited liability        **COMPLAINT**
    company;
20  ARIZONA FLEET SERVICES, a domestic
    corporation; JOE PRICE, individually, and    (Tort: Products Liability)
21  JOE PRICE d/b/a PRICE CAR COMPANY
22  a domestic corporation,                           Tier 3

23                     Defendants.

24

25      Plaintiffs, Mark Myers and Jenni Myers, for his complaint, allege the following:

26
        1.    Plaintiffs Mark Myers and Jenni Myers are married.  They reside in and are citizens
27
28  of Keller, Texas.

1

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

2.      Defendant FCA US LLC is an entity formerly known as Chrysler Group LLC, incorporated in Delaware, with its principal place of business in Auburn Hills, Michigan. Defendant's sole member is FCA North American Holdings, LLC, an entity incorporated in Delaware with its principal place of business in New York. FCA North America Holding LLC's sole member is Fiat Chrysler Automobiles N.V., a publicly traded company incorporated in the Netherlands with it principal place of business in London. Service of process upon this Defendant may be had by serving its registered agent for service, CT Corporation System, at 3800 N. Central Avenue, Suite 460, Phoenix, Arizona 85012.

3.      Defendant Arizona Fleet Services is a domestic corporation doing business in Arizona and service of process upon this Defendant may be had by serving its registered agent for service, Austin Oliver at 7059 West Festival Way, Tucson, AZ 85755.

4.      Defendant Joe Price is an individual who resides in and is a citizen of the state of Arizona, and service or process may be had by serving him at his residence, 1809 N. Sundial, Mesa, AZ 85205, or wherever he may be found.

5.      Defendant Joe Price d/b/a Price Car Company is a domestic corporation doing business in Arizona and service of process upon this Defendant may be had by serving its Owner, Joe Price at 1809 N. Sundial, Mesa, AZ 85205, or wherever he may be found.

## ASSUMED AND COMMON NAMES

6.      Plaintiffs hereby give notice that all defendants are being sued in all of their business or common names regardless of whether such businesses are partnerships, unincorporated associations, individuals, entities, or private corporations.

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

## GENERAL ALLEGATIONS

7.   On or about January 12, 2018, Mark Myers was a driving a 2002 Jeep Wrangler (VIN#1J4FA39SX2P748885) ("subject vehicle") traveling eastbound on SH105, near CR 2305 in Liberty County, Texas, when another vehicle collided head-on with Plaintiff Mark Myers.

8.   The subject vehicle was designed by Defendant FCA or its predecessor.

9.   The subject vehicle was manufactured by Defendant FCA or its predecessor.

10.  The subject vehicle was also assembled and tested by Defendant FCA or its predecessor.

11.  Even if Defendant FCA did not design, manufacture, assemble, or test the subject vehicle, Defendant FCA has agreed to assume all such liabilities.

12.  Prior to the subject accident, the other Defendants performed certain repairs/maintenance/inspection to or of the subject vehicle.

13.  It is an imprudent and negligent act for someone to place cars on the market for sale if the vehicle's safety systems are not all properly functional.

14.  The Defendants either knew or should have known this.

15.  Defendants were negligent in many ways, including in the inspection of the subject vehicle. Defendants were also negligent in failing to advise the Plaintiffs that the subject vehicle had suffered extensive damage.

16.  Defendants' negligence was the cause of Plaintiff Mark Myers' injuries and Plaintiffs' damages.

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

17. The negligence of Defendants was inherently undiscoverable until an accident occurred, and Plaintiffs had no objective knowledge of any actionable conduct until after the accident.

18. The negligence was essentially undetectable, inherently dormant, characterized by prolonged latency, and no immediate injury manifested itself to alert Plaintiffs until after the accident.

19. At the time of the accident, Mark Myers was properly seated and properly wearing the available seat belt.

20. However, despite being properly seated and properly wearing the available seat belt, Mark Myers sustained serious injuries when the vehicle failed to protect him because it violated several crashworthiness principles.

21. There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world. They are as follows:

    1.    Maintain survival space;

    2.    Provide proper restraint throughout the entire accident;

    3.    Prevent ejection;

    4.    Distribute and channel energy; and

    5.    Prevent post-crash fires.

22. When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design,

4

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

23. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

24. Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. For example, in a rollover, if the roof collapses such that no survival space is left, it does not matter what kind of restraint system, glass, fuel system, or energy absorbing system is used, because these systems have been rendered moot.

25. Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of the accident versus the cause of an injury.

26. Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death following an accident through the use of a vehicle's various safety systems.

27. Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

28. General Motors has stated in the past that, "The rich don't deserve to be safe. . . . Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

5

SHUMWAY LAW PLLC
4647 N. 32ⁿᵈ St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

29.   Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

30.   Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon auto manufacturers to investigate and find out what other automakers are doing with regards to safety and to apply those same methods or technology to their own vehicle.

31.   Furthermore, an automaker cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

32.   While there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards to not adequately protect the public.

## COUNT I

## NEGLIGENCE AND PRODUCT LIABILTIY

33.   It was entirely foreseeable to and well-known by Defendant FCA that accidents and incidents involving its vehicles, such as occurred herein, would on occasion take place during the normal and ordinary use of said vehicle.

34.   The injuries complained of occurred because the vehicle in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable,

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

accidents. The vehicle in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

35.   Defendant FCA, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question.

36.   As detailed herein, the vehicle contains and/or Defendant has committed either design, manufacturing, marketing, assembling, and/or testing defects.

37.   Defendant either knew or should have known of at least one safer alternative design which would have prevented the serious injuries to the Plaintiff.

38.   In addition to the foregoing, Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the vehicle was unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because Defendant knew and/or should have known of the following, non-exhaustive list of defects:

a.   The vehicle failed to provide reasonable protection;
b.   The vehicle failed to provide reasonable occupant safety;
c.   Other manufacturers refused to utilize the passive shoulder belt with manual lap belt design;
d.   Research dating back into the 1960's revealed that belts without a lap belt would cause head and neck injuries;
e.   Research dating back into the 1960's revealed that belts without a lap belt would cause submarining injuries;
f.   Research revealed that belts without lap belts would cause intra-abdominal overload;
g.   The vehicle was not properly subjected to finite element modeling, finite element analysis and other computer aided accident scenarios; and/or

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

h.   The defects and negligence were the producing, direct, substantial and proximate cause of the injuries and damages in question.

39.   Defendant also failed to conduct proper testing and engineering analysis during the design, development and testing of the vehicle.

40.   Defendant were negligent in the manufacture, assembly, marketing, and/or testing of the vehicle in question.

41.   In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death;

42.   Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

43.   If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

44.   If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

45.   A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent.

46.   Based upon information and/or belief, Defendant either used or knew about advanced safety features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

47.   Defendant's occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

48. When Defendant designed the subject vehicle, it did not reinvent the wheel. Defendant used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicles. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

49. Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendant is also in possession of what, if any, engineering analysis it performed.

50. However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

51. Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendants knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

52. The foregoing acts and/or omissions, design defects and negligence of Defendants were the producing, direct, proximate and legal cause of the Plaintiff's serious injuries and damages.

## COUNT II

### NEGLIGENCE

53. Plaintiffs' claims against the other Defendants include all of what has previously been mentioned.

9

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

54. Additionally, Plaintiffs file this claim due to Defendants' negligent acts and/or omissions which include, but which are not necessarily limited to, one of more of the following:

    a.   Defendants were negligent for making representations and/or failing to inform (failure to warn) Plaintiffs regarding the vehicle;

    b.   Defendants were negligent in repair;

    c.   Defendant were negligent in modifications;

    d.   Defendants were negligent in supervision;

    e.   Defendants were negligent in quality control;

    f.   Defendants were negligent in maintenance;

    g.   Defendants were negligent in service;

    h.   Defendants failed to properly inspect the safety of the vehicle;

    i.   Defendants failed to properly inspect for, repair, and/or report safety hazards;

    j.   Defendants failed to properly inspect the safety systems on the vehicle; and/or

    k.   Plaintiffs did not discover the negligent acts of the Defendants until an accident caused severe injuries to Plaintiff.

55. After materials are produced in discovery and after Defendants and others have been deposed, additional allegations may come to light, and Plaintiffs reserve the right to amend their pleadings.

## REQUEST FOR RELIEF

56. As a direct and/or proximate result of the above-referenced acts and/or omissions of one or more of the Defendants, Plaintiff Mark Myers has suffered past, present, and/or future: extreme emotional distress, pain and suffering, mental anguish, disfigurement, physical impairment, loss of income, loss of earning capacity, loss of enjoyment of life, loss of consortium, and interference with his daily activities.

57. As a result of the acts and/or omissions of one or more of the Defendants, Mark Myers has become obligated to pay extensive medical expenses as a result of his injuries.

58. As a result of the act and/or omissions of one or more of the Defendants, Mark

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

1   Myers has suffered lost wages in the past and in all likelihood will into the future as result

2   of his injuries.

3
4   59.  As a direct and/or proximate result of the above-referenced acts and/or omissions

5   of one or more of the Defendants, and because her husband suffered his severe injuries,

6   Plaintiff Jenni Myers has suffered past, present, and/or future loss of consortium, and past,

7   present, and/or future loss of care, maintenance, support, services, advice, counsel,

8   reasonable contributions of pecuniary value, and loss of companionship and society.

9
10  60.  By reason of the nature and severity of Plaintiff's injuries, Plaintiffs have been

11  caused to incur medical charges and expenses in the past, and it is anticipated that Plaintiffs

12  will continue to incur medical expenses in the future, for the proper care and treatment of

13  injuries

14
15  61.  The above and foregoing acts and/or omissions of one or more of the Defendants,

16  resulting in the serious injuries to Mark Myers, have caused actual damages to Plaintiffs in

17  excess of the minimum jurisdictional limits of this Court.

18  62.  For the reasons presented herein, Plaintiffs pray that Defendants be cited to appear

19
20  and answer, and that upon a final trial of this cause, Plaintiffs recovers judgment against

21  Defendants for:

22      a.  actual damages;
23      b.  prejudgment and post-judgment interest beginning January 12, 2018;
        c.  costs of suit; and
24      d.  all other relief, general and special, to which Plaintiffs are entitled to at law
25          and/or in equity, and/or which the Court deems proper.

26

27

28

11

DATED this 10 day of January, 2020.

SHUMWAY LAW PLLC

G. Lynn Shumway
4647 N. 32nd Street
Suite 125
Phoenix, Arizona 85018

and

E. Todd Tracy, Texas SBN 20178650
*(Pro Hav Vice pending)*
Andrew G. Counts, Texas SBN 24036408
*(Pro Hac Vice pending)*
**THE TRACY LAW FIRM**

*Attorneys for Plaintiffs*

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 2

 CT Corporation

TO: Melissa Gravlin
FCA US LLC
1000 Chrysler Dr Ofc of
Auburn Hills, MI 48326-2766

RE: **Process Served in Arizona**

FOR: FCA US LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Mark Myers and Jenni Myers, Pltfs. vs. FCA US LLC, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Certificate(s), Demand, Complaint |
| **COURT/AGENCY:** | Maricopa County - Superior Court, AZ<br>Case # CV2020000674 |
| **NATURE OF ACTION:** | Product Liability Litigation - Manufacturing Defect - 2002 Jeep Wrangler, VIN:<br>1J4FA39SX2P748885 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Phoenix, AZ |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 01/14/2020 at 12:41 |
| **JURISDICTION SERVED :** | Arizona |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | G. Lynn Shumway<br>Shumway Law PLLC<br>4647 N. 32nd Street<br>Suite 125<br>Phoenix, AZ 85018<br>602-795-3720 |
| **REMARKS:** | The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 01/14/2020, Expected Purge Date: 01/19/2020<br><br>Image SOP<br><br>Email Notification, Lance Arnott SOPVerification@wolterskluwer.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>1999 Bryan St Ste 900<br>Dallas, TX 75201-3140 |
| **For Questions:** | 877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

# EXHIBIT 3

# Delaware

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS ON FILE OF "FCA US LLC" AS RECEIVED AND
FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF FORMATION, FILED THE TWENTY-EIGHTH DAY OF
APRIL, A.D. 2009, AT 12:47 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "NEW CARCO
ACQUISITION LLC" TO "CHRYSLER GROUP LLC", FILED THE TENTH DAY OF
JUNE, A.D. 2009, AT 10:47 O'CLOCK P.M.

CERTIFICATE OF AMENDMENT, CHANGING ITS NAME FROM "CHRYSLER
GROUP LLC" TO "FCA US LLC", FILED THE THIRD DAY OF DECEMBER,
A.D. 2014, AT 12:47 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE EFFECTIVE DATE OF
THE AFORESAID CERTIFICATE OF AMENDMENT IS THE FIFTEENTH DAY OF
DECEMBER, A.D. 2014.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID LIMITED LIABILITY COMPANY, "FCA US LLC".

Jeffrey W. Bullock, Secretary of State

4681266  8100H

150111559

AUTHENTICATION: 2076159

DATE: 01-28-15

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:51 PM 04/28/2009*
*FILED 12:47 PM 04/28/2009*
*SRV 090404563 - 4681266 FILE*

# CERTIFICATE OF FORMATION

## OF

## NEW CARCO ACQUISITION LLC

This Certificate of Formation of New CarCo Acquisition LLC, dated as of April 28, 2009, is being duly executed and filed by Giorgio Fossati, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 Del. C. §18-101, et seq).

      1.     Name. The name of the limited liability company formed hereby is New CarCo Acquisition LLC (the "Company").

      2.     Registered Office. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

      3.     Registered Agent. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation as of the date first above written.

Name: Giorgio Fossati
Title: Authorized Person

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 11:10 PM 06/10/2009*
*FILED 10:47 PM 06/10/2009*
*SRV 090607799 - 4681266 FILE*

# CERTIFICATE OF AMENDMENT

## OF THE

# CERTIFICATE OF FORMATION

## OF

# NEW CARCO ACQUISITION LLC

This Certificate of Amendment of the Certificate of Formation of New CarCo Acquisition LLC (the "Company"), dated as of June 10, 2009, is being duly executed and filed by the undersigned, as an authorized person, pursuant to Section 18-202 of the Delaware Limited Liability Company Act.

FIRST: The name of the limited liability company to which this Certificate of Amendment relates is New CarCo Acquisition LLC.

SECOND: Section 1 of the Certificate of Formation of the Company is hereby deleted and replaced with the following:

"1.   Name. The name of the limited liability company hereby is Chrysler Group LLC (the "Company")."

*[Signature page follows]*

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Amendment as of the date first above written.

NEW CARCO ACQUISITION LLC

By: _____

Name: Giorgio Fossati

Title: Vice President and Secretary

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 12:53 PM 12/03/2014*
*FILED 12:47 PM 12/03/2014*
*SRV 141480355 - 4681266 FILE*

# STATE OF DELAWARE

## CERTIFICATE OF AMENDMENT OF THE

## CERTIFICATE OF FORMATION

1. Name of Limited Liability Company:     **Chrysler Group LLC**

2. Article 1 of the Certificate of Formation of the limited liability company is hereby amended in its entirety as follows:

   **"1. Name. The name of the limited liability company is hereby FCA US LLC (the "Company")."**

3. The effective date of this Certificate of Amendment to the Certificate of Formation is **December 15, 2014.**

IN WITNESS WHEREOF, the undersigned have executed this Certificate on the 3rd day of December , 2014.

Chrysler Group LLC

By: _____
Marjorie H. Loeb,
Secretary

**EXHIBIT 4**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| Chrysler LLC, *et al.,* | : | Case No. 09-50002 (AJG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
-------------------------------------------------------------x

### ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH AND RELATED PROCEDURES AND (III) GRANTING RELATED RELIEF

This matter coming before the Court on the motions, dated May 3, 2009 and

May 22, 2009 (Docket Nos. 190 and 1742) (collectively, the "Sale Motion")[1] filed by the above-

captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order

(the "Sale Order"), pursuant to sections 105, 363 and 365 of the United States Bankruptcy Code,

11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 6004-1,

6006-1 and 9006-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for

the Southern District of New York:  (i) authorizing and approving the entry into, performance

under and terms and conditions of the Master Transaction Agreement, dated as of April 30, 2009

(collectively with all related agreements, documents or instruments and all exhibits, schedules

and addenda to any of the foregoing, and as amended, the "Purchase Agreement"), substantially

---

[1]     Unless otherwise stated, all capitalized terms not defined herein shall have the meanings given to them in the Sale Motion and the Bidding Procedures Order (as defined below).

in the form attached hereto as <u>Exhibit A</u> (without all of its voluminous exhibits), between and

among Fiat S.p.A. ("<u>Fiat</u>"), New CarCo Acquisition, LLC (the "<u>Purchaser</u>"), a Delaware limited

liability company formed by Fiat, and the Debtors,[2] whereby the Debtors have agreed to sell, and

the Purchaser has agreed to purchase the "<u>Purchased Assets</u>" (as such term is defined in Section

2.06 of the Purchase Agreement), which Purchased Assets include, without limitation, the

Assumed Agreements (as defined below), substantially all of the Debtors' tangible, intangible

and operating assets related to the research, design, manufacturing, production, assembly and

distribution of passenger cars, trucks and other vehicles (including prototypes) under brand

names that include Chrysler, Jeep® or Dodge (the "<u>Business</u>"), certain of the facilities related

thereto and all rights, intellectual property, trade secrets, customer lists, domain names, books

and records, software and other assets used in or necessary to the operation of the Business or

related thereto to the Purchaser (collectively, and including all actions taken or required to be

taken in connection with the implementation and consummation of the Purchase Agreement, the

"<u>Sale Transaction</u>"); (ii) authorizing and approving the sale by the Debtors of the Purchased

Assets, free and clear of liens, claims (as such term is defined by section 101(5) of the

Bankruptcy Code), liabilities, encumbrances, rights, remedies, restrictions and interests and

encumbrances of any kind or nature whatsoever whether arising before or after the Petition

---

[2]    The following Debtors are "Sellers" under the Purchase Agreement:  Alpha Holding, LP ("<u>Alpha</u>"),
Chrysler, LLC; Chrysler Aviation Inc.; Chrysler Dutch Holding LLC; Chrysler Dutch Investment LLC;
Chrysler Dutch Operating Group LLC; Chrysler Institute of Engineering; Chrysler International
Corporation; Chrysler International Limited, L.L.C.; Chrysler International Services, S.A.; Chrysler Motors
LLC; Chrysler Realty Company LLC; Chrysler Service Contracts Florida, Inc.; Chrysler Service Contracts
Inc.; Chrysler Technologies Middle East Ltd.; Chrysler Transport Inc.; Chrysler Vans LLC; DCC 929, Inc.;
Dealer Capital, Inc.; Global Electric Motorcars, LLC; NEV Mobile Service, LLC; NEV Service, LLC;
Peapod Mobility LLC; TPF Asset, LLC; TPF Note, LLC; and Utility Assets LLC.

Date,[3] whether at law or in equity, including all claims or rights based on any successor or

transferee liability, all environmental claims, all change in control provisions, all rights to object

or consent to the effectiveness of the transfer of the Purchased Assets to the Purchaser or to be

excused from accepting performance by the Purchaser or performing for the benefit of the

Purchaser under any Assumed Agreement and all rights at law or in equity (collectively,

"Claims") (other than certain liabilities that are expressly assumed or created by the Purchaser, as

set forth in the Purchase Agreement or as described herein (collectively, the "Assumed

Liabilities")); (iii) authorizing the assumption and assignment to the Purchaser of certain

executory contracts and unexpired leases of the Debtors (collectively, the "Assumed

Agreements") in accordance with the Contract Procedures set forth in the Bidding Procedures

Order, the Purchase Agreement and this Sale Order; (iv) authorizing and approving the entry

into, performance under and terms and conditions of the UAW Retiree Settlement Agreement (as

defined herein); and (v) granting other related relief; the Court having conducted a hearing on the

Sale Motion on May 27, 2009 through May 29, 2009 (collectively, the "Sale Hearing") at which

time all interested parties were offered an opportunity to be heard with respect to the Sale

Motion; the Court having reviewed and considered, among other things, (i) the Sale Motion and

the exhibits thereto, (ii) the Purchase Agreement attached hereto as Exhibit A, (iii) this Court's

prior order (Docket No. 492), dated May 8, 2009 (the "Bidding Procedures Order") approving

competitive bidding procedures for the Purchased Assets (the "Bidding Procedures"), (iv) all

objections to the Sale Transaction filed in accordance with the Bidding Procedures Order or

raised on the record at the Sale Hearing, (v) Memorandum of Law in Support of Sale Motion

---

[3]     As used herein, "Petition Date" refers to (a) April 30, 2009 for all of the Debtors other than Alpha and
(b) May 19, 2009 for Alpha.

(Docket No. 191), (vi) Supplemental Memorandum of Law in Support of Sale Motion (Docket

No. 2130), (vii) the Consolidated Reply to Objections to the Sale Motion (Docket Nos. 2155 and

2565), (viii) the Statement of the United States Department of the Treasury in Support of the

Commencement of Chrysler LLC's Chapter 11 Case (Docket No. 69), (ix) the Statement of the

Official Committee of Unsecured Creditors in Support of Debtors Motion for Order Authorizing

the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and

Encumbrances (the "Creditors' Committee Statement"), and the related Memorandum of Law

(Docket No. 1846 and 2147); (x) the Response to Various Objections Relating to Successor

Liability Issues (Docket No. 2111); (xi) the Response of International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America to Motion of the

Debtors and Debtors in Possession for an Order Authorizing the Sale of Substantially All of the

Debtors' Operating Assets and Other Relief (Docket No. 2085); (xii) the Supplemental Statement

of the International Union, United Automobile, Aerospace, and Agricultural Implement Workers

Union of America, AFL-CIO in Support of Motion of the Debtors and Debtors in Possession for

an Order Authorizing the Sale of Substantially All of the Debtors' Operating Assets and Other

Relief and Response to Individual Retiree Statements Concerning Approval of UAW Retiree

Settlement Agreement (Docket No. 2094) and (xiii) the arguments of counsel made, and the

evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale

Motion and the Bidding Procedures Order has been provided in accordance with the Bidding

Procedures Order and that the relief requested in the Sale Motion is in the best interests of the

Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale

Hearing and these cases; and after due deliberation thereon; and good and sufficient cause

appearing therefore, including for the reasons set forth in the Court's Opinion dated May 31,

2009 (Docket No. 3073);

**IT IS HEREBY FOUND AND DETERMINED THAT:**

### THE DEBTORS AND THESE CASES

A.      As of the Petition Date and for a period of more than a year before the

commencement of these chapter 11 cases, the Debtors worked with financial advisors and with

their various constituencies to try to raise capital or implement a viable transaction that would

allow them to continue the Debtors' operations.  (See DX 20; May 27, 2009 Hearing Tr.

(Testimony of Tom Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli);

Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at 87-92).  The Debtors presented

credible evidence that, as of the Petition Date, they had explored strategic alternatives for

the Business over an extended period of time and had communicated with more than 15 parties

about possible sales, mergers, combinations and alternatives regarding debt or equity capital

investments or financing and had prepared standalone business plans in the event that strategic

alternatives did not materialize or were insufficient.  (See Id.).  The Sale Transaction is the result

of the Debtors' extensive efforts.

### JURISDICTION, FINAL ORDER AND STATUTORY PREDICATES

B.      This Court has jurisdiction over the Sale Motion, the Sale Transaction and

the Purchase Agreements pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), and this matter is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).  Venue of these cases and

the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  Debtor Peapod

Mobility LLC ("Peapod") is a New York limited liability company.  Debtor Chrysler Realty

Company LLC ("Chrysler Realty") is the owner of certain valuable real property located on

11th Avenue in New York, New York. Debtor Chrysler is the direct or indirect parent of Peapod, Chrysler Realty and each of the other Debtors.

C.      This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein.

D.      The statutory predicates for the relief sought in the Sale Motion and granted in this Sale Order include, without limitation, sections 105(a), 363(b), (f) and (m) and 365(a), (b) and (f) of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004 and 6006.

## JUDICIAL NOTICE

E.      Pursuant to Federal Rule of Evidence 201(c), incorporated into these proceedings pursuant to Bankruptcy Rule 9017, the Court takes judicial notice of the (1) March 30, 2009 Remarks by the President of the United States on the American Automotive Industry; (2) April 30, 2009 Remarks by the President of the United States on the Auto Industry; and (3) the fact of the publication of the Notice of Proposed Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances and Final Sale Hearing Related Thereto in the national editions of *The New York Times* on May 12, 2009, *The Wall Street Journal* on May 12, 2009 and *USA Today* on May 13, 2009, and the worldwide edition of *The Financial Times* on May 13, 2009. (See DX 8; DX 18; DX 19).

## SOUND BUSINESS PURPOSE

F.      The Debtors seek to convey the Purchased Assets, including those related to the research, design, manufacture (at 16 domestic manufacturing facilities), assembly (at seven domestic assembly plants) and wholesale distribution of passenger cars and trucks under

the brand names Chrysler, Jeep® and Dodge, all of which are subject to Claims, including those held by the Debtors' prepetition secured lenders.  (See DX 64, at §2.06).

       G.     In the second half of 2008, Chrysler began to experience an "unprecedented" loss of cash (See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)). Currently, the Debtors are losing over $100 million dollars per day.  (See Deposition of Matthew Feldman, May 26, 2009, at 65:18-66:5).  Unless the Sale Transaction is approved without delay, the Debtors' assets will continue to erode, and they will be forced to liquidate in the near term. (See May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn, May 24, 2009, at Exhibit 1, at 7-29)).

       H.     The Debtors have demonstrated, and the Purchase Agreement reflects, both (1) good, sufficient and sound business purposes and justifications for the immediate approval of the Purchase Agreement and the Sale Transaction (May 28, 2009 Hearing Tr. (Testimony James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)); and (2) compelling circumstances for the approval of the Purchase Agreement and the Sale Transaction outside of the ordinary course of the Debtors' business pursuant to section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, the Debtors' estates will suffer immediate and irreparable harm if the relief requested in the Sale Motion is not granted on an expedited basis (See May 28, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at 9-27; Deposition of Frank Ewasyshyn, May 24, 2009, Exhibit 1, at 8-29).  In light of the exigent circumstances of these chapter 11 cases and the risk of deterioration in the going concern value of the Purchased Assets pending the proposed Sale Transaction, time is of the essence in (a) consummating the Sale Transaction, (b) preserving

the viability of the Debtors' businesses as going concerns and (c) minimizing the widespread and

adverse economic consequences for the Debtors' estates, their creditors, employees, retirees, the

automotive industry and the broader economy that would be threatened by protracted

proceedings in these chapter 11 cases.  (See DX 13; DX 14; May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Ronald Nardelli);

May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr.

(Testimony of James Chapman); Deposition Tr. of Ronald Bloom, at 65; see generally DX 20).

I.      The consummation of the Sale Transaction outside of a plan of

reorganization pursuant to the Purchase Agreement neither impermissibly restructures the rights

of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of

reorganization for the Debtors.  The Sale Transaction does not constitute a *sub rosa* plan of

reorganization.  (See DX 4; DX 5; DX 10; May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)).

J.      Entry of an order approving the Purchase Agreement and all the

provisions thereof is a necessary condition precedent to the Purchaser's consummation of the

Sale Transaction, as set forth in the Purchase Agreement.  (See DX 64, at § 8.02(q)).

K.      The Purchase Agreement was not entered into, and none of the Debtors,

the Purchaser or the Purchaser's present or contemplated owners, have entered into the Purchase

Agreement or propose to consummate the Sale Transaction, for the purpose of hindering,

delaying or defrauding the Debtors' present or future creditors.  None of the Debtors,

the Purchaser nor the Purchaser's present or contemplated owners is entering into the Purchase

Agreement, or proposing to consummate the Sale Transaction, fraudulently for the purpose of

statutory and common law fraudulent conveyance and fraudulent transfer claims whether under

the Bankruptcy Code or under the laws of the United States, any state, territory, possession

thereof, or the District of Columbia or any other applicable jurisdiction with laws substantially

similar to the foregoing.  (See DX 5; DX 6; DX 10; May 27, 2009 Hearing Tr. (Testimony of

Altavilla)).

### HIGHEST AND BEST OFFER

L.      On May 8, 2009, this Court entered the Bidding Procedures Order

approving Bidding Procedures for the Purchased Assets.  The Bidding Procedures provided a

full, fair and reasonable opportunity for any entity to make an offer to purchase the Purchased

Assets.  No additional Qualifying Bids for the Purchased Assets were received by the Debtors.

Therefore, the Purchaser's bid, as reflected in the Purchase Agreement, is the only Qualified Bid

for the Purchased Assets and was designated as the Successful Bid pursuant to the Bidding

Procedures Order (Docket No. 492).  Likewise, no party came forward at the Sale Hearing with a

bid or offer.  As such, no Auction was conducted, and the Purchaser's bid, as reflected in the

Purchase Agreement, was presented to the Court as the Successful Bid. (See May 27, 2009

Hearing Tr. (Testimony of Robert Manzo)).

M.      As demonstrated by the testimony and other evidence proffered or

adduced prior to or at the Sale Hearing, and in light of the exigent circumstances presented and

emergency nature of the relief requested (1) the Debtors have adequately marketed the Purchased

Assets (See May 27, 2009 Hearing Tr. (Testimony of Thomas Lasorda); May 28, 2009 Hearing

Tr. (Testimony of Robert Nardelli); Deposition of Scott Garberding, May 24, 2009, Exhibit 2, at

87-92)); (2) the Purchased Assets are deteriorating rapidly in value and there are good business

reasons to sell these assets outside of a plan of reorganization (See May 28, 2009 Hearing Tr.

(Testimony of Robert Nardelli); Deposition of Frank Ewasyshyn, May 24, 2009, at Exhibit 1, at

7-29; Deposition of Matthew Feldman, May 26, 2009, at 65:21-66:5)); (3) the consideration

provided for in the Purchase Agreement constitutes the highest or otherwise best offer for the

Purchased Assets and provides fair and reasonable consideration for the Purchased Assets (See

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (4) the Sale Transaction, as a transfer of deteriorating assets, is an

extraordinary, non-market transaction, the consideration for which exceeds what would have

been obtainable in a transaction subject to ordinary market forces (See Deposition of Ronald

Bloom, May 26, 2009, at 65:4-66:10); (5) the Sale Transaction is the only alternative to

liquidation available to the Debtors (See May 28, 2009 Hearing Tr. (Testimony of Robert

Nardelli)); (6) if the Sale Transaction is not approved and consummated, the Debtors will have

no alternative but to cease operations and liquidate (See May 28, 2009 Hearing Tr. (Testimony

of Robert Nardelli)); (7) the Sale Transaction will provide a greater recovery for the Debtors'

creditors than would be provided by any other practical available alternative, including, without

limitation, liquidation whether under chapter 11 or chapter 7 of the Bankruptcy Code (See DX;

May 27, 2009 Hearing Tr. (Testimony of Robert Manzo)); (8) no other party or group of parties

has offered to purchase the Purchased Assets for greater economic value to the Debtors or their

estates (See May 27, 2009 Hearing Tr. (Testimony of Robert Manzo); May 27, 2009 Hearing Tr.

(Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli));

(9) the consideration to be paid by the Purchaser under the Purchase Agreement exceeds the

liquidation value of the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert

Manzo)) and (10) the consideration to be paid by the Purchaser under the Purchase Agreement

constitutes reasonably equivalent value and fair consideration (as those terms may be defined in

each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

United States, any state, territory or possession thereof or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing. (See DX 14; DX 15; May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)). The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment. (See May 27, 2009 Hearing Tr. (Testimony of Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of James Chapman); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli)).

N.      Neither the Purchaser nor Fiat have furnished the Debtors with a good faith deposit in connection with the Purchase Agreement. The Debtors submit that in light of the extensive prepetition negotiations culminating in the various complex agreements with the Debtors, the United States Department of the Treasury (the "U.S. Treasury"), the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW") and other stakeholders, as well as Fiat's substantial investment of time and resources, the Purchaser's and Fiat's commitment to consummate the Fiat Transaction is clear without the need to provide a good faith deposit. See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla); May 28, 2009 (Testimony of David Curson); May 28, 2009 (Testimony of Robert Nardelli); May 28, 2009 (Testimony of James Chapman); Deposition of Matthew Feldman, May 26, 2009, at 37:21-39:1)).

## BEST INTEREST OF CREDITORS

O.      Approval of the Purchase Agreement and the consummation of the Sale Transaction with the Purchaser at this time is in the best interests of the Debtors, their estates, creditors, employees, retirees and other parties in interest. (See DX 6; Creditors' Committee Statement, at ¶ 2, Docket No. 1846; May 28, 2009 Hearing Tr. (Testimony of David Curson)).

**DESCRIPTION OF THE PURCHASER AND THE PURCHASER'S GOOD FAITH**

P.    The Purchaser is a newly formed Delaware limited liability company that as of the date of the Sale Hearing, is a wholly-owned subsidiary of Fiat.  The Purchaser is not an "insider" of any of the Debtors, as that term is defined by section 101(31) of the Bankruptcy Code.  (See DX 64, at Art. IV-A).

Q.    Upon the closing of the Sale Transaction (the "Closing"), (1) Fiat will contribute to the Purchaser certain valuable technology and management expertise, (2) the U.S. Treasury and Export Development Canada ("EDC") will lend the Purchaser approximately $8 billion in new financing and (3) the UAW Retiree Settlement Agreement, the entry into which is a condition to the UAW CBA (as defined below) and its assumption and assignment to Purchaser, will become effective.  Following the making of the foregoing contributions to the Purchaser, Fiat, the VEBA (as defined below), the U.S. Treasury and EDC, through 7169931 Canada Inc., will hold 100% of the equity in the Purchaser.  (DX 3; DX 64, Exhibit J, K).

R.    The Purchaser is a person with whom the Debtors are associated within the meaning of section 525 of the Bankruptcy Code.

S.    The Purchase Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and the Purchaser in good faith, without collusion and from arm's-length bargaining positions.  The Purchaser has proceeded in good faith in all respects in connection with this proceeding, is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  None of the Debtors, the Purchaser nor the Purchaser's present or contemplated owners have engaged in any conduct that (1) would cause or permit the Purchase Agreement or any of the transactions contemplated thereby to be avoided; (2) would tend to hinder, delay or defraud creditors; or (3) impose costs and damages under section 363(n)

of the Bankruptcy Code. (See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla);

May 27, 2009 (Testimony of Robert Manzo); May 28, 2009 Hearing Tr. (Testimony of David

Curson); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); Deposition of Matthew

Feldman, May 26, 2009, at 37:21-39:1; Deposition Tr. of Ronald Bloom, at 87).

### NOTICE OF THE SALE MOTION, AND THE CURE AMOUNTS

T.    As evidenced by the affidavits and certificates of service filed with the

Court, in light of the exigent circumstances of these cases and the wasting nature of the Debtors'

temporarily idled facilities and assets and based upon the representations of counsel at the Sale

Hearing and the testimony of the Debtors' claims and noticing agent, the Court finds that:

(1) proper, timely, adequate and sufficient notice of the Sale Motion, the Bidding Procedures

Order, the Sale Hearing and the UAW Retiree Settlement Agreement has been provided by

the Debtors in accordance with the Bidding Procedures Order; (2) such notice, and the form and

manner thereof, was good, sufficient, reasonable and appropriate under the exigent

circumstances prevailing in these chapter 11 cases; and (3) no other or further notice of the Sale

Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing or the UAW Retiree

Settlement Agreement is or shall be required. (See DX 7; May 27, 2009 Hearing Tr. (Testimony

of Daniel McElhinney)). In light of the need to grant the relief requested in the Sale Motion on

an expedited basis to avoid any erosion in the going concern value of the Purchased Assets, a

reasonable opportunity to object or be heard with respect to the Sale Motion and the relief

requested therein has been afforded to all interested persons and entities, including, but not

limited to, the following:

(i)    counsel to the Official Committees of Unsecured Creditors appointed in
these chapter 11 cases under section 1102 of the Bankruptcy Code (the "Creditors
Committee");

(ii)    the U.S. Treasury, a prepetition lender and the provider of the debtor in possession financing approved by this Court on a final basis on May 20, 2009 (the "DIP Financing Facility")"), outside counsel to the U.S. Treasury and the Acting United States Attorney for the Southern District of New York;

(iii)    counsel to EDC, a lender under the DIP Financing Facility;

(iv)    counsel to the UAW;

(v)    counsel to the Purchaser;

(vi)    counsel to the administrative agent and collateral agent for the Debtors' prepetition secured First Lien Lenders (as defined below);

(vii)    counsel to Cerberus;

(viii)    counsel to Daimler;

(ix)    parties who, in the past year, have expressed in writing to the Debtors an interest in acquiring the Purchased Assets;

(x)    nondebtor parties (collectively, the "Non-Debtor Counterparties") to the Assumed Agreements;

(xi)    all parties who are known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in the Purchased Assets or who are reflected as secured parties in lien searches conducted by the Debtors;

(xii)    the Securities and Exchange Commission;

(xiii)    the Internal Revenue Service;

(xiv)    all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities;

(xv)    all applicable state and local taxing authorities;

(xvi)    the Office of the United States Trustee for the Southern District of New York;

(xvii)    the Federal Trade Commission;

(xviii)    the United States Attorney General/Antitrust Division of Department of Justice;

(xix)    the Environmental Protection Agency;

(xx)    the United States Attorney;

-14-

(xxi)    the Pension Benefit Guaranty Corporation;

(xxii)    applicable foreign regulatory authorities in non-U.S. countries in which the Debtors do business;

(xxiii)    all parties that filed objections to the Sale Motion;

(xxiv)    all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002;

(xxv)    the Debtors' retirees and surviving spouses represented by the UAW, including the members of the "Class" as defined in the UAW Retiree Settlement Agreement;

(xxvi)    all employees of the Debtors;

(xxvii)    all dealers with current agreements for the sale or leasing of Chrysler, Jeep or Dodge brand vehicles;

(xxviii)    any other party identified on the creditor matrix in these cases.

(See DX 7).

U.    Additionally, the Debtors published notice of the Sale Transaction in the national editions of *USA Today*, *The Wall Street Journal* and *The New York Times*, as well as the worldwide edition of *The Financial Times*.  (See DX 8).  With regard to parties who have claims against the Debtors, but whose identities are not reasonably ascertainable by the Debtors (including, but not limited to, parties with potential contingent warranty claims against the Debtors), the Court finds that such publication notice was sufficient and reasonably calculated under the circumstances to reach such parties.

V.    In accordance with the Contract Procedures as set forth in the Bidding Procedures Order, the Debtors have provided notice or shall provide notice (an "Assignment Notice") of their intent to assume and assign the Assumed Agreements and of the related proposed amounts ("Cure Costs") to cure prepetition and postpetition defaults under Assumed Agreements with each such Non-Debtor Counterparty.  See Notices of Filing of Schedules of Designated Agreements (DX 16; DX 62; DX 63; Deposition of Scott Garberding, May 24, 2009,

Exhibit 1). The service and provision of the Assignment Notices that were served in accordance with the Bidding Procedures Order, was good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the Assumed Agreements described by the Assignment Notices and the assumption and assignment of the Assumed Agreements. (See Affidavits of Service (Docket Nos. 1041, 1996, 1997, 1998, 2003, 2004, 2016, 2017, 2018, 2019, 2020, 2022, 2023, 2025, 2026, 2027, 2028, 2029, 2030, 2081 and 2108). All Non-Debtor Counterparties to the Assumed Agreements have had an opportunity to object to both the Cure Costs listed in the Assignment Notices and the assumption and assignment of the Assumed Agreements (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code). With respect to executory contracts or unexpired leases that are designated by the Debtors as Assumed Agreements pursuant to the Contract Procedures and Section 2.10 of the Purchase Agreement and for which responses to Assignment Notices are due after the entry of this Sale Order, the Contract Procedures provide all Non-Debtor Counterparties to such Assumed Agreements with the opportunity to object to both the Cure Costs identified in any Assignment Notice delivered to any such Non-Debtor Counterparty and the assumption and assignment of the applicable Assumed Agreement (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Purchaser for purposes of section 365(c)(1) of the Bankruptcy Code).

## SECTION 363(F) REQUIREMENTS MET FOR FREE AND CLEAR SALE

W.    The Debtors may sell the Purchased Assets free and clear of all Claims

because, in each case where a Claim is not an Assumed Liability, one or more of the standards

set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Except as provided

in this Sale Order, the assumption and assignment of each of the Assumed Agreements is also

free and clear of all Claims other than the payment of the Cure Costs.

X.    The Debtors are the sole and lawful owners of the Purchased Assets and

no other person has any ownership right title or interest therein.  The Debtors' non-Debtor

affiliates have acknowledged and agreed to the sale and, as required by and in accordance with

the Transition Services Agreement, transferred any legal, equitable or beneficial right, title or

interest they may have in or to the Purchased Assets to the Purchaser.  (See DX 64).

Y.    The transfer of Purchased Assets constituting "Collateral" as defined

under that certain Second Amended and Restated Collateral Trust Agreement (the "CTA"), dated

as of January 2, 2009, among, *inter alia*, certain of the Debtors and their subsidiaries, JPMorgan

Chase Bank, N.A. as both First Priority Agent ("First Priority Agent") and Second Priority

Agent, the U.S. Treasury as Third Priority Agent and Wilmington Trust Company as Collateral

Trustee (the "Collateral Trustee") has been consented to for purposes of section 363(f)(2) of the

Bankruptcy Code, subject to and in accordance with that certain Consent to Sale and Liquidation

of Collateral delivered by the First Priority Agent as "Controlling Party" under the CTA to the

Debtors (the "First Priority Consent"), subject to the terms of the First Priority Consent,

including, without limitation, to the indefeasible payment by the Purchaser immediately upon the

sale of the Purchased Assets of $2 billion in immediately available funds to the First Priority

Agent to be applied as set forth in the First Priority Consent.  The First Priority Consent binds all

parties holding debt under the First Lien Credit Agreement in their capacity as such (collectively, the "First Lien Lenders").  (See DX 55; DX 57).

        Z.     In addition, those holders of Claims who did object fall within one or more of the other subsections of sections 363(f) and 365 of the Bankruptcy Code as (1) the consideration received in exchange for the Purchased Assets is greater than the aggregate value of all liens on the Purchased Assets (See May 27, 2009 Hearing Tr. (Testimony of Robert Manzo)), (2) there is a *bona fide* dispute with respect to certain of the Claims asserted (e.g., claims of certain dealers relating to the proposed rejection of their dealership agreements) (See May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla)); or (3) such holders could be compelled in a legal or equitable proceeding to accept a money satisfaction of their Claims.  The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid and effective transfer of all of the legal, equitable and beneficial right, title and interest in and to the Purchased Assets free and clear of all Claims that are not Assumed Liabilities (including, specifically and without limitation, any products liability claims, environmental liabilities, employee benefit plans and any successor liability claims), except as otherwise provided in this Sale Order.  All holders of Claims are adequately protected — and the Sale Transaction thus satisfies section 363(e) of the Bankruptcy Code — by having their Claims, if any, attach to the proceeds of the Sale Transaction ultimately attributable to the property against which they have a Claim or other specifically dedicated funds, in the same order of priority and with the same validity, force and effect that such Claim holder had prior to the Sale Transaction, subject to any rights, claims and defenses of the Debtors or their estates, as applicable, or as otherwise provided herein.

AA.    The Purchaser would not have entered into the Purchase Agreement and would not consummate the Sale Transaction, thus adversely affecting the Debtors, their estates, creditors, employees, retirees and other parties in interest if the sale of the Purchased Assets was not free and clear of all Claims other than Assumed Liabilities, or if the Purchaser would, or in the future could, be liable for any such Claims, including, without limitation and as applicable, certain liabilities (collectively, the "Excluded Liabilities") that expressly are not assumed by the Purchaser, as set forth in the Purchase Agreement or in this Sale Order.  The Purchaser asserts that it will not consummate the Sale Transaction unless the Purchase Agreement specifically provides and this Court specifically orders that none of the Purchaser, its affiliates, their present or contemplated members or shareholders (other than the Debtors as the holder of equity in Purchaser), or the Purchased Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, (a) any Claim other than (x) an Assumed Liability or (y) a Claim against any "Purchased Company" (as such term is defined in the Purchase Agreement) or (b) any successor liability for any of the Debtors.  (See May 27, 2009 Hearing Tr. (Testimony of Alfredo Altavilla)).

BB.    Without limiting the generality of the foregoing, the Purchase Agreement provides the Debtors with reasonably equivalent value and fair consideration (as those terms are defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and the Bankruptcy Code), and was not entered into for the purpose or, nor does it have the effect of, hindering, delaying or defrauding creditors of any of the Debtors under any applicable laws. Except for the Assumed Liabilities, the Sale Transaction shall not impose or result in the imposition of any liability or responsibility on Purchaser or its affiliates, successors or assigns or

any of their respective assets (including the Purchased Assets), and the transfer of the Purchased

Assets to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or

assigns or any of their respective assets (including the Purchased Assets), to any liability for any

Claims, including, without limitation, for any successor liability or any products liability for the

sale of any vehicles by the Debtors or their predecessors or affiliates, except as expressly

identified as an Assumed Liability.

### ASSUMPTION AND ASSIGNMENT OF THE ASSUMED AGREEMENTS

CC.    The assumption and assignment of the Assumed Agreements are integral

to the Purchase Agreement, are in the best interests of the Debtors and their estates and represent

the reasonable exercise of the Debtors' sound business judgment. (See May 27, 2009 Hearing

Tr. (Testimony of Alfredo Altavilla); May 28, 2009 Hearing Tr. (Testimony of David Curson);

May 28, 2009 Hearing Tr. (Testimony of Peter Grady); May 27, 2009 Hearing Tr. (Testimony of

Thomas Lasorda); May 28, 2009 Hearing Tr. (Testimony of Robert Nardelli); May 28, 2009

Hearing Tr. (Testimony of James Chapman)).

DD.    With respect to each of the Assumed Agreements, the Debtors have met

all requirements of section 365(b) of the Bankruptcy Code.  Further, the Purchaser has provided

all necessary adequate assurance of future performance under the Assumed Agreements in

satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code.  (See May 27, 2009 Hearing

Tr. (Testimony of Alfredo Altavilla)).  Accordingly, the Assumed Agreements can be assumed

by the Debtors and assigned to the Purchaser, as provided for in the Contract Procedures set forth

in the Bidding Procedures Order, the Sale Motion and the Purchase Agreement.  The Contract

Procedures are fair, appropriate and effective and, upon the payment by the Purchaser of all Cure

Costs (which costs are the sole obligation of the Purchaser under the Purchase Agreement) and

the payment of such other obligations assumed pursuant to this Sale Order and approval of the

assumption and assignment for a particular Assumed Agreement thereunder, the Debtors shall be

forever released from any and all liability under the Assumed Agreement.

      EE.    The Purchaser has acknowledged that it will be required to comply with

the National Traffic and Motor Vehicle Safety Act, as amended and recodified ("NTMVSA"), as

applicable to the business of the Purchaser after the Closing Date.  In addition, the Purchaser has

agreed to assume as Assumed Liabilities under the Purchase Agreement and this Sale Order the

Debtors' notification, remedy and other obligations under 49 U.S.C. §§ 30116 through 30120 of

the NTMVSA relating to vehicles manufactured by the Debtors prior to the Closing Date that

have a defect related to motor vehicle safety or do not to comply with applicable motor vehicle

safety standards prescribed under the NTMVSA.  The Purchaser shall not otherwise be liable for

any failure by the Debtors to comply with the provisions of the NTMVSA.

      FF.    For the avoidance of doubt, and notwithstanding anything else in this Sale

Order to the contrary:

- the Debtors are neither assuming nor assigning to the Purchaser the settlement agreement (the "2008 Settlement Agreement") between the Debtors, the UAW and certain of the Debtors' retirees, dated March 31, 2008, which was approved by the United States District Court for the Eastern District of Michigan on July 31, 2008, in the class action of *Int'l Union, UAW, et al. v. Chrysler, LLC*, Case No. 07-CV-14310 (E.D. Mich. filed Oct. 11, 2007) and established, among other things, an independent Voluntary Employee Beneficiary Association (the "VEBA") that would become responsible for retiree health care on behalf of current and future UAW retirees of the Debtors and their surviving spouses and eligible dependents (the "*English* Case VEBA") (DX 4; May 28, 2009 Hearing Tr. (Testimony of David Curson));

- the 2007 Chrysler-UAW National Agreement, including (1) the Production, Maintenance and Parts National Agreement, (2) the Engineering Office & Clerical National Agreement, (3) the Toledo Assembly Plant/Jeep Unit, Local 12 Agreement, (4) Daimler Chrysler Financial Services North America, LLC (Farmington) and (5) Daimler Chrysler Financial Services North America, LLC (Detroit), and all appendices, memoranda of understanding, supplemental agreements, local agreements and benefit plans, as modified effective April 30, 2009 (the "UAW CBA"), shall be assumed by the Debtors and assigned to the Purchaser pursuant to this Sale Order and section 365 of the Bankruptcy

Code.  Assumption and assignment of the UAW CBA is integral to the Sale
Transaction and the Purchase Agreement, is in the best interests of the Debtors
and their estates, creditors, employees and retirees and represent the reasonable
exercise of the Debtors' sound business judgment (See May 28, 2009 Hearing Tr.
(Testimony of David Curson));

- the UAW, as the exclusive collective bargaining representative of employees of
  the Purchaser and the "authorized representative" of UAW-represented retirees of
  the Debtors under section 1114(c) of the Bankruptcy Code, and the Purchaser
  engaged in good faith negotiations in conjunction with the Sale Transaction
  regarding the funding of retiree health benefits within the meaning of
  section 1114(a) of the Bankruptcy Code.  Conditioned upon the consummation of
  the Sale Transaction and the assumption and assignment of the UAW CBA, the
  UAW and the Purchaser have entered into a Retiree Settlement Agreement
  (the "UAW Retiree Settlement Agreement"), which, among other things, provides
  for the financing by the Purchaser of modified retiree health care obligations for
  the Class and Covered Group (as defined in the UAW Retiree Settlement
  Agreement) through contributions by the Purchaser to the *English* Case VEBA.
  The Debtors, the Purchaser and the UAW specifically intend that their actions in
  connection with the UAW Retiree Settlement Agreement and related undertakings
  incorporate the compromise of certain claims and rights and shall be deemed to
  satisfy the requirements of 29 U.S.C. § 186(c)(2) (See DX 4; May 28, 2009
  Hearing Tr. (Testimony of David Curson)); and

- the Debtors' sponsorship of the Internal Existing VEBA (as defined in the UAW
  Retiree Settlement Agreement) shall be transferred to the Purchaser under the
  Purchase Agreement (See DX 64, at § 6.08).

## VALIDITY OF THE TRANSFER

GG.    As of the closing of the Sale Transaction (the "Closing"), the transfer of

the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the

Purchased Assets, and will vest the Purchaser with all right, title and interest of the Debtors in

and to the Purchased Assets, free and clear of all Claims other than Assumed Liabilities.

HH.    With the entry of this Sale Order, the Debtors (1) have full corporate

power and authority to execute the Purchase Agreement and all other documents contemplated

thereby, and the Sale Transaction has been duly and validly authorized by all necessary corporate

action of the Debtors; (2) have all of the corporate power and authority necessary to consummate

the transactions contemplated by the Purchase Agreement; (3) have taken all actions necessary to

authorize and approve the Purchase Agreement and the consummation by the Debtors of the

transactions contemplated thereby; and (4) upon entry of this Sale Order, need no consents or

approvals, other than those expressly provided for in the Purchase Agreement, which may be

waived by the Purchaser, to consummate such transactions.  (See DX 38; DX 64 at Art. IV-A).

      II.     To the extent that the right, title and interest of the Debtors in and to any

of the Purchased Assets ultimately is transferred to the Purchaser after the Closing pursuant to a

plan of reorganization confirmed in these chapter 11 cases, such transfer shall be deemed a

transfer pursuant to section 1146 of the Bankruptcy Code and shall not be taxed under any law

imposing a stamp, transfer or any other similar tax.

### PERSONALLY IDENTIFIABLE INFORMATION

      JJ.     The Debtors currently maintain certain privacy policies that govern the use

of "personally identifiable information" (as such term is defined by section 101(41A) of the

Bankruptcy Code) in the operation of their businesses.  The Debtors propose to sell certain assets

containing personally identifiable information in a manner that is not in compliance with their

current existing privacy policies.  As such, in the Bidding Procedures Order, the Court directed

the U.S. Trustee to promptly appoint a consumer privacy ombudsman in accordance with

section 332 of the Bankruptcy Code, and Alan Chapell, CIPP (the "Privacy Ombudsman") was

appointed as a consumer privacy ombudsman under section 332 of the Bankruptcy Code on

May 11, 2009 (Docket No. 594).  The Privacy Ombudsman is a disinterested person as required

by section 332(a) of the Bankruptcy Code.  The Privacy Ombudsman filed his report with the

Court on May 28, 2009 (Docket No. 2790) (the "Ombudsman Report") and presented his report

at the Sale Hearing, and the Ombudsman Report has been reviewed and considered by the Court.

The Court has given due consideration to the (1) facts, (2) exigent circumstances surrounding

and (3) the conditions of the sale of personally identifiable information in connection with the

Sale Transaction, including as set forth in the Ombudsman Report. No showing has been made that the sale of personally identifiable information in connection with the Sale Transaction violates applicable non-bankruptcy law, and the Court concludes that such sale is appropriate in conjunction with the Sale Transaction.

**NOW THEREFORE, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED THAT:**

### GENERAL PROVISIONS

1.    The Sale Motion is granted in its entirety and entry into and performance under and in respect of the Purchase Agreement and the Sale Transaction is approved, as set forth in this Sale Order.

2.    The findings of fact and conclusions of law set forth in the Court's Opinion, dated May 31, 2009 (Docket No. 3073), as supplemented by the findings of fact stated above and conclusions of law stated herein shall constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

3.    All objections, if any, to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits with prejudice, except as expressly provided herein. Attached hereto as Exhibit B is a summary schedule of filed objections and the treatment of each.

## APPROVAL OF THE PURCHASE AGREEMENT

4.    The Purchase Agreement, all transactions contemplated therein and all of the terms and conditions thereof are hereby approved, subject to the terms and conditions of this Sale Order to the extent of any express conflict herewith.  In the event of any direct conflict between the terms and conditions of the Purchase Agreement and those of this Sale Order as in effect at the Closing Date, the terms and conditions of this Sale Order shall govern, provided that no change to this Sale Order made after the Closing Date without the consent of the Purchaser shall affect the rights or obligations of the Purchaser arising out of or relating to the Purchase Agreement in any manner.

5.    Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors are authorized and directed to perform their obligations under and comply with the terms of the Purchase Agreement and consummate the Sale Transaction, pursuant to and in accordance with the terms and conditions of the Purchase Agreement and this Sale Order.

6.    The Debtors, as well as their affiliates, officers, employees and agents, are authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement, in substantially the same form as the Purchase Agreement attached hereto as Exhibit A, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and to take all further actions and execute such other documents as may be (a) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession, the Purchased Assets (including, but not limited to, all necessary transition services to be provided to the Purchaser by the Debtors), (b) necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement and (c) as may be reasonably requested by Purchaser to implement the Purchase Agreement and

consummate the Sale Transaction in accordance with the terms thereof, all without further order

of the Court.

7.     This Sale Order and the Purchase Agreement shall be binding in all

respects upon the Purchaser, the Debtors, their affiliates, any trustees appointed in the Debtors'

cases (whether under chapter 11 or chapter 7 of the Bankruptcy Code), all creditors (whether

known or unknown) of any Debtors, all interested parties and their successors and assigns,

including, but not limited to, any party asserting a Claim and any Non-Debtor Counterparty to

the Assumed Agreements.  Nothing contained in any chapter 11 plan confirmed in these

bankruptcy cases or the order confirming any such chapter 11 plan shall conflict with or derogate

from the provisions of the Purchase Agreement or this Sale Order, and to the extent of any

conflict or derogation between this Sale Order or the Purchase Agreement and such future plan

or order, the terms of this Sale Order and the Purchase Agreement shall control to the extent of

such conflict or derogation.

8.     All amounts, if any, to be paid by Debtors' pursuant to the Purchase

Agreement shall constitute administrative expenses pursuant to sections 503(b) and 507(a)(1) of

the Bankruptcy Code and shall be due and payable if and when any Debtors' obligations arise

under the Purchase Agreement without further order of the Court.

### TRANSFER OF PURCHASED ASSETS FREE AND CLEAR

9.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code,

the Debtors are authorized and directed to transfer the Purchased Assets in accordance with the

terms of the Purchase Agreement.  The Purchased Assets shall be transferred to the Purchaser,

and upon consummation of the Purchase Agreement, such transfer (a) shall be a valid, legal,

binding and effective transfer; (b) shall vest the Purchaser with all right, title and interest of

the Debtors in the Purchased Assets; and (c) shall be free and clear of all Claims except for

Assumed Liabilities with all such Claims to attach to the proceeds of the Sale Transaction

ultimately attributable to the Purchased Assets against or in which such Claims are asserted, or

other specifically dedicated funds, in the order of their priority, with the same validity, force and

effect which they now have as against the Purchased Assets, subject to any rights, claims and

defenses the Debtors or their estates, as applicable, may possess with respect thereto.

   10. In connection with the transfer of the Purchased Assets to the Purchaser

(a) the Debtors are authorized and directed to execute, deliver and perform their obligations

under the First Priority Consent, including by indefeasibly paying, or causing the indefeasible

payment of, immediately upon consummation of such transfer of the Purchased Assets,

$2 billion in immediately available funds to the First Priority Agent to be applied as set forth in

the First Priority Consent; and (b) Wilmington Trust Company as Collateral Trustee under the

CTA is authorized and directed to comply with the Direction Letter dated as of May 27, 2009

delivered to it by the First Priority Agent as "Controlling Party" under the CTA, including by

executing and delivering such documents as are necessary to permit the transfer of the Purchased

Assets free and clear of liens on the Purchased Assets held by Wilmington Trust Company as

Collateral Trustee under the CTA.

   11. Notwithstanding paragraph 15 below or anything to the contrary in this

Sale Order or the Purchase Agreement, (a) any Purchased Asset that is subject to any mechanics',

carriers', workers', repairers', shippers', marine cargo, construction, toolers', molders' or similar

lien or any statutory lien on real and personal property for property taxes not yet due shall

continue to be subject to such lien after the Closing Date if and to the extent that such lien (i) is

valid, perfected and enforceable as of the Petition Date (or becomes valid, perfected and

enforceable after the Petition Date as permitted by section 546(b) or 362(b)(18) of the

Bankruptcy Code), (ii) could not be avoided by any Debtor under sections 544 to 549, inclusive, of the Bankruptcy Code or otherwise, were the Closing not to occur; and (iii) the Purchased Asset subject to such lien could not be sold free and clear of such lien under applicable non-bankruptcy law, and (b) any Liability as of the Closing Date that is secured by a lien described in clause (a) above (such lien, a "Continuing Lien") that is not otherwise an Assumed Liability shall constitute an Assumed Liability with respect to which there shall be no recourse to the Purchaser or any property of the Purchaser other than recourse to the property subject to such Continuing Lien. The Purchased Assets are sold free and clear of any reclamation rights; *provided, however,* that nothing, in this Sale Order or the Purchase Agreement shall in any way impair the right of any claimant against the Debtors with respect to any alleged reclamation right to the extent such reclamation right is not subject to the prior rights of a holder of a security interest in the goods or proceeds with respect to which such reclamation right is alleged, or impair the ability of a claimant to seek adequate protection against the Debtors with respect to any such alleged reclamation right. Further, nothing in this Sale Order or the Purchase Agreement shall prejudice any rights, defenses, objections or counterclaims that the Debtors, the Purchaser, the U.S. Treasury, EDC, the Creditors' Committee or any other party in interest may have with respect to the validity or priority of such asserted liens or rights, or the type (or amount), if any, of required adequate protection.

12.    Except as otherwise provided in the Purchase Agreement, all persons and entities (and their respective successors and assigns), including, but not limited to, all debt security holders, equity security holders, affiliates, governmental, tax and regulatory authorities, lenders, customers, dealers, employees, trade creditors, litigation claimants and other creditors, holding Claims (whether legal or equitable, secured or unsecured, known or unknown, matured

or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated) except for Assumed Liabilities or Claims against any Purchased Company, arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Business prior to Closing or the transfer of the Purchased Assets to the Purchaser, are hereby forever barred, estopped and permanently enjoined from asserting such Claims against the Purchaser, its successors or assigns, its property or the Purchased Assets. No such persons or entities shall assert against the Purchaser or their successors in interest any Claim arising from, related to or in connection with the ownership, sale or operation of any Asset prior to the Closing, except for Assumed Liabilities.

13.    This Sale Order (a) shall be effective as a determination that, as of the Closing, (i) no Claims other than (x) Assumed Liabilities relating to the Purchased Assets or (y) Claims against any Purchased Company, will be assertable against the Purchaser, its affiliates, successors or assigns or any of their respective assets (including the Purchased Assets), (ii) the Purchased Assets shall have been transferred to the Purchaser free and clear of all Claims and (iii) the conveyances described herein have been effected; and (b) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, registrars of patents, trademarks or other intellectual property, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and

instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

14.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the Purchased Assets shall not have delivered to the Debtors prior to the Closing of the Sale Transaction, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests that the person or entity has with respect to the Debtors or the Purchased Assets or otherwise, then only with regard to Purchased Assets that are purchased by the Purchaser pursuant to the Purchase Agreement and this Sale Order (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Purchased Assets; and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the applicable Purchased Assets other than the Assumed Liabilities. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

15.    All persons or entities in possession of some or all of the Purchased Assets are directed to surrender possession of such Purchased Assets to the Purchaser or its respective designees at the time of the Closing of the Sale Transaction.

16.    Following the Closing of the Sale Transaction, no holder of any Claim shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based

on or related to any such Claim, or based on any actions the Debtors may take in their chapter 11 cases.

17. All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets to the Purchaser in accordance with the Purchase Agreement and this Sale Order.

18. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction contemplated by the Purchase Agreement.

19. Notwithstanding anything else contained herein or in the Purchase Agreement, in connection with the purchase of the Debtors' brands and related Purchased Assets, the Purchaser, from and after the Closing, will recognize, honor and pay liabilities under Lemon Laws for additional repairs, refunds, partial refunds (monetary damages) or replacement of a defective vehicle (including reasonable attorneys' fees, if any, required to be paid under such Lemon Laws and necessarily incurred in obtaining those remedies), and for any regulatory obligations under such Lemon Laws arising now, including but not limited to cases resolved prepetition or in the future, on vehicles manufactured by the Debtors in the five years prior to the Closing (without extending any statute of limitations provided under such Lemon Laws), but in any event not including punitive, exemplary, special, consequential or multiple damages or penalties and not including any claims for personal injury or other consequential damages that may be asserted in relationship to such vehicles under the Lemon Laws. As used herein, "Lemon Law" means a federal or state statute, including, but not limited to, claims under the Magnuson-

Moss Warranty Act based on or in conjunction with a state breach of warranty claim, requiring a manufacturer to provide a consumer remedy when the manufacturer is unable to conform the vehicle to the warranty after a reasonable number of attempts as defined in the applicable statute. In connection with the foregoing, the Purchaser has agreed to continue addressing Lemon Law claims (to the extent that they are Assumed Liabilities) using the same or substantially similar procedural mechanisms previously utilized by the Debtors.

20.    The Purchased Owned Real Property and PP&E (as such terms are defined in the Purchase Agreement) that, as of the Closing, are subject to existing statutory liens or any liens that may be created or perfected in accordance with section 362(b)(18) of the Bankruptcy Code shall be transferred to the Purchaser subject to (a) any applicable property taxes for the tax year 2009 (collectively, the "2009 Property Taxes") owed to state and local taxing authorities in the United States (collectively, the "Relevant Taxing Authorities") and (b) any liens related to such 2009 Property Taxes.  The 2009 Property Taxes shall be paid by the Purchaser; however, as between the Purchaser and the Debtors such 2009 Property Taxes shall be prorated as of the Closing Date and settled upon receipt of the relevant property tax bills.  The Relevant Taxing Authorities shall bill their 2009 Property Taxes to the Purchaser in the ordinary course, not as an expedited or jeopardy assessment.

21.    The Debtors shall deposit designated funds in the amount of $63 million in a dedicated escrow account (the "Tax Escrow") to satisfy sales and use taxes, Michigan business taxes and other taxes owed to the Relevant Taxing Authorities in respect of any of the Debtors (including predecessors of the Debtors) and not covered by paragraph 20 above, to the extent such taxes are (a) secured taxes or may become secured by liens that may be created or perfected in accordance with section 362(b)(18) of the Bankruptcy Code or (b) of the nature authorized to

be paid under the Order, Pursuant to Sections 105(a), 363(b), 507(a) and 541 of the Bankruptcy

Code, Authorizing the Debtors and Debtors in Possession to Pay Certain Prepetition Taxes

(Docket No. 355) to the extent such taxes were or may be asserted or assessed against

individuals (collectively, the "Additional Taxes"). Any Claims for Additional Taxes shall attach

to, and be satisfied from, the Tax Escrow.

       22.    (a)    Notwithstanding any contrary provision of this Sale Order or the

Purchase Agreement, the 61 Vehicles, as described and defined in the response of Wilmington

Trust Company to the Sale Motion (Docket No. 1188), will be treated as Excluded Assets that

will not be transferred to the Purchaser.

           (b)    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code,

the Debtors' assumption and assignment to the Purchaser of all of the Debtors' right, title and

interest in or under the Debtors' guaranteed depreciation program agreement and ancillary

agreements related thereto (collectively, the "GDP Agreement") with Dollar Thrifty Automotive

Group, Inc. and its affiliates (collectively, "DTAG") are hereby approved, and all requirements

of section 365 of the Bankruptcy Code are hereby deemed satisfied as of the date of, and

effective only upon, the Closing of the Sale Transaction. DTAG has consented to such

assumption and assignment and agrees that, subject to payment of Cure Costs, such assumption

and assignment shall not constitute an event of default thereunder or permit the termination

thereof. The Debtors and DTAG shall confer in good faith to determine the amount of the Cure

Costs to be paid under the GDP Agreement. If the Debtors and DTAG are unable to reach a

resolution of such cure cost amount, either of such parties may apply to the Court for an order,

upon notice and a hearing, determining the correct Cure Cost amount.

(c)     All obligations of Chrysler LLC under the GMAC MAFA Term Sheet (the "GMAC Term Sheet") attached to the Purchase Agreement as Exhibit A, or if executed, the definitive GMAC Master Autofinance Agreement, which agreement shall be substantially on the same terms as the GMAC Term Sheet or the Annexes thereto, as well as any intellectual property licensing agreements entered into connection therewith and all the other agreements that are specified in the GMAC Term Sheet, including, without limitation, one or more repurchase agreements with substantially the same terms as set forth in Annex D to Exhibit A of the Purchase Agreement (collectively with the GMAC Term Sheet, the "GMAC MAFA Documents") shall be assigned by the Debtors to the Purchaser, and the Purchaser shall be deemed to have assumed the GMAC MAFA Documents, pursuant to this Sale Order and the Bidding Procedures Order, and each non-Debtor party to the GMAC MAFA Documents shall be deemed to have consented to such assumption and assignment.  Assumption and assignment of the GMAC MAFA Documents are integral to the Sale Transaction and the Purchase Agreement, are in the best interests of the Debtors and their estates, creditors, employees and retirees and represent the reasonable exercise of the Debtors' sound business judgment.

(d)     At the Purchaser's written election, to be made by notice to Chrysler Financial Services Americas LLC ("Chrysler Financial") no later than June 12, 2009, or such other date as the Purchaser and Chrysler Financial may agree, either: (i) (A) the vehicles related to unperformed or partially unperformed repurchase obligations arising from or related to agreements between the Debtors and dealers whose dealerships were terminated prepetition, or arising from or related to prepetition agreements between Chrysler Financial and the Debtors (collectively, the "Repurchased Vehicles"), and (B) the vehicles commonly referred to by Chrysler Financial and the Debtors as "conversion vehicles" that are currently in the possession

-34-

of entities that convert such vehicles into "conversion vehicles" (together with Repurchased

Vehicles, the "Conversion and Repurchased Vehicles"), will be treated as "Excluded Assets" that

will not be transferred to the Purchaser; or (ii) will be treated as Purchased Assets and the alleged

liens in favor of Chrysler Financial or its affiliates on the Conversion and Repurchased Vehicles

will be Continuing Liens to the extent they meet the requirements of subparagraphs 11(a)(i)

through (iii) above.

        (e)     Chrysler Financial and its affiliates object to the sale to the

Purchaser of any insurance policy, surety bond or related indemnity arrangement to the extent

that it (i) is an executory contract to extend a financial accommodation or a personal services

contract and therefore not assumable and assignable to the Purchaser pursuant to section

365(c)(1) or (c)(2) of the Bankruptcy Code or (ii) is property the sale of which is not permitted

under state or contract law and that entitles Chrysler Financial and its affiliates to adequate

protection pursuant to section 363(e) of the Bankruptcy Code or that may not be sold free and

clear of the interests of Chrysler Financial and its affiliates pursuant to section 363(f) of the

Bankruptcy Code. The parties reserve all rights (including, without limitation, any rights under

the Contract Procedures and, in the case of the Purchaser, any rights against the Debtors pursuant

to Sections 2.11 and 2.12 of the Purchase Agreement) and agree that no such policy, bond or

arrangement shall be deemed to be transferred to Purchaser and that no liens, rights of setoff,

equitable subrogation or equitable lien arising in favor of Chrysler Insurance Company, as

insurer or surety, as against any Debtor's estate shall be terminated, diminished or affected by

reason of any provision of the Purchase Agreement or this Sale Order until such objections are

resolved by the Court.

23.     Nothing in this Sale Order or in the Purchase Agreement releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order.

## APPROVAL OF UAW RETIREE SETTLEMENT AGREEMENT

24.     The UAW Retiree Settlement Agreement, all transactions contemplated therein and all of the terms and conditions thereof are fair, reasonable and in the best interests of the retirees and are hereby approved. The Debtors, the Purchaser and the UAW are authorized to perform their obligations under, or in connection with, the implementation of the UAW Retiree Settlement Agreement and comply with the terms of the UAW Retiree Settlement Agreement pursuant to and in accordance with the terms and conditions of the UAW Retiree Settlement Agreement and this Sale Order. The Trust Amendments are hereby approved and the *English Case* VEBA Trust Agreement is reformed accordingly (as such terms are defined in the UAW Retiree Settlement Agreement).

## ASSUMPTION AND ASSIGNMENT OF ASSUMED AGREEMENTS

25.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and in accordance with the Contract Procedures, the Debtors' assumption and assignment or other transfer to the Purchaser of all of the Debtors' right, title and interest in or under the Assumed Agreements are hereby approved, with only such exceptions as Purchaser may agree in writing, and all requirements of section 365 of the Bankruptcy Code are hereby deemed satisfied. For the avoidance of doubt, subject to the Contract Procedures (including the resolution of any Section 365 Objection and the issuance of a Confirmation Notice, as set forth in the Bidding Procedures Order), the Debtors shall be deemed to have assumed and assigned each of the Assumed Agreements as of the date of and effective only upon the Closing of the Sale Transaction and,

absent such Closing, each of the Assumed Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.

26.    Except as provided herein, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code and the Contract Procedures to assume and assign, sell and otherwise transfer the Assumed Agreements of all of the Debtors' right, title or interest therein or thereunder to the Purchaser free and clear of all Claims, and to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Agreements to the Purchasers.

27.    In accordance with the Contract Procedures, the Assumed Agreements shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Agreement (including those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.  There shall be no rent accelerations, assignment fees, penalties, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption or assignment of the Assumed Agreements.  No Assumed Agreement may be terminated, or the rights of any party modified in any respect, including pursuant to any "change of control" clause, by any other party thereto as a result of the transactions contemplated by the Purchase Agreement.

28.    To the extent that the Purchaser exercises its right to exclude any Assumed Agreement from the Sale Transaction prior to the applicable Agreement Assumption Date, such Assumed Agreement shall (a) be deemed never to have been assumed by the Debtors or assigned

to the Purchaser and (b) remain subject to assumption, rejection or assignment by the Debtors at any time in the future.

29.     Except as may be otherwise agreed to by the parties to an Assumed Agreement, the Cure Costs under the Assumed Agreements shall be paid by the Purchaser as soon as practicable and in no event later than ten days after the later of (a) the Closing of the Sale Transaction or (b) following the date on which such Assumed Agreement is deemed assumed and assigned in accordance with the Contract Procedures.  With respect to Disputed Cure Costs, the Purchaser shall reserve sufficient funds to pay the full amount of any Disputed Cure Costs related to the Sale Transaction until such time as there is a resolution among the parties or a final order of this Court determining the correct Cure Costs.  In addition to the Cure Costs (but without duplication), the Purchaser will assume and pay, in the ordinary course of business and as they come due, all amounts for goods delivered and services provided prepetition for which payment was not due as of the Petition Date and for postpetition goods delivered and services provided to the Debtors under each Assumed Agreement to the extent due and payable and not otherwise paid by the Debtors.

30.     Payment of the Cure Costs shall be a full satisfaction of any and all defaults under the Assumed Agreements, whether monetary or non-monetary, and upon payment of the Cure Costs any default of the Debtors thereunder shall have been irrevocably cured.  Upon the assumption and assignment of an Assumed Agreement under the Contract Procedures, the Debtors shall be released from any liability whatsoever arising under the Assumed Agreements and the Cure Costs and ongoing obligations under the Assumed Agreement shall be solely the obligation of the Purchaser.  Except as otherwise provided in this Sale Order, each Non-Debtor Counterparty to an Assumed Agreement hereby is forever barred, estopped and

permanently enjoined from asserting against the Debtors or the Purchaser, their successors or

assigns or the property of any of them, any default existing as of the date of the assumption of

the Assumed Agreement.

31.    The failure of the Debtors or the Purchaser to enforce at any time one or

more terms or conditions of any Assumed Agreement shall not be a waiver of such terms or

conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of

the Assumed Agreements.

32.    Upon the Agreement Assumption Date (or such earlier date as set forth in

the Contract Procedures), the Purchaser shall be fully and irrevocably vested with all right, title

and interest of the Debtors under the Assumed Agreements.

33.    The assignments of each of the Assumed Agreements are made in good

faith under sections 363(b) and (m) of the Bankruptcy Code.

34.    In connection with the foregoing and consistent with the Contract

Procedures, the Purchaser and the Creditors' Committee have agreed to the following:  (a) no

later than the second calendar day after the initial Section 365 Objection Deadline, the Purchaser

will serve Confirmation Notices on the applicable Non-Debtor Counterparties; (b) no later than

the second calendar day after the initial Section 365 Hearing, the Purchaser will serve additional

Confirmation Notices on the applicable Non-Debtor Counterparties; (c) the Purchaser and the

Creditors' Committee acknowledge that, if the Closing occurs prior to June 12, 2009, the terms

of the Contract Procedures provide that the Assurance Letter procedure will not apply; and

(d) paragraph 20 of the Bidding Procedures Order is clarified to provide that all Designated

Agreements (rather than all contracts) that have not become Confirmed Contracts as of the

Closing Date shall constitute "Excluded Contracts" for purposes of the Purchase Agreement

(without any requirement to update the Company Disclosure Letter) unless such Designated

Agreements subsequently become Confirmed Contracts in accordance with the Contract

Procedures.  The failure of the Purchaser to deliver a Confirmation Notice with respect to any

Non-Debtor Counterparty as contemplated in clause (a) and (b) of this paragraph 34, whether

because the parties have not agreed to Cure Costs or otherwise, shall not preclude the ability of

the Purchaser to deliver a Confirmation Notice to such Non-Debtor Counterparty after such time

and prior to the "Final Designation Date" (as defined in the Bidding Procedures Order).

**ADDITIONAL PROVISIONS**

35.    Except for the Assumed Liabilities expressly set forth in the Purchase

Agreement or described therein or Claims against any Purchased Company, none of the

Purchaser, its successors or assigns or any of their respective affiliates shall have any liability for

any Claim that (a) arose prior to the Closing Date, (b) relates to the production of vehicles prior

to the Closing Date or (c) otherwise is assertable against the Debtors or is related to the

Purchased Assets prior to the Closing Date.  The Purchaser shall not be deemed, as a result of

any action taken in connection with the Purchase Agreement or any of the transactions or

documents ancillary thereto or contemplated thereby or the acquisition of the Purchased Assets,

to:  (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with

respect to any obligations arising under the Assumed Agreements from and after the Closing);

(b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be a mere continuation or

substantial continuation of the Debtors or the enterprise of the Debtors.  Without limiting the

foregoing, the Purchaser shall not have any successor, derivative or vicarious liabilities of any

kind or character for any Claims, including, but not limited to, on any theory of successor or

transferee liability, *de facto* merger or continuity, environmental, labor and employment,

products or antitrust liability, whether known or unknown as of the Closing, now existing or

hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

36.    The Purchaser (or its designee) is authorized and directed, in accordance

with Section 5.20 of the Purchase Agreement, to substitute, backstop or replace, as the case may

be, in a manner reasonably satisfactory to the Debtors, those letters of credit existing as of the

Closing that secure future obligations of the Purchaser under an Assumed Agreement and are

identified in writing by the Debtors as part of the Cure Costs.  The Purchaser shall cause the

originals of any such substituted or replaced letters of credit to be returned to the Debtors or the

issuer thereof with no further drawings made thereunder.

37.    The Purchaser is hereby granted a first priority lien and super-priority

administrative claim over the proceeds of any tax refunds (including interest thereon), returns of

withholding taxes or similar payments, and any proceeds of tax sharing, contribution or similar

agreements (in each case, other than on refunds due to be paid to third parties pursuant to the

Original Contribution Agreement, as defined in the Purchase Agreement) to secure the payment

of all amounts due to the Purchaser from any of the Debtors under the tax indemnities in

Article 9 of the Purchase Agreement.

38.    Effective upon the Closing and except as otherwise set forth herein or

provided by stipulations filed with or announced to the Court with respect to a specific matter, all

persons and entities are forever prohibited and enjoined from commencing or continuing in any

matter any action or other proceeding, whether in law or equity, in any judicial, administrative,

arbitral or other proceeding against the Purchaser, its successors and assigns, or the Purchased

Assets, with respect to any (a) Claim other than (i) Assumed Liabilities or (ii) Claims against any

Purchased Company or (b) successor liability of the Purchaser for any of the Debtors, including,

without limitation, the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Purchaser, or its successors, assigns, affiliates or their respective assets, including the Purchased Assets; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors as against the Purchaser or its successors, assigns, affiliates or their respective assets, including the Purchased Assets; (iii) creating, perfecting or enforcing any lien, claim, interest or encumbrance against the Debtors as against the Purchaser or its successors, assigns, affiliates or their respective assets, including the Purchased Assets; (iv) asserting any setoff, right of subrogation or recoupment of any kind (in the case of recoupment only, except as a defense for payment of an obligation other than an Assumed Agreement) for any obligation of any of the Debtors as against any obligation due the Purchaser or its successors, assigns, affiliates or their respective assets, including the Purchased Assets; (v) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with such assets.

39.     Except for the applicable Assumed Liabilities, the Purchaser shall not have any liability or other obligation of the Debtors or their affiliates arising under or related to the Purchased Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein or in the Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to,

any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto*

merger or substantial continuity, whether known or unknown as of the Closing, now existing or

hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated,

with respect to the Debtors or their affiliates or any obligations of the Debtors or their affiliates

arising prior to the Closing, including, but not limited to, liabilities on account of any taxes

arising, accruing or payable under, out of, in connection with, or in any way relating to the

operation of the Purchased Assets prior to the Closing of the Sale Transaction.

      40.    Upon the Debtors' assignment of the Assumed Agreements to the

Purchaser under the provisions of this Sale Order and any additional order contemplated by the

Purchase Agreement, no default shall exist under any Assumed Agreement, and no counterparty

to any Assumed Agreement shall be permitted to declare a default by the Purchaser under such

Assumed Agreement or otherwise take action against the Purchaser as a result of any Debtor's

financial condition, bankruptcy or failure to perform any of its obligations under the relevant

Assumed Agreement.

      41.    For the avoidance of doubt:

     (a)    with respect to each Excluded Contract, the Purchaser is not acquiring any right, title or interest in, to and under such Excluded Contract, including without limitation any claim, cause of action, right of recoupment or receivable (whether for money or property), and all rights of a Non-Debtor Counterparty against the Debtors arising under such Excluded Contract, including rights of setoff, are not modified or waived;

     (b)    with respect to each Assumed Agreement, nothing in this Sale Order or the Purchase Agreement affects the contractual rights and remedies of a Non-Debtor Counterparty under such Assumed Agreement, including, without limitation, any right of setoff, recoupment, subrogation, indemnity rights and any defenses to performance, except to the extent such contractual rights and remedies result from the financial condition or bankruptcy of a Debtor or arise out of or relate to a default or failure to perform under such Assumed Agreement at or prior to the time of assumption and assignment;

(c)    with respect to Purchased Assets (whether Assumed Agreements or other Purchased Assets such as Claims and receivables), nothing in this Sale Order or the Purchase Agreement affects any other defense or right of the non-Debtor obligor under applicable law, *provided that* a non-Debtor obligor may not assert any setoff, recoupment or other right or defense to the extent (a) resulting from the financial condition or bankruptcy of a Debtor or arising out of or relating to a default or failure to perform under such Assumed Agreement at or prior to the time of assumption and assignment or (b) arising out of or relating to an Excluded Liability; and

(d)    with respect to leases, nothing in this Sale Order or the Purchase Agreement shall (a) affect the rights of any lessor of property leased by a Debtor under an unexpired lease except to the extent such unexpired lease becomes an Assumed Agreement in accordance with the Contract Procedures and applicable law, (b) sell to the Purchaser any leased property not owned by a Debtor or (c) with respect to leases that are Excluded Contracts, affect possessory or ownership rights as against any Debtor or the Purchaser.

42.    The Purchaser has given substantial consideration under the Purchase Agreement for the benefit of the holders of Claims. The discrete consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given in favor of the Purchaser by all holders of any Claims of any kind whatsoever.

43.    While the Debtors' bankruptcy cases are pending, this Court shall retain jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith in all respects), to adjudicate disputes related to this Sale Order or the Purchase Agreement and to enter any orders under sections 105, 363 and/or 365 (or other relevant provisions) of the Bankruptcy Code with respect to the Assumed Agreements.

44.    Nothing in this Sale Order or the Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a governmental unit under environmental statutes or

regulations (or any associated liabilities for penalties, damages, cost recovery or injunctive relief) that any entity would be subject to as the owner or operator of property after the date of entry of this Sale Order. Notwithstanding the foregoing sentence, nothing in this Sale Order shall be interpreted to deem the Purchaser as the successor to the Debtors under any state law successor liability doctrine with respect to any liabilities under environmental statutes or regulations for penalties for days of violation prior to entry of this Sale Order or for liabilities relating to off-site disposal of wastes by the Debtors prior to entry of this Sale Order. Nothing in this paragraph should be construed to create for any governmental unit any substantive right that does not already exist under law.

45.    No bulk sales law, or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Purchase Agreement, the Sale Motion and this Sale Order.

46.    The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not affect the validity of the Sale Transaction (including the assumption and assignment of the Assumed Agreements), unless such authorization is duly stayed pending such appeal.

47.    The consideration provided by the Purchaser for the Purchased Assets constitutes reasonably equivalent value and fair consideration (as those terms may be defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the

United States, any state, territory or possession thereof or the District of Columbia or any other

applicable jurisdiction with laws substantially similar to the foregoing.

48.    The Sale Transaction may not be avoided under section 365(n) of the

Bankruptcy Code.

49.    The terms and provisions of the Purchase Agreement and this Sale Order

shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates,

their creditors, the Purchaser, the respective affiliates, successors and assigns of each, and any

affected third parties, including, but not limited to, all persons asserting claims in the Purchased

Assets to be sold to the Purchaser pursuant to the Purchase Agreement, notwithstanding any

subsequent appointment of any trustee(s), examiner(s) or receiver(s) under any chapter of the

Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding

on such trustee(s), examiner(s) or receiver(s) and shall not be subject to rejection or avoidance by

the Debtors, their estates, their creditors, their shareholders or any trustee(s), examiner(s), or

receiver(s).

50.    The failure specifically to include any particular provision of the Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it

being the intent of the Court that the Purchase Agreement and its exhibits and ancillary

documents be authorized and approved in their entirety.

51.    The Purchase Agreement may be modified, amended or supplemented by

the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof,

without further order of the Court, provided that any such modification, amendment or

supplement does not materially change the terms of the Purchase Agreement or modify the

express terms of this Sale Order.

52.    Each and every federal, state and local governmental agency, department or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

53.    Subject to further order of the Court and consistent with the terms of the Purchase Agreement and the Transition Services Agreement, the Debtors and the Purchaser are authorized to, and shall, take appropriate measures to maintain and preserve, until the consummation of any chapter 11 plan for the Debtors, the books, records and any other documentation, including tapes or other audio or digital recordings and data in or retrievable from computers or servers relating to or reflecting the records held by the Debtors or their affiliates relating to the Debtors' businesses.

54.    Consistent with the terms of the Purchase Agreement and the Transition Services Agreement, the Debtors have agreed to transfer to the Purchaser (or one or more of its subsidiaries, as applicable) a substantial portion of the Debtors' cash management system maintained pursuant to an order of this Court (Docket No. 1303) entered on May 20, 2009, including, without limitation, several bank accounts maintained by the Debtors.  Such cash management system assets, including such bank accounts, constitute Purchased Assets under the Purchase Agreement.  Notwithstanding the foregoing transfers, the Debtors will maintain such bank accounts and a cash management system that is necessary to effect the orderly administration of the Debtors' chapter 11 estates, including any modifications thereof after the Closing, to ensure a reasonable accounting and segregation of the Debtors' cash  To the extent any funds of the Debtors that do not constitute Purchased Assets are held in accounts transferred to the Purchaser (or one or more of its subsidiaries), such funds shall be promptly returned to the appropriate Debtor, and such funds shall remain subject to any and all liens of the Debtors'

lienholders thereon.  Likewise, to the extent that any funds that constitute Purchased Assets are

held in accounts maintained by one or more Debtors after the Closing, such funds shall be

promptly transferred to the Purchaser.  The applicable Debtors and the Purchaser (and/or one or

more of its subsidiaries, as applicable), may execute any agreement, assignment, novation,

instrument or other document the parties deem necessary or appropriate to effectuate the

transfers described in this paragraph, which is consistent with the general authority to the same

provided in paragraph 6 hereof.

55.    Those powers of attorney granted by Chrysler LLC and any of the other

Debtors and any related documentation entered into by such entities for the purpose of (a)

effectuating the transfers of such entities' interests in their non-debtor foreign affiliates to the

Purchaser, Chrysler Motors LLC or their respective designees in connection with consummation

of the Sale Transaction or (b) effectuating the transfers of interests in certain foreign affiliates to

Chrysler LLC or any of the other Debtors prior to consummation of the Sale Transaction are here

by ratified and approved in all respects, regardless of whether such powers of attorney or other

documentation were issued or entered into prior to or subsequent to the Petition Date.

56.    The Debtors are hereby authorized and empowered, upon and in

connection with the Closing, to change their corporate names and the caption of these chapter 11

cases, consistent with applicable law.  The Debtors shall file a notice of change of case caption

within one business day of the Closing, and the change of case caption for these chapter 11 cases

shall be deemed effective as of the Closing.

57.    As provided by Bankruptcy Rules 6004(h) and 6006(d), this Sale Order

shall not be stayed for ten days after its entry and shall be effective as of 12:00 noon, Eastern

Time, on Friday June 5, 2009, and the Debtors and the Purchaser are authorized to close the Sale

Transaction on or after 12:00 noon, Eastern Time, on Friday June 5, 2009.[4]  Any party objecting

to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay or risk its

appeal being foreclosed as moot in the event Purchaser and the Debtors elect to close prior to this

Sale Order becoming a Final Order.

58.    Any amounts payable to the Purchaser shall be paid by the Debtors in the

manner provided in the Purchase Agreement without further order of this Court, shall be an

allowed administrative claim under sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall

be protected as provided in the Bidding Procedures Order and shall not be altered, amended,

discharged or affected by any plan proposed or confirmed in these cases without the prior written

consent of the Purchaser.

59.    This Court retains jurisdiction to interpret, implement and enforce the

terms and provisions of this Sale Order including to compel delivery of the Purchased Assets, to

protect the Purchaser against any Claims and to enter any orders under sections 105, 363 or 365

(or other applicable provisions) of the Bankruptcy Code to transfer the Purchased Assets and the

Assumed Agreements to the Purchaser.

Dated:  New York, New York
        June 1, 2009

                                         **s/Arthur J. Gonzalez**
                                         UNITED STATES BANKRUPTCY JUDGE

---

[4] The Court considered the Debtor's request for a waiver of the stay imposed, pursuant to Bankruptcy Rules 6004(h) and 6006(d), objections filed to that request, and Debtors' modified request as of June 1, 2009, whereby Debtors' sought a waiver of the stay imposed to permit a closing to take place on Thursday, June 4, 2009 at 9:00 a.m.  In their modified request, the Debtors reference the deposition testimony of Matthew Feldman, an advisor to the President's Auto Task Force, indicating that the Debtors are losing $100 million a day, and the other exigent circumstances facing Chrysler, including the continuing deterioration of its asset value, its supply chain, and its going-concern value.  The Court determines that a partial waiver of the stay is justified.  Any request to further modify the stay should be made to the appellate court.

**EXHIBIT A**
**PURCHASE AGREEMENT**

**EXHIBIT B**
**SUMMARY SCHEDULE OF FILED OBJECTIONS**

# EXHIBIT 5

EXECUTION VERSION

MASTER TRANSACTION AGREEMENT

among

FIAT S.p.A.,

NEW CARCO ACQUISITION LLC,

CHRYSLER LLC

and

the other SELLERS identified herein

# TABLE OF CONTENTS

**Page**

ARTICLE I

DEFINITIONS

Section 1.01    Specific Definitions ...............................................................................2

ARTICLE II

CONTRIBUTION; CLOSING; PURCHASE AND SALE

Section 2.01    Closing Transactions...............................................................................2

Section 2.02    Closing ....................................................................................................2

Section 2.03    Closing Deliveries by the Company ........................................................3

Section 2.04    Closing Deliveries by Fiat ......................................................................3

Section 2.05    Closing Deliveries by Purchaser.............................................................4

Section 2.06    Purchase and Sale of Purchased Assets .................................................5

Section 2.07    Excluded Assets......................................................................................6

Section 2.08    Assumption of Liabilities........................................................................8

Section 2.09    Excluded Liabilities ...............................................................................9

Section 2.10    Excluded Contract Designations; Cure Amounts .................................11

Section 2.11    Non-Assignment of Assets ....................................................................11

Section 2.12    Further Conveyances and Assumptions.................................................12

Section 2.13    Consideration for the Purchased Assets................................................12

Section 2.14    Designation of Purchased and Excluded Subsidiaries..........................12

Section 2.15    Viper .....................................................................................................12

MASTER TRANSACTION AGREEMENT dated as of April 30, 2009 (this "<u>Agreement</u>"), among FIAT S.p.A., a *Società per Azioni* organized under the laws of Italy ("<u>Fiat</u>") , NEW CARCO ACQUISITION LLC, a Delaware limited liability company and an indirect wholly-owned subsidiary of Fiat ("<u>Purchaser</u>"), CHRYSLER LLC, a Delaware limited liability company ("the <u>Company</u>"), and the Subsidiaries of the Company identified on the signature pages hereto (each of the Company and such Subsidiaries, a "<u>Seller</u>" or "<u>Selling Group Member</u>" and, collectively, "<u>Sellers</u>").

WHEREAS, the Company is, directly and through its Subsidiaries, engaged in the business of developing, manufacturing, distributing and selling a range of automotive products, mainly full-size, mid-size and compact cars, minivans, sport utility vehicles, parts and accessories, and of providing leasing and fleet-management services for retail and commercial customers, at various locations in the United States and around the world (such business, the "<u>Company Business</u>");

WHEREAS, Sellers have filed or will file voluntary petitions for relief (the "<u>Petitions</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq., as amended (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") and the Sellers will be debtors in possession under the Bankruptcy Code;

WHEREAS, in accordance with the terms and conditions set forth herein, Purchaser wishes to purchase from the Sellers the Purchased Assets in accordance with sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, Purchaser has entered into Equity Subscription Agreements with each of the VEBA Trust, the U.S. Treasury and Canada, each dated as of the date hereof (the "<u>Equity Subscription Agreements</u>"), pursuant to which Purchaser has agreed to issue, on the Closing Date, to (i) the VEBA Trust the Class A Membership Interests in Purchaser set forth in the Schedule of Members (the "<u>Schedule of Members</u>") to the Operating LLC Agreement attached as Exhibit H (the "<u>VEBA LLC Interest</u>"), (ii) the U.S. Treasury the Class A Membership Interests in Purchaser set forth in the Schedule of Members (the "<u>UST LLC Interest</u>"), (iii) Canada the Class A Membership Interests in Purchaser set forth in the Schedule of Members (the "<u>Canada LLC Interest</u>", and together with the UST LLC Interest and the VEBA LLC Interest, the "<u>Other LLC Interests</u>");

WHEREAS, in exchange for the Purchased Assets, in accordance with the terms and conditions set forth herein, Purchaser (i) wishes to assume from the Sellers the Assumed Liabilities and (ii) pay to the Company cash consideration in the amount of $2,000,000,000 (the "<u>Cash Consideration</u>");

WHEREAS, in accordance with the terms and conditions set forth herein, Fiat (i) desires to contribute or cause to be contributed to Purchaser, among other things, certain rights to Fiat technology, including Fiat Group Automobiles S.p.A. product platforms, Fiat Powertrain Technologies S.p.A. powertrains and other key technology, management services, access to international markets and other distribution enhancements under and pursuant to the terms and conditions of the Master Industrial Agreement, (ii) will retain through its wholly-owned Subsidiary Class B Membership Interests in Purchaser initially representing 20% of the total Membership Interests in Purchaser (by vote and value on a fully diluted basis), but that

upon the occurrence of certain events set forth in the Operating LLC Agreement may increase up to a 35% Membership Interest in Purchaser (by vote and value on a fully diluted basis) and (iii) shall have options for Fiat or its designated Subsidiaries to purchase additional Membership Interests as set forth in the Operating LLC Agreement, such that Fiat may, directly or indirectly, own a 51% total Membership Interest in Purchaser (by vote and value on a fully diluted basis) upon full exercise of such options;

WHEREAS, Fiat and the Company desire to cooperate in (i) the development of joint purchasing programs; (ii) the sale of certain Fiat products into the United States, Canada and Mexico (the "NAFTA Region") with the support of the Company's distribution network; (iii) the sale of certain Company products outside the NAFTA Region through the Fiat distribution network; (iv) research and development activities; and (v) branding opportunities; and

WHEREAS, in connection with the transactions contemplated hereby, it is necessary to reorganize the ownership structure of the Company.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Sellers, Purchaser and Fiat hereby agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01    Specific Definitions.  As used in this Agreement, and unless the context requires a different meaning, the terms defined in the Definitions Addendum have the meanings specified or referred to therein.

ARTICLE II

CONTRIBUTION; CLOSING; PURCHASE AND SALE

Section 2.01    Closing Transactions.  Subject to the terms and conditions of this Agreement, at the Closing, (A) Fiat and certain of its Affiliates, Purchaser, and the Sellers and their Affiliates shall enter into the Master Industrial Agreement and the other Transaction Agreements to which they are a party, (B)  Purchaser will, and Fiat shall cause Purchaser to, issue the Other LLC Interests to the VEBA Trust, Canada (or its designee), and the U.S. Treasury (or its designee) pursuant to the Equity Subscription Agreements, (C) Purchaser will pay the Cash Consideration, (D) the Purchaser will issue the Closing Date VEBA Note and (E) Purchaser shall, and Fiat shall cause Purchaser to, purchase the Purchased Assets and assume the Assumed Liabilities from the Company.

Section 2.02    Closing.  On the terms and subject to the conditions of this Agreement, at the Closing (as defined below), the Sellers, Fiat and the Purchaser shall take or cause to be taken the actions and make or cause to be made the transfers described in Section 2.01, Section 2.06, Section 2.07, Section 2.08 and Section 2.09.  The "Closing" is to be held at the offices of Sullivan & Cromwell LLP, 1701 Pennsylvania Ave, N.W., Washington,

D.C. 20006-5805 at 10:00 a.m. Washington, D.C. time on the second Business Day following the satisfaction or waiver (in accordance with this Agreement) of the conditions to the obligations of the parties hereto set forth in Section 8.01 and Section 8.02 (other than those conditions that by their nature are to be satisfied at the Closing), or at such other place or at such other time or on such other date as Fiat and the Company may mutually agree upon in writing (the "Closing Date"). All the transactions set forth in Section 2.01, Section 2.06, Section 2.07, Section 2.08 and Section 2.09 will be considered to have taken place simultaneously on the Closing Date, and no such transaction will be considered to have been made until all steps taken at the Closing shall have been completed, except that the issuance of the Other LLC Interests to the VEBA Trust, the U.S. Treasury (or its designee) and Canada (or its designee) shall be deemed to occur immediately prior to any such transaction.

      Section 2.03    Closing Deliveries by the Company. At the Closing, the Company shall deliver or cause to be delivered to Fiat the following:

      (a)    stock certificates or similar documents representing all of the outstanding shares of capital stock or other equity interests of the Purchased Companies;

      (b)    fully executed copies of the Third Party Transaction Agreements to which the Company or any of its Subsidiaries is a party;

      (c)    counterparts of each Transaction Agreement and each Conveyance Document to which the Company or an Affiliate of the Company is a party executed by the Company and each such Affiliate a party thereto;

      (d)    a certificate reasonably satisfactory in form and substance to Fiat of the Chief Executive Officer and Chief Financial Officer of the Company certifying as to the matters set forth in Section 8.02(a) and Section 8.02(f);

      (e)    the same solvency certificate that is provided to U.S. Treasury under the U.S. Treasury Loan Documents;

      (f)    a duly executed certificate with respect to each of the Sellers that none of the Sellers is a "foreign person" within the meaning of Section 1445 of the Code and the Treasury Regulations promulgated thereunder; and

      (g)    any other documents or instruments reasonably requested by Fiat to consummate the transactions contemplated hereby, including any other documents or instruments contemplated to be delivered at the Closing under this Agreement.

      Section 2.04    Closing Deliveries by Fiat. At the Closing, Fiat shall deliver or cause to be delivered to the Company the following:

      (a)    fully executed copies of the Third Party Transaction Agreements to which Fiat or any of its Subsidiaries is a party;

       (b)     counterparts of the Master Industrial Agreement and each of the Transaction Agreements to which Fiat or any Subsidiary of Fiat is a party executed by Fiat and each Subsidiary of Fiat that is a party thereto;

       (c)     a certificate reasonably satisfactory in form and substance to the Company of Alfredo Altavilla or the Chief Executive Officer of Fiat certifying as to the matters set forth in Section 8.01(a); and

       (d)     any other documents or instruments reasonably requested by the Company to consummate the transactions contemplated hereby, including any other documents or instruments contemplated to be delivered at the Closing under this Agreement.

       Section 2.05   <u>Closing Deliveries by Purchaser</u>.  At the Closing, Purchaser shall deliver or cause to be delivered to the Company the following:

       (a)     the Cash Consideration by wire transfer in immediately available funds to an account of the Company specified by the Company at least three Business Days prior to the Closing Date;

       (b)     evidence reasonably satisfactory in form and substance to the recipient thereof (or, in the case of the VEBA Trust, the UAW) of the issuance of the Other LLC Interests by Purchaser to the VEBA Trust, the U.S. Treasury (or its designee) and Canada (or its designee);

       (c)     evidence reasonably satisfactory in form and substance to UAW of the issuance of the Closing Date VEBA Note;

       (d)     fully executed copies of the Third Party Transaction Agreements to which Purchaser is a party;

       (e)     counterparts of each Conveyance Document, the Master Industrial Agreement and each Transaction Agreement to which Purchaser is a party executed by Purchaser;

       (f)     a certificate reasonably satisfactory in form and substance to Fiat of a duly authorized executive officer of Purchaser certifying as to the matters set forth in Section 8.01(a);

       (g)     documentation of the assumption of the Collective Bargaining Agreement, which documents will be reasonably satisfactory to the UAW, and the UAW Retiree Settlement Agreement executed by Purchaser;

       (h)     evidence of the filing of the Certificate of Amendment in accordance with Section 5.19(b); and

       (i)     any other documents or instruments reasonably requested by the Company to consummate the transactions contemplated hereby, including any other documents or instruments contemplated to be delivered at the Closing under this Agreement.

Section 2.06    Purchase and Sale of Purchased Assets.  On the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, transfer, convey and deliver to Purchaser, all of the Sellers' right, title and interest in, to and under the Purchased Assets as of immediately prior to the Closing, free and clear of all Liens other than those created by Purchaser and free and clear of any other interest in the Purchased Assets to the extent provided in the Sale Order.  For all purposes of this Agreement, the term "Purchased Assets" shall mean all of the properties, assets and rights of Sellers (other than the Excluded Assets) existing as of the Closing, real or personal, tangible or intangible, including all of Sellers' right, title and interest in:

(a)    the Contracts to which any Selling Group Member is a party, including any insurance policies, except to the extent otherwise provided in the Sale Order ("Assumed Contracts");

(b)    trade and account receivables, including all accounts receivable owed to a Selling Group Member by another Selling Group Member or by a Purchased Company ("Trade Receivables");

(c)    (i) restricted or escrowed cash, cash equivalents or marketable securities relating to Assumed Liabilities, Assumed Contracts and Letters of Credit to be replaced under Section 5.20 and (ii) cash and cash equivalents listed on Schedule 2.06(c) ;

(d)    by quitclaim deed, owned real property ("Purchased Owned Real Property");

(e)    leasehold interests in real property leased or subleased ("Purchased Leased Real Property");

(f)    all PP&E, other than the PP&E physically located as of Closing at the Excluded Owned Real Property and the Excluded Leased Real Property, but including the PP&E described on Section 2.06(f) of the Company Disclosure Letter;

(g)    (i) subject to Section 2.14, the Equity Interests in the Subsidiaries of the Company listed on Section 2.06(g)(i) (other than the entities listed under the subheading "*Wholly Owned Subsidiaries – b. Purchased Companies which are not purchased entities*") of the Company Disclosure Letter (each, a "Purchased Entity"; the Purchased Entities and all of their Subsidiaries, other than Excluded Subsidiaries, the "Purchased Companies"), and (ii) the Equity Interests in the entities (other than Subsidiaries of the Company) listed on Section 2.06(g)(ii) of the Company Disclosure Letter;

(h)    Intellectual Property, subject to any rights previously granted to a third party in any of the foregoing to the extent such rights are preserved by the Sale Order;

(i)    all Inventory, wherever physically located, including new vehicles, service parts, precious metals, raw materials and work-in-process (the "Purchased Inventory");

(j)    all defenses, counterclaims, rights of recovery, rights of setoff and rights of recoupment, in each case only to the extent primarily related to the Purchased Assets or the Assumed Liabilities;

(k)    all Documents of whatever nature and wherever located that are related to the Company Business as currently conducted, including those in the possession or control of the Sellers;

(l)    all Permits (and applications therefor) owned, held or maintained by Sellers and related to or useful in the Company Business as currently conducted and expected to be conducted by Purchaser after the Closing, in each case except to the extent provided in the Sale Order;

(m)    any claim, right or interest of any of the Sellers in or to any refund, rebate, abatement or other recovery of Taxes, but only to the extent the Taxes to be refunded were paid with respect to the Purchased Assets or with respect to the Purchased Companies in respect of any taxable period (or portion thereof) beginning after the Closing Date, and any refund or other recovery of Conveyance Taxes;

(n)    any claim, right or interest of any of the Purchased Companies in or to any refund, rebate, abatement or other recovery of Taxes for any taxable period, but not any such amount that is required to be paid by the Company to Daimler AG or an Affiliate of Daimler AG pursuant to the Original Contribution Agreement, or, if entered into pursuant to Section 5.11, the Tax Settlement Agreement;

(o)    to the extent not included by Section 2.06(n), any rights or interests assigned to the Company or its Affiliates pursuant to (i) the Tax Indemnity Agreement to the extent such rights or interests are not superseded by the CGI Indemnity Assignment Agreement, and (ii) the Daimler Transactions, as such rights or interests may be modified by, and to the extent such rights or interests are not extinguished by, the Tax Settlement Agreement;

(p)    all guarantees and warranties of third parties to the extent related to Purchased Assets or Assumed Liabilities, except to the extent provided in the Sale Order;

(q)    the claims and causes of action listed on Section 2.06(q)of the Company Disclosure Letter; and

(r)    any and all rights of any Selling Group Member or any Subsidiary of the Company related to or arising under any Benefit Plan listed on Section 2.06(r) of the Company Disclosure Letter (which such Section 2.06(r) shall include all Benefit Plans (other than the VEBA Trust) maintained for the benefit of any current or former employee or retiree of the Company or any of its Subsidiaries that is or was covered by any Collective Bargaining Agreement) ("Included Plans") and any assets held in trust to fund, and all insurance policies funding, any of the Liabilities under such Included Plans.

Section 2.07    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and Sellers shall retain all of its

right, title and interest to, in and under the Excluded Assets.  For all purposes of this Agreement, the term "Excluded Assets" shall mean:

(a)    the Contracts listed on Section 2.07(a) of the Company Disclosure Letter or deemed after the date hereof to be excluded pursuant to Section 2.10 (the "Excluded Contracts");

(b)    cash, cash equivalents and marketable securities not included in the Purchased Assets by operation of Section 2.06(c);

(c)    the prepaid assets, financial assets and surety bonds listed on Section 2.07(c) of the Company Disclosure Letter;

(d)    all real property owned by Sellers and listed on Section 2.07(d) of the Company Disclosure Letter (the "Excluded Owned Real Property");

(e)    all real property leased by Sellers and listed on Section 2.07(e) of the Company Disclosure Letter (the "Excluded Leased Real Property");

(f)    the PP&E physically located as of Closing at the Excluded Owned Real Property and the Excluded Leased Real Property, excluding the PP&E described in Section 2.06(f) of the Company Disclosure Letter;

(g)    the Inventory described on Section 2.07(g) of the Company Disclosure Letter;

(h)    any Equity Interest in any direct or indirect Subsidiary of the Company that is not a Purchased Company, including the Sellers and any Excluded Subsidiary;

(i)    all of Sellers' defenses, counterclaims, rights of recovery, rights of setoff and rights of recoupment that are not described in Section 2.06(j);

(j)    all Documents that contain or are: (A) confidential personnel and medical records pertaining to any employee other than a Transferred Employee; (B) other books and records that the Sellers are required by Law to retain or that the Sellers determine are necessary or advisable to retain including Tax Returns, financial statements and corporate or other entity filings; provided that Purchaser shall have the right to make copies of any portions of such retained books and records that relate to the Purchased Assets or Assumed Liabilities; (C) any information management systems of Sellers that are subject to third party licensing restrictions that prohibit the transfer thereof; and (D) minute books, stock ledgers and stock certificates of Sellers;

(k)    all Permits that are not described in Section 2.06(l);

(l)    except as otherwise provided in this Agreement, any claim, right or interest of any of the Sellers in or to any refund, rebate, abatement or other recovery for Taxes that is not described in Section 2.06(m);

(m)     all rights under Sellers' insurance policies and any refunds of premiums or claims due with respect to such insurance policies, to the extent such insurance policies are not Assumed Contracts;

(n)     all of Sellers' rights under or pursuant to any warranties (express or implied), representations and guarantees made by third parties that are not described in Section 2.06(p);

(o)     any rights, claims or causes of action of any Selling Group Member against third parties (including avoidance actions or similar causes of action arising under Sections 544 through 553 of the Bankruptcy Code) arising out of events or occurring on or prior to the Closing Date that are not described in Section 2.06(q);

(p)     any and all rights of any Selling Group Member or any Subsidiary of the Company related to or arising under any Benefit Plan not listed on Section 2.06(r) of the Company Disclosure Letter ("Excluded Plans") and any assets held in trust to fund, and all insurance policies funding, any of the Liabilities under such Excluded Plans;

(q)     any and all rights of the Sellers or their Affiliates under any Transaction Agreement or any Alliance Agreement; and

(r)     those assets set forth on Section 2.07(r) of the Company Disclosure Letter, including the Viper Assets if (i) such assets are sold pursuant to Section 2.15(a)(i) or (ii) the Purchaser elects to exclude such assets pursuant to Section 2.15(b).

Section 2.08    Assumption of Liabilities.  On the terms and subject to the conditions and limitations set forth in this Agreement, at the Closing, Purchaser shall assume, effective as of the Closing, and shall timely perform and discharge in accordance with their respective terms, the Assumed Liabilities and no others.  For purposes of this Agreement, "Assumed Liabilities" means (without duplication) each of the following Liabilities of Sellers existing as of immediately prior to the Closing:

(a)     all Liabilities under Assumed Contracts, including leases relating to Purchased Leased Real Property, other than any Assumed Contract that becomes an Excluded Contract after the Closing Date pursuant to Section 2.10;

(b)     all trade or account payables that would be required by GAAP (disregarding intercompany consolidation rules) to be reflected as such on a balance sheet of the Sellers as of the Closing, including all accounts payable due from a Selling Group Member to another Selling Group Member or to a Purchased Company, whether or not invoiced prior to Closing, excluding accounts payable to any supplier that is not a party to any Assumed Contract and any accounts payable that were not incurred in the ordinary course of the business of the Seller ("Trade Payables");

(c)     all Environmental Liabilities present on the Purchased Owned Real Property and the Purchased Leased Real Property, but excluding the Environmental Liabilities described in Section 2.09(h);

(d)    all Liabilities (excluding any Liabilities set forth in Section 2.09(d) hereof or any Liabilities with respect to any Excluded Plan that is not a health benefit plan) related to or arising out of the employment or termination of employment of (i) any current or former employee or retiree (and any dependents or beneficiaries thereof) of the Company or any of its Subsidiaries that is or was covered by any Collective Bargaining Agreement or (ii) any Transferred Employee not covered by (i), in each case whether arising prior to, on or after the Closing Date;

(e)    any Liabilities to be expressly assumed by Purchaser or any of its Subsidiaries pursuant to ARTICLE VI hereof;

(f)    any and all Liabilities or obligations of any Selling Group Member or Subsidiary of any Selling Group Member related to or arising under any Included Plan or any health benefit plan that is an Excluded Plan;

(g)    all Liabilities pursuant to product warranties, product returns and rebates on vehicles sold by Sellers prior to the Closing;

(h)    all Product Liability Claims arising from the sale after the Closing of Products or Inventory manufactured by Sellers or their Subsidiaries in whole or in part prior to the Closing;

(i)    any Liabilities arising out of the claims and causes of action listed on Section 2.06(q) of the Company Disclosure Letter;

(j)    all Conveyance Taxes applicable to the transfer of the Purchased Assets pursuant to this Agreement;

(k)    the Cure Amounts related to the Assumed Contracts payable by Purchaser pursuant to Section 2.10;

(l)    any Liabilities arising as a result of the operation of the Company Business after the Closing, including any Environmental Liabilities arising as a result of Purchaser's ownership or operation of the Purchased Assets after the Closing;

(m)    [Reserved.]

(n)    the Liabilities set forth on Section 2.08(n) of the Company Disclosure Letter.

Section 2.09    Excluded Liabilities.  Purchaser shall not assume and shall be deemed not to have assumed, and Sellers shall be solely and exclusively liable with respect to, any Liabilities of Sellers other than the Assumed Liabilities (collectively, the "Excluded Liabilities").  For the avoidance of doubt, the Excluded Liabilities include the following:

(a)    all Liabilities arising out of, or related to, any Excluded Assets;

(b)    all Liabilities under Excluded Contracts;

(c)     all Liabilities, other than Liabilities under Included Plans, related to or arising out of the employment of Company Employees who are not Transferred Employees (other than any current or former employee that is or was covered by any Collective Bargaining Agreement);

(d)     all Liabilities of any Seller for workers' compensation claims against any Seller that relate to the period on or before the Closing Date, irrespective of whether such claims are made prior to, on or after the Closing Date;

(e)     all Liabilities for expenses of the Sellers (i) for the negotiation and preparation of this Agreement, (ii) relating to the transactions contemplated hereby or (iii) incurred in connection with the commencement and continuance of the Bankruptcy Case (including Bankruptcy-Related Fees);

(f)     except as otherwise provided herein and other than Taxes relating to the Purchased Assets for taxable periods (or portions thereof) beginning after the Closing Date, all Liabilities for Taxes of any Selling Group Member;

(g)     any and all Liabilities or obligations of any Selling Group Member or Subsidiary of the Company related to or arising under any Excluded Plan that is not a health benefit plan;

(h)     all Environmental Liabilities related to the Excluded Owned Real Property or the Excluded Owned Leased property, or any Environmental Liability relating to the ownership or operation of the Company Business or relating to any generation, transport, release or presence of any Hazardous Material on or from any Owned Real Property or Leased Real Property prior to or ongoing at Closing;

(i)     all Product Liability Claims arising from the sale of Products or Inventory prior to the Closing;

(j)     all Liabilities in strict liability, negligence, gross negligence or recklessness for acts or omissions arising prior to or ongoing at the Closing;

(k)     all Liabilities of any Seller for (i) the litigation between certain of the Sellers and Faurecia Interior Systems, Inc. and its Affiliates (collectively, "Faurecia") in the Oakland County, Michigan Circuit Court, and (ii) any other claims that Faurecia may have or assert against any Seller that relate to the period on or before the Closing Date, irrespective of whether such claims are asserted prior to, on or after the Closing Date; and

(l)     all Liabilities of any Seller for claims of any kind or nature whatsoever relating to Getrag Transmission Manufacturing, LLC, Getrag International GmbH or their respective Affiliates, including but not limited to the litigation between certain of the Sellers and Getrag Transmission Manufacturing, LLC and Getrag International GmbH in the Eastern District of Michigan (Case No. 08-14592), irrespective of whether such claims are asserted prior to, on or after the Closing Date.

For the avoidance of doubt, nothing herein shall be deemed to provide or require that Sellers will retain or be liable for any Liabilities of the Purchased Companies after the Closing.

Section 2.10    Excluded Contract Designations; Cure Amounts.  At the Closing, or thereafter to the extent permitted by the Bidding Procedures Order, and pursuant to section 365 of the Bankruptcy Code, Sellers shall assume and assign to Purchaser, and Purchaser shall assume from Sellers, the Assumed Contracts.  At any time prior to the deadline for rejecting contracts in the Bidding Procedures Order, Purchaser or Fiat may add to Section 2.07(a) of the Company Disclosure Letter any Contract to which a Selling Group Member is a party by giving reasonably detailed written notice thereof to Sellers, thereby designating such Contract an Excluded Contract.  Notwithstanding the foregoing, Purchaser or Fiat may not designate any Collective Bargaining Agreement or the GMAC Master AutoFinance Agreement as an Excluded Contract under this Section 2.10 or otherwise.  Notwithstanding, any other provision hereof, the Liabilities of Sellers under or related to any Contract, other than any Collective Bargaining Agreement, added to Section 2.07(a) of the Company Disclosure Letter under this Section 2.10 will constitute Excluded Liabilities.  The amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts (the "Cure Amounts") shall be paid by Purchaser as and when finally determined by the Bankruptcy Court pursuant to the procedures set forth in the Bidding Procedures Order, and not by Sellers and Sellers shall have no liability therefor.

Section 2.11    Non-Assignment of Assets.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Purchased Asset if (a) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Purchaser thereunder and (b) the Bankruptcy Court shall not have entered an Order providing that such Necessary Consent is not required.  In such event, Sellers and Purchaser will use their reasonable best efforts to obtain the Necessary Consents with respect to any such Purchased Asset or any claim or right or any benefit arising thereunder for the assignment thereof to Purchaser as Purchaser may reasonably request; *provided, however*, that Sellers shall not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.  If such Necessary Consent is not obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Selling Group Member thereunder so that Purchaser would not in fact receive all such rights, such Selling Group Member and Purchaser will cooperate in a mutually agreeable arrangement, to the extent feasible and at no expense to such Selling Group Member, under which Purchaser would obtain the benefits and assume the obligations thereunder in accordance with this Agreement, including subcontracting, sub-licensing, or sub-leasing to Purchaser, or under which such Selling Group Member would enforce for the benefit of Purchaser with Purchaser assuming such Selling Group Member's obligations and any and all rights of such Selling Group Member against a third party thereto.  Without limiting the foregoing, with respect to Intellectual Property licenses, if Sellers are permitted to sublicense only in exchange for a one-time fixed payment or an ongoing fee, Sellers shall notify Purchaser thereof and, only if Purchaser agrees in writing to be responsible to such

-11-

payment or fee, as applicable, Sellers shall sublicense whatever rights it is permitted to sublicense under the respective Intellectual Property licenses, subject to the payment or fee being paid by Purchaser.

Section 2.12    Further Conveyances and Assumptions. From time to time following the Closing, Sellers and Purchaser shall execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each Selling Group Member and its Affiliates and their successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the transactions contemplated hereby.

Section 2.13    Consideration for the Purchased Assets. The aggregate consideration provided by Purchaser to the Sellers for the Purchased Assets shall be (i) the assumption of the Assumed Liabilities and (ii) the Cash Consideration.

Section 2.14    Designation of Purchased and Excluded Subsidiaries.

(a)    At any time and from time to time prior to the earlier of June 30, 2009 and the fifth Business Day prior to the Closing, the Purchaser may with respect to national sales companies, designate any such company, and any Subsidiary thereof, as an Excluded Subsidiary; *provided, however*, if any such company is so designated, each of its Subsidiaries must also be designated as an Excluded Subsidiary.

(b)    At any time and from time to time prior to May 18, 2009, the Purchaser may  designate (A) Chrysler Canada Holding ULC, (B) Alpha Holding LP and (C) 3217923 Nova Scotia Company as Excluded Subsidiaries, in which case all direct Subsidiaries of Alpha Holding LP shall be Purchased Entities and all Subsidiaries of Alpha Holding LP shall be Purchased Companies and Alpha Holding LP shall execute and deliver this Agreement as a Seller.

Section 2.15    Viper. (a)   Subject to Section 2.15(b) below, notwithstanding any provision of this Agreement to the contrary, (i) Seller may, at its option, sell Intellectual Property and Purchased Inventories that relate solely to Vehicle Production (as defined in the Transition Services Agreement) and are not necessary or useful in any other line of business (the "Viper Assets") prior to the Closing Date in an arm's-length transaction to a party other than Purchaser on terms and conditions reasonably acceptable to the Purchaser, *provided* that the right of the Seller to sell the Viper Assets shall terminate on June 8, 2009 if no binding written agreement to purchase the Viper Assets has been executed and delivered by a bona fide purchaser at such time, and (ii) in connection with any such sale, Seller and Purchaser, as applicable, shall grant to the purchaser of the Viper Assets on terms and conditions reasonably acceptable to the Purchaser a non-exclusive license of other Intellectual Property of the Seller necessary for Vehicle Production as currently conducted.  The Purchaser shall at the request of the Seller work in good faith to facilitate such sale.  If the sale of the Viper Assets is consummated prior the Closing Date, the Seller shall receive in trust for, segregate and convey to the Purchaser on the Closing

-12-

Date all right, title and interest in the proceeds of such sale, which proceeds shall constitute Purchased Assets for all purposes of this Agreement.  If any commitment to purchase the Viper Assets is made prior to the Closing Date, but not consummated, the Purchased Assets shall include Seller's right, title and interest in the Viper Assets and in any agreement evidencing such commitment and any related or ancillary agreements entered into in connection therewith.

(b)    Purchaser may at any time elect by written notice to Seller that it elects not to acquire some or all of the Viper Assets (or agreement or proceeds of sale) described in Section 2.15(a), in which case such Viper Assets (or agreement or proceeds) shall constitute Excluded Assets.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except as set forth in the Company Disclosure Letter (it being understood that any information set forth in one section or subsection of the Company Disclosure Letter relating to representations and warranties shall be deemed to apply to and qualify the Section or subsection of this Agreement to which it corresponds in number and each other subsection of this ARTICLE III to the extent that it is readily apparent on its face that such information would be applicable to such other Section or subsection), subject to the entry of the Sale Order and the approval of this Agreement and the Transactions by the Bankruptcy Court, each Selling Group Member represents and warrants to Fiat and Purchaser, as of the date hereof or, if a representation or warranty is made as of a specified date, as of such date, as follows:

Section 3.01    Organization, Standing and Power.  Each of the Company and its Significant Subsidiaries is duly organized and validly existing under the Laws of its jurisdiction of organization and, subject to the limitations imposed on the Sellers as a result of having filed a petition for relief under the Bankruptcy Code, has all requisite corporate, limited liability company or partnership power, as the case may be, and authority to own, lease or otherwise hold its properties and assets and to conduct its business as presently conducted.  Each of the Company and its Significant Subsidiaries is duly qualified or licensed to do business and is in good standing (where such concept is recognized under applicable Law) in each jurisdiction where the nature of its business or the ownership, leasing or operation of its properties makes such qualification or licensing necessary, other than where the failure to be so qualified, licensed or in good standing, individually or in the aggregate, has not had and would not be reasonably likely to have a Company Material Adverse Effect.  The Company has made available to Fiat prior to the execution of this Agreement true and complete copies of the Constitutive Documents of the Company and its Significant Subsidiaries, in each case as in effect on the date of this Agreement.

Section 3.02    Subsidiaries.  Section 3.02 of the Company Disclosure Letter lists each Subsidiary of the Company that is a Purchased Company and the jurisdiction of organization thereof.  There are no shares of capital stock, options, profits interests, phantom equity awards or other similar obligations related to, or for which the payout is determined by reference to the value of any Purchased Company, or other equity interests or Rights in any Purchased Company issued, reserved for issuance or outstanding.  All the outstanding shares of

-13-

**EXHIBIT 6**

JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306
Corinne Ball
Veerle Roovers

JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
David G. Heiman

JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309
Telephone: (404) 581-3939
Facsimile: (404) 581-8330
Jeffrey B. Ellman

Attorneys for Debtors
and Debtors in Possession

SULLIVAN & CROMWELL
125 Broad Street
New York, New York 10004-2498
Telephone (212) 558-4000
Facsimile (212) 558-3588
Andrew G. Dietderich
Mark U. Schneiderman

Attorneys for Fiat S.p.A. and
Chrysler Group LLC

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x

In re

Old Carco LLC
(f/k/a Chrysler LLC), *et al.*,

                   Debtors.

------------------------------------------------------- x

:   Chapter 11

:   Case No. 09-50002 (AJG)

:   (Jointly Administered)

**STIPULATION AND AGREED ORDER**
**APPROVING AMENDMENT NO. 4 TO MASTER TRANSACTION AGREEMENT**

WHEREAS, on April 30, 2009 (the "Petition Date"), Old Carco LLC

f/k/a Chrysler LLC ("Old Carco") and 24 of its affiliated debtors and debtors in possession

(collectively with Old Carco, the "Original Debtors") commenced their reorganization cases by

filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code

(the "Bankruptcy Code"). On May 19, 2009, Alpha Holding LP (collectively with the Original

Debtors, the "Debtors") commenced its reorganization case by filing a voluntary petition under

chapter 11 of the Bankruptcy Code. By orders of the Court (Docket Nos. 97 and 2188), the

Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

jointly administered under In re Old Carco LLC (f/k/a Chrysler LLC), et al., Case

No. 09-50002 (AJG);

WHEREAS, Old Carco is a party to the Master Transaction Agreement, dated as

of April 30, 2009 (as amended and collectively with all exhibits and supporting and ancillary

documents, the "Purchase Agreement"),[1] among Fiat S.p.A., a *Societ per Azioni* organized under

the laws of Italy, Chrysler Group LLC, formerly known as New CarCo Acquisition LLC, a

Delaware limited liability company, Old Carco and the Old Carco subsidiaries identified on the

signature pages to the Purchase Agreement;

WHEREAS, on May 31, 2009, this Court issued: (a) an Opinion Granting the

Debtors' Motion Seeking Authority to Sell, Pursuant to 11 U.S.C. 363, Substantially All of the

Debtors' Assets (Docket No. 3073) (the "Sale Opinion"); and (b) an Opinion and Order

Regarding Emergency Economic Stabilization Act of 2008 and Troubled Asset Relief Program

---

[1]     All terms used but not defined herein have the meaning given to such terms in the Purchase
Agreement.

(Docket Nos. 3074 and 3229) (together with the Sale Opinion, the "Opinions"). On June 1, 2009 and consistent with the Sale Opinion, this Court entered the Order (I) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of all Liens, Claims, Interests and Encumbrances, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection therewith and Related Procedures and (III) Granting Related Relief (Docket No. 3232) (the "Sale Order") approving the Purchase Agreement and the transactions contemplated thereby. The Opinions and the Sale Order were affirmed by the United States Court of Appeals for the Second Circuit. See In re Chrysler LLC, 576 F.3d 108 (2d Cir. 2009);

WHEREAS, pursuant to the Purchase Agreement, Chrysler Group LLC acquired substantially all of the assets of the Debtors in a sale transaction that was consummated on June 10, 2009 (the "Closing");

WHEREAS, the undersigned parties desire to amend the Purchase Agreement pursuant to the terms and conditions of Amendment No. 4 to Master Transaction Agreement, dated as of October 29, 2009 (the "MTA Amendment"), a copy of which is attached hereto as Annex A;

WHEREAS, pursuant to and as set forth in the MTA Amendment, among other things: (a) Section 2.08(h) of the Purchase Agreement is amended in its entirety to add certain Product Liability Claims as Assumed Liabilities; and (b) Section 2.09(i) of the Purchase Agreement is amended to include as Excluded Liabilities all Product Liability Claims arising from the sale of Products or Inventory on or prior to the Closing that are not described in Section 2.08(h) of the Purchase Agreement (as amended by the MTA Amendment);

WHEREAS, the Debtors believe that the MTA Amendment is appropriate and in the best interests of their estates and creditors;

WHEREAS, the undersigned parties agree to the terms and conditions relating to the MTA Amendment set forth in this Stipulation and Agreed Order, filed with the Court with a notice of presentment on October 29, 2009 (Docket No. 5867) (the "Stipulation and Agreed Order");

WHEREAS, on November 3, 2009, Patricia Pascale filed a Limited Objection to the Stipulation and Agreed Order (Docket No. 5887) (the "Limited Objection") and the Stipulation and Agreed Order was subsequently set for hearing on November 19, 2009;

WHEREAS, on November 16, 2009, Chrysler Group LLC and Fiat S.p.A. filed a Reply to the Limited Objection (Docket No. 5953).

NOW, THEREFORE, it is hereby stipulated and agreed by and between the parties to this Stipulation and Agreed Order, through their undersigned counsel, that:

1.      The Debtors are authorized to enter into the MTA Amendment, the MTA Amendment is hereby APPROVED and the Limited Objection is OVERRULED.

2.      The Court shall retain jurisdiction over all matters or disputes arising out of or in connection with this Stipulation and Agreed Order.

3.      This Stipulation and Agreed Order shall not be modified, altered, amended or vacated without the prior written consent of all parties hereto. Any such modification, alteration, amendment or vacation in whole or in part shall be subject to the approval of this Court. No statement made or action taken in the negotiation of this Stipulation and Agreed Order may be used by any party for any purpose whatsoever.

4.      This Stipulation and Agreed Order is the entire agreement between the parties in respect of the subject matter hereof and may be signed in counterpart originals.

*[The remainder of this page is intentionally blank.]*

| | |
|---|---|
| Dated: November 19, 2009 | Respectfully submitted, |
| /s/ Andrew G. Dietderich<br>SULLIVAN & CROMWELL LLP<br>125 Broad Street<br>New York, New York 10004-2498<br>Telephone: (212) 558-4000<br>Facsimile: (212) 558-3588<br>Andrew G. Dietderich<br>Mark U. Schneiderman<br><br>ATTORNEYS FOR FIAT S.P.A.<br>AND CHRYSLER GROUP LLC | /s/ Jeffrey B. Ellman<br>JONES DAY<br>222 East 41st Street<br>New York, New York 10017<br>Telephone: (212) 326-3939<br>Facsimile: (212) 755-7306<br>Corinne Ball<br>Veerle Roovers<br><br>JONES DAY<br>North Point<br>901 Lakeside Avenue<br>Cleveland, Ohio 44114<br>Telephone: (216) 586-3939<br>Facsimile: (216) 579-0212<br>David G. Heiman<br><br>JONES DAY<br>1420 Peachtree Street, N.E.<br>Suite 800<br>Atlanta, Georgia 30309<br>Telephone: (404) 581-3939<br>Facsimile: (404) 581-8330<br>Jeffrey B. Ellman<br><br>ATTORNEYS FOR DEBTORS<br>AND DEBTORS IN POSSESSION |
| IT IS SO ORDERED.<br><br>Dated: New York, New York<br>      November 19, 2009 | s/Arthur J. Gonzalez<br>UNITED STATES BANKRUPTCY JUDGE |

## ANNEX A

### AMENDMENT NO. 4 TO
### MASTER TRANSACTION AGREEMENT

This AMENDMENT NO. 4, dated as of October 27, 2009 (this "Amendment"), to the Master Transaction Agreement, dated as of April 30, 2009 (as amended by Amendment No. 1 thereto dated as of May 31, 2009, Amendment No. 2 thereto dated as of June 5, 2009 and Amendment No. 3 thereto dated as of June 10, 2009, the "MTA"), among Fiat S.p.A., a *Società per Azioni* organized under the laws of Italy ("Fiat"), Chrysler Group LLC, formerly known as New CarCo Acquisition LLC, a Delaware limited liability company ("Purchaser"), Old CarCo LLC, formerly known as Chrysler LLC, a Delaware limited liability company (the "Company") and the Subsidiaries of the Company identified on the signature pages thereto (each of the Company and such Subsidiaries, a "Seller" or "Selling Group Member" and, collectively, "Sellers"). All capitalized terms used but not defined herein have the meanings set forth in the MTA.

WHEREAS, Fiat, Purchaser and Sellers wish to further amend the MTA, as more fully set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and undertakings contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Section 2.08(h) of the MTA shall be amended in its entirety to read as follows:

"(h)     (i) all Product Liability Claims arising from the sale after the Closing of Products or Inventory manufactured by Sellers or their Subsidiaries in whole or in part prior to the Closing and (ii) all Product Liability Claims arising from the sale on or prior to the Closing of motor vehicles or component parts, in each case manufactured by Sellers or their Subsidiaries and distributed and sold as a Chrysler, Jeep, or Dodge brand vehicle or MOPAR brand part, solely to the extent such Product Liability Claims (A) arise directly from motor vehicle accidents occurring on or after Closing, (B) are not barred by any statute of limitations, (C) are not claims including or related to any alleged exposure to any asbestos-containing material or any other Hazardous Material and (D) do not include any claim for exemplary or punitive damages."

2.      Section 2.09(i) of the MTA shall be amended in its entirety to read as follows:

"(i)     all Product Liability Claims arising from the sale of Products or Inventory on or prior to the Closing that are not described in Section 2.08(h);"

3.      Except as expressly provided herein, all of the terms and provisions in the MTA are and shall remain in full force and effect, on the terms and subject to the conditions set forth therein. This Amendment does not constitute, directly or by implication, an amendment or waiver of any provision of the MTA, or any other right, remedy, power or privilege of any party to the MTA, except as expressly set forth herein.

4.  This Amendment shall be binding upon and inure solely to the benefit of the parties hereto and their respective permitted successors and permitted assigns. Subject to the preceding sentence, nothing herein, express or implied, is intended to or shall be deemed to confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever.

5.  This Amendment may not be amended except by an instrument in writing signed by each of the parties hereto. At any time, any party hereto may (a) extend the time for the performance of any obligation or other act of any other party hereto and (b) waive compliance with any agreement or condition contained herein. Any such extension or waiver shall be valid if set forth in an instrument in writing signed by the party or parties to be bound thereby.

6.  This Amendment shall be governed by and construed in accordance with the laws of the State of New York, excluding (to the extent permissible by law) any rule of law that would cause the application of the laws of a jurisdiction other than the State of New York.

7.  Without limiting any party's right to appeal any order of the Bankruptcy Court, each party hereby irrevocably (i) submits to the exclusive jurisdiction of the Bankruptcy Court, for the purpose of any action or proceeding arising out of or relating to this Amendment, (ii) each party hereto hereby irrevocably agrees that all claims in respect to such action or proceeding may be heard and determined exclusively in the Bankruptcy Court and (iii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from the Bankruptcy Court, including a motion to dismiss on the grounds of forum non conveniens. Each of the parties hereto agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law; provided, however, that if the Bankruptcy Case has closed, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County for the resolution of any such claim or dispute. Each of the parties hereto irrevocably consents to the service of the summons and complaint and any other process in any action or proceeding relating to the transactions contemplated by this Amendment, on behalf of itself or its property, by personal delivery of copies of such process to such party. Such service shall be in lieu of any other potentially applicable requirement of service, including, without limitation, the Hague Convention on the Service Abroad of Judicial and Extra-Judicial Documents in Civil or Commercial Matters. Nothing in this Section 7 shall affect the right of any party to serve legal process in any other manner permitted by law.

8.  This Amendment may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

9.  If any term or other provision of this Amendment is invalid, illegal or incapable of being enforced by any rule of Law, or public policy, then to the maximum extent permitted by

Law, all other conditions and provisions of this Amendment shall nevertheless remain in full force and effect.

10. This Amendment shall become effective immediately upon entry of an order approving this Amendment by the Bankruptcy Court in form and substance acceptable to Fiat, Purchaser and Sellers.

*[Remainder of page left intentionally blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the date first written above by their respective officers thereunto duly authorized.

FIAT S.p.A.

By: _____
Name: Sergio Marchionne
Title: Chief Executive Officer


CHRYSLER GROUP LLC, formerly known as
NEW CARCO ACQUISITION LLC

By: _____
Name: Holly Leese
Title: Senior Vice President

OLD CARCO LLC, formerly known as
    CHRYSLER LLC

By: _____
    Name: Ronald E. Kolka
    Title: Chief Executive Officer




OLD CARCO AVIATION INC., formerly known
    as CHRYSLER AVIATION INC.

By: _____
    Name: Ronald E. Kolka
    Title: President




OLD CARCO INTERNATIONAL
    CORPORATION, formerly known as
    CHRYSLER INTERNATIONAL
    CORPORATION

By: _____
    Name: Ronald E. Kolka
    Title: President

OLD CARCO INTERNATIONAL LIMITED,
L.L.C., formerly known as CHRYSLER
INTERNATIONAL LIMITED, L.L.C.,

By:     OLD CARCO INTERNATIONAL
        CORPORATION, formerly known
        as CHRYSLER INTERNATIONAL
        CORPORATION

By:     _R. E. Kolka_____
        Name: Ronald E. Kolka
        Title: President

OLD CARCO INTERNATIONAL SERVICES,
S.A., formerly known as CHRYSLER
INTERNATIONAL SERVICES, S.A.

By:     _R. E. Kolka_____
        Name: Ronald E. Kolka
        Title: President

OLD CARCO MOTORS LLC, formerly known as
CHRYSLER MOTORS LLC

By:     _R. E. Kolka_____
        Name: Ronald E. Kolka
        Title: President

OLD CARCO REALTY COMPANY LLC,
          formerly known as CHRYSLER REALTY
          COMPANY LLC

By: _____
          Name: Ronald E. Kolka
          Title: President


OLD CARCO SERVICE CONTRACTS
          FLORIDA, INC., formerly known as
          CHRYSLER SERVICE CONTRACTS
          FLORIDA, INC.

By: _____
          Name: Ronald E. Kolka
          Title: President


OLD CARCO SERVICE CONTRACTS INC.,
          formerly known as CHRYSLER SERVICE
          CONTRACTS INC.

By: _____
          Name: Ronald E. Kolka
          Title: President

[Signature Page to Amendment No. 4 to the MTA]

OLD CARCO TECHNOLOGIES MIDDLE EAST
LTD., formerly known as CHRYSLER
TECHNOLOGIES MIDDLE EAST LTD.

By: _____
Name: Ronald E. Kolka
Title: President


OLD CARCO TRANSPORT INC., formerly
known as CHRYSLER TRANSPORT,
INC.

By: _____
Name: Ronald E. Kolka
Title: President


OLD CARCO VANS LLC, formerly known as
CHRYSLER VANS LLC

By: _____
Name: Ronald E. Kolka
Title: President

DCC 929, INC.

By: _____
       Name: Ronald E. Kolka
       Title: President


DEALER CAPITAL, INC.

By: _____
       Name: Ronald E. Kolka
       Title: President


GLOBAL ELECTRIC MOTORCARS, LLC

By: _____
       Name: Ronald E. Kolka
       Title: President

NEV MOBILE SERVICE, LLC

By: _____
    Name: Ronald E. Kolka
    Title: President



NEV SERVICE, LLC

By: _____
    Name: Ronald E. Kolka
    Title: President



PEAPOD MOBILITY LLC

By: _____
    Name: Ronald E. Kolka
    Title: President

TPF ASSET, LLC

By:   OLD CARCO LLC, formerly known as
       CHRYSLER LLC

By:   _____
       Name: Ronald E. Kolka
       Title: Chief Executive Officer

TPF NOTE, LLC

By:   OLD CARCO LLC, formerly known as
       CHRYSLER LLC

By:   _____
       Name: Ronald E. Kolka
       Title: Chief Executive Officer

UTILITY ASSETS LLC

By:   _____
       Name: Ronald E. Kolka
       Title: President

OLD CARCO DUTCH HOLDING LLC, formerly
known as CHRYSLER DUTCH
HOLDING LLC

By: _____
Name: Ronald E. Kolka
Title: President


OLD CARCO DUTCH INVESTMENT LLC,
formerly known as CHRYSLER DUTCH
INVESTMENT LLC

By: _____
Name: Ronald E. Kolka
Title: President


OLD CARCO DUTCH OPERATING GROUP
LLC, formerly known as CHRYSLER
DUTCH OPERATING GROUP LLC

By: _____
Name: Ronald E. Kolka
Title: President


OLD CARCO INSTITUTE OF ENGINEERING,
formerly known as CHRYSLER
INSTITUTE OF ENGINEERING

By: _____
Name: Ronald E. Kolka
Title: President

ALPHA HOLDING LP

By:    3217923 NOVA SCOTIA COMPANY

By:    OLD CARCO LLC, formerly known as
       CHRYSLER LLC

By:    _____
       Name: Ronald E. Kolka
       Title: Chief Executive Officer

# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                 :

In re:                          :       Chapter 11
                                 :

OLD CARCO LLC, f/k/a       :       Case No. 09-50002 (AJG)
CHRYSLER LLC, *et al.*,        :
                                 :

           Debtors.       :       (Jointly Administered)
                                 :

------------------------------------------------------------ x

BRADLEY E. WOLFF,       :       Adv. Proc. No. 10-05007 (AJG)
                                 :

           Plaintiff,      :

  -against-             :

CHRYSLER GROUP LLC; and   :
DOES 1-50, inclusive,      :

           Defendants.   :

------------------------------------------------------------ x

## OPINION GRANTING DEFENDANT'S MOTION TO DISMISS

A P P E A R A N C E S

SULLIVAN & CROMWELL LLP
Attorneys for Chrysler Group LLC
125 Broad Street
New York, NY 10004

        By:    Steven L. Holley, Esq.
                Michael J. Ushkow, Esq.

GATES, O'DOHERTY, GONTER & GUY, LLP
Attorneys for Chrysler Group LLC
15635 Alton Parkway, Suite 260
Irvine, CA 92618

        By:    Matthew M. Proudfoot, Esq.

CARONNA, JOHNSON & HODDICK, LLP
Attorneys for Bradley E. Wolff
71650 Sahara Road, Suite 2
Rancho Mirage, CA 92270

By:     Larry Hoddick, Esq.

MCCOY, TURNAGE & ROBERTSON, LLP
Attorneys for Bradley E. Wolff
5469 Kearney Villa Road, Suite 206
San Diego, CA 92123

By:     Lilys D. McCoy, Esq.


ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

Before this Court is a Motion to Dismiss pursuant to Federal Rule of Civil Procedure

12(b)(6) (the "Motion") by Chrysler Group LLC ("New Chrysler") against Bradley E. Wolff's

First Amended Complaint For Damages Based on Breach of Contract and Promissory Estoppel

(the "Complaint"). Mr. Wolff originated this proceeding in the Superior Court of Riverside,

California on December 4, 2009 with a prior version of the Complaint. New Chrysler removed

this proceeding to the United States District Court for the Central District of California pursuant

to sections 1331, 1334, and 1452 of Title 28 of the United States Code. On New Chrysler's

motion pursuant to section 1412 of Title 28 of the United States Code, the case was transferred to

the Southern District of New York on March 4, 2010 for referral to this Court based on this

Court's jurisdiction to interpret its own orders. Mr. Wolff filed the Complaint on April 6, 2010.

New Chrysler filed the Motion on June 14, 2010. Mr. Wolff filed an Opposition to the Motion

on July 8, 2010. New Chrysler filed a Reply in support of the Motion on July 13, 2010. This

Court conducted a hearing on July 15, 2010. For the reasons outlined below, the Motion is

granted in its entirety.

## BACKGROUND

The following sets forth factual allegations found in the Complaint, which the Court must assume to be true on a Rule 12(b)(6) motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Legal conclusions set forth in the Complaint have been excluded to the extent they are not intertwined with relevant facts, as they should not be presumed to be true or correct and do not bolster the factual sufficiency of a complaint on a motion to dismiss. *See Starr v. Sony BMG,* 592 F.3d 314, 317 n.1 (2d Cir. 2010) (noting that a court "'considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumptions of truth.'") (quoting *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949-50 (2009)).

On November 17, 2003, Chrysler LLC (now known as "Old Carco") manufactured a 2004 Dodge Ram, which Bradley E. Wolff ("Mr. Wolff") later purchased. After experiencing problems with the vehicle, Mr. Wolff filed a complaint against Old Carco in the Superior Court of Riverside County, California on April 16, 2006, alleging violations of the Song-Beverly Consumer Warranty Act and the Magnuson-Moss Warranty Act (the "Lemon Law(s)"). The parties negotiated a resolution of the suit and Old Carco sent Mr. Wolff a draft settlement agreement on April 21, 2009, under which Old Carco would agree to pay Mr. Wolff $16,000 in damages and reasonable costs, expenses, and attorney's fees[1] and Mr. Wolff would agree to dismiss his complaint (the "Settlement Agreement"). Mr. Wolff signed and returned this agreement to Old Carco, but neither party took any further action to settle the case at that time.

---

[1] Mr. Wolff claimed $124,894.02 regarding such amounts in the California state suit against Old Carco, but Old Carco's bankruptcy stayed the California suit before that court considered the request, and Mr. Wolff has dismissed that case. Mr. Wolff requests the same amount plus additional costs, fees, and expenses in an amount according to proof in the First Amended Complaint. Mr. Wolff also filed a Proof of Claim for $165,303.94 in the Old Carco Chapter 11 case.

Old Carco filed for Chapter 11 bankruptcy on April 30, 2009, before Old Carco or Mr. Wolff had performed any obligations under the Settlement Agreement. Old Carco entered the proceeding with an expectation that it would sell the bulk of its assets with court approval on an expedited schedule. All parties in interest received notice and an opportunity to be heard. The Ad Hoc Committee Seeking Fairness for Warranty and Lemon Law Claimants (the "Ad Hoc Committee") filed an objection to the Debtor's Motion for an Order Authorizing the Sale of Substantially All of Debtors' Assets Free and Clear of All Liens, Claim, Interests and Encumbrances and Certain Related Relief (the "Sale Motion" requesting the "Sale Order"). Mr. Wolff filed a proof of claim for his damages and expenses on May 14, 2009. The Ad Hoc Committee reached an agreement with Old Carco and New Chrysler (the "Agreement on Changes") regarding modifications to the proposed Sale Order and withdrew its objection.[2] Mr. Wolff did not file an objection to the Sale Order.

The Sale Order, entered on June 1, 2009, is an order of this Court authorizing New Chrysler and Old Carco to execute the Master Transaction Agreement. The Sale Order defines those terms of the sale that are relevant to the bankruptcy sale approval and refers to the Master Transaction Agreement for further details. The Sale Order directs that New Chrysler will assume only certain Lemon Law liabilities and executory contracts from Old Carco. Specifically, paragraph 19 states,

---

[2] Complaint, ¶¶ 18-25, Ex. 2-3. *See also* Ad Hoc Committee's Withdrawal of Objection to the Sale Order, Dock. No. 2916, Case 09-50002 (AJG), May 29, 2009. The Agreement on Changes included a comma between "prepetition" and "or" that the Sale Order did not include. At the hearing of July 15, 2010, Mr. Hoddick began his statement for Mr. Wolff by alleging, "Chrysler Group, in its Reply Brief that's before the Court has removed a critical comma from the paragraph 19 language that's before the court. This case may hinge on the meaning of that single comma. They have submitted a Reply Brief to the court removing critical punctuation from the Sale Order." Mr. Hoddick was mistaken; in fact, both parties have cited the correct Sale Order punctuation in their pleadings (although Mr. Wolff's pleadings occasionally conflate the Agreement on Changes and the Sale Order) and the comma's presence or absence does not affect the meaning of the Sale Order as it relates to this proceeding. *See* Compl. ¶26, Def.'s Memo. ¶6, Def.'s Reply ¶7. Because the variant comma is not material to the Court's conclusions, the Court will not resolve the issue in this opinion, although Mr. Hoddick's argument concerning the significance of the variation is considered in the Discussion.

> Notwithstanding anything else contained herein or in the in the Purchase Agreement, in connection with the purchase of the Debtors' brands and related Assets, the Purchaser, from and after Closing, will recognize, honor and pay liabilities under Lemon Laws for additional repairs, refunds, partial refunds (monetary damages) or replacement of a defective vehicle (including reasonable attorney's fees, if any, required to be paid under such Lemon Laws and necessarily incurred in obtaining those remedies), and for any regulatory obligations under such Lemon Laws arising now, including but not limited to cases resolved prepetition or in the future, on vehicles manufactured by the Debtors in the five years prior to the Closing (without extending any statute of limitations provided under such Lemon Laws), but in any event not including punitive, exemplary, special, consequential or multiple damages or penalties and not including any claims for personal injury or other consequential damages that may be asserted in relationship to such vehicles under the Lemon Laws.

A corresponding amendment to the Master Transaction Agreement uses slightly different language to assume the same liabilities, but in the event of any conflict, the Sale Order's language controls. Additionally, regarding an issue not discussed specifically within the Sale Order, section 2.08(n)(1) of the Article II Company Disclosure Letter to the Master Transaction Agreement states that New Chrysler assumes certain "[l]iabilities under incentive programs offered to dealers and customers prior to closing." Other provisions of the Sale Order emphasize that New Chrysler assumes specific liabilities of Old Carco but does not become a successor to Old Carco; all non-assumed Old Carco claims are barred against New Chrysler. *See* Sale Order ¶¶ 12-17, 35, 38, 39, 42. The sale closed on June 10, 2009 and the Sale Order is now final.

On August 24, 2009, Matthew Proudfoot, counsel for New Chrysler, sent a letter to Larry Hoddick, counsel for Mr. Wolff (Pl.'s First Opp., Ex. E, the "Proudfoot Letter") serving court-approved Notice Regarding Treatment of Lemon Law Claims in Connection With Chrysler LLC Bankruptcy Cases and Sale of Assets to Chrysler Group with Exhibits (the "Lemon Law Notice"). The Lemon Law Notice generally directs those parties to whom New Chrysler assumed liabilities under paragraph 19 of the Sale Order to pursue their claim in one of the following ways:

(a) filing the appropriate papers in a Lemon Law Action (consistent with applicable procedural requirements in such action) to indicate that New Chrysler is being substituted for the Debtors as the defendant in the proceeding, *provided that* such papers contain an affirmative statement that only Assumed Lemon Law Liabilities are being pursued against New Chrysler, solely to the extent permitted by the Lemon Law Provision of the Sale Order, and that any additional pre-Closing liabilities will be pursued (if at all) only by filing a proof of claim in these cases; (b) dismissing the Lemon Law Action and filing a new action solely against New Chrysler, which seeks only relief with respect to the Assumed Lemon Law Liabilities; or (c) any other similar arrangement acceptable to the Debtors and New Chrysler in their sole discretion that results in no claims being pursued against the Debtors in any nonbankruptcy forum and no Excluded Liabilities being pursued against New Chrysler.

Compl. ¶37.

The Lemon Law Notice does not modify the Sale Order or any party's rights under the Sale Order; it only informs Lemon Law claimants of the effect of the Sale Order and New Chrysler's treatment of assumed liabilities. The Proudfoot Letter specifically states New Chrysler's opinion regarding Mr. Wolff's claim: "based on our review of the relevant materials we have determined that none of the claims asserted therein [by Mr. Wolff] have been assumed by [New Chrysler]. We therefore are unwilling to consent to the substitution of [New Chrysler] in place of Old Carco . . . ." This language most directly excludes options "(c)" of the Lemon Law Notice, but also expresses New Chrysler's belief that New Chrysler did not assume any liability to Mr. Wolff under the Sale Order, excluding options "(a)" and "(b)" unless Mr. Wolff can demonstrate that New Chrysler did assume the Settlement Agreement under the Sale Order. Mr. Wolff alleges that he relied on the Lemon Law Notice to pursue option "(b)"; he voluntarily dismissed his state proceeding against Old Carco with prejudice on December 3, 2009 and now pursues breach of contract and promissory estoppel claims against New Chrysler in this proceeding.

Mr. Wolff alleges that New Chrysler assumed or should have assumed the Settlement Agreement under the language of paragraph 19 of the Sale Order and has now breached that contract. Compl. ¶¶ 27-32, 46-47. Mr. Wolff further alleges that New Chrysler assumed Old

Carco's settlement with him under the language of section 2.08(n)(1) of the Master Transaction Agreement as integrated into the Sale Order and has now breached that contract. Compl. ¶¶ 33-36, 46-47. Mr. Wolff also pleads a promissory estoppel claim based on the same facts. Citing the legal deficiencies of Mr. Wolff's claims, New Chrysler has moved for dismissal of this proceeding under Federal Rule of Civil Procedure 12(b)(6).

## JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), and under paragraph 59 of the Sale Order. Because this proceeding is ancillary to the Sale Order, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## DISCUSSION

*Motion to Dismiss Standard*

Federal Rule of Civil Procedure ("Rule") 12(b)(6) is incorporated into bankruptcy procedure by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012(b). In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief, the court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007). In addition, the court draws all reasonable inferences from the factual allegations in favor of the plaintiff.

*Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992); *Myvett v. Williams*, 638 F. Supp. 2d 59, 64 (D.D.C. 2009).

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92 L. Ed. 2d 209 (1986). Bare assertions, "devoid of 'further factual enhancement'[,]" are not sufficient to withstand a motion to dismiss. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citation omitted).

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998); *see also Erickson*, 551 U.S. at 94, 127 S. Ct. at 2200 (noting that Rule 8(a)(2) sets forth "liberal pleading standards"). Pursuant to Rule 8(a), which is made applicable to adversary proceedings by Bankruptcy Rule 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Erickson*, 551 U.S. at 93, 127 S. Ct. at 2200 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007) (quoting, in turn, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed. 2d 80 (1957). Thus, specific facts are not necessary. *Id.* 551 U.S. at 93, 127 S. Ct. at 2200.

While detailed factual allegations are not necessary, the need to provide the "grounds" for entitlement to relief requires "more than labels and conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65. The allegations must show that the right to relief is more than speculative. *Id.* at 553, 127 S. Ct.

at 1965. There must be a "reasonably founded hope" that the discovery process will uncover relevant evidence. *Id*. at 559, 563 n.8, 127 S. Ct. 1967, 1969 n.8.

To adequately support the claim, there must be sufficient facts identified to suggest that the legally vulnerable conduct is plausible. *Id*. at 556, 127 S. Ct. at 1965. A complaint meets the plausibility standard when factual content is pled "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, ___ U.S. at ___, 129 S. Ct. at 1949. Once the plausibility threshold is met, the complaint survives even if the identified facts seem improbable or recovery is thought to be remote or unlikely. *Twombly*, 550 U. S. at 556, 127 S. Ct. 1965. Although *Twombly* was decided in the context of an antitrust litigation, the plausibility standard to test the sufficiency of a complaint applies in all civil actions. *Iqbal*, ___ U.S. at ___, 129 S. Ct. at 1953. The plausibility standard, however, does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. Thus, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563, 127 S. Ct. at 1969.

Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555 n.3, 127 S. Ct. at 1965 n.3. However, once the claim is adequately supported, specific facts beyond those needed to state the claim are not necessary. *Id*. at 570, 127 S. Ct. at 1973-74. Indeed, other sections of the Federal Rules of Civil Procedure support a simplified notice pleading standard, including Rule 8(f), which provides that technical forms of pleading or motions are not required, and Rule 8(e)(1), which provides that pleadings are to construed in a way that does substantial justice. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14, 122 S. Ct. 992, 998, 152 L. Ed. 2d 1 (2002). The simplicity required by the rule, in forgoing additional

factual detail, recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id*. at 512-13, 122 S. Ct. at 998; *see also*, *Conley*, 355 U.S. at 47-48, 78 S. Ct. at 103. Based upon the liberal pleading standard established by Rule 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997). In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter. *Id*.

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to weigh the evidence which may be offered to support it. *Cooper*, 140 F.3d at 440. The determination is not whether a claimant will ultimately prevail, but whether the claimant should be allowed to offer evidence to support the claim. *Swierkiewicz*, 534 U.S. at 511, 122 S. Ct. at 997.

*Distinction between Old Carco and New Chrysler*

The Complaint pleads allegations against Old Carco and New Chrysler almost interchangeably, but for the purposes of this proceeding solely against New Chrysler, it is essential to distinguish the two entities. This Court's opinion approving the Sale Order and the Sale Order itself define with a high degree of specificity which liabilities New Chrysler assumed from Old Carco and which liabilities Old Carco retained. *See In re Chrysler LLC*, 405 B.R. 84 (Bankr. S.D.N.Y. 2009).[3]

---

[3] The Second Circuit affirmed the sale opinion by summary order. 2009 U.S. App LEXIS 12351, at *2 (2d Cir. 2009). The U.S. Supreme Court then denied objectors' motion for a stay of the Sale Order. *Ind. State Police Pension Trust v. Chrysler LLC (in re Chrysler LLC)*, 129 S. Ct. 2275 (2009). After the sale was consummated, the Second Circuit issued a full opinion affirming the sale opinion. *In re Chrysler LLC*, 576 F.3d 108 (2d Cir. 2009).

Mr. Wolff alleges in the Complaint, "THE DEBTORS refused to honor all of their warranty obligations, including those to PLAINTIFF. Rather THE DEBTORS began picking and choosing which obligations they would uphold and which ones they would ignore." Compl. ¶15. This allegation and others like it in the pleadings contradict the documents Mr. Wolff has cited and do not lead logically to Mr. Wolff's requested relief. Old Carco, Debtors referenced in this case, did not choose which obligations to uphold and which to ignore, nor is it a party to the Complaint. New Chrysler is not a related debtor, nor is it responsible for all of Old Carco's obligations. Old Carco and New Chrysler are distinct entities against which different claims may be asserted. Any claims against New Chrysler based upon the purchase of Old Carco's assets are limited to those liabilities assumed under the Sale Order.

After receiving the Lemon Law Notice and the Proudfoot Letter, Mr. Wolff chose to dismiss his suit against Old Carco and pursue this proceeding against New Chrysler alone. Even if the Court accepts Mr. Wolff's claims against Old Carco as alleged, those claims do not determine the outcome of his action against New Chrysler. Because New Chrysler is a separate company that paid Old Carco adequate consideration for assets under the Sale Order, New Chrysler is not liable for all claims against Old Carco. Under the authority of sections 105 and 363, the Sale Order explicitly bars claims against New Chrysler based solely on Old Carco's liability; New Chrysler's liabilities are limited to those assumed under the Sale Order. Sale Order ¶¶ 12, 35. As discussed below, the terms of the Sale Order indicate that New Chrysler did not assume Old Carco's liability as to Mr. Wolff. [4]

---

The Supreme Court granted objectors' petition for certiorari and vacated the Second Circuit judgment, remanding the case to the Second Circuit "with instructions to dismiss the appeal as moot." 130 S. Ct. 1015 (2009). Because the appeal has been dismissed as moot, the Sale Order is now final and unappealable.

[4] Mr. Wolff alleges that New Chrysler has paid other claims similar to his, pointing to *Gualtieri v. Chrysler*, a case which is not attached, cited, or summarized in any of the pleadings thus far and which the Court has not located.

*Breach of Contract Claim*

Mr. Wolff alleges that New Chrysler breached a contract with him. Under general principles of contract law, a contract typically requires a bargain, consisting of mutual manifestation of assent and mutual consideration. *Bowsher v. Merck & Co.*, 460 U.S. 824, 862 (1983) (citing Restatement (Second) of Contracts § 17 (1981)). Mr. Wolff alleges plausible facts indicating that he reached such a bargain with Old Carco through the Settlement Agreement.[5] In the absence of any alleged separate agreement between Mr. Wolff and New Chrysler, it is also necessary for him to allege that New Chrysler assumed the Settlement Agreement under the Sale Order and the Master Transaction Agreement.[6] Consequently, Mr. Wolff's breach of contract claim rises or falls not on interpretation of a private contract, but on interpretation of the Sale Order.

---

The Defendant's Opposition cites to the Declaration of Amy Benecoff to support the allegation, but the Declaration says nothing about *Gualtieri*. Regardless of whether Mr. Wolff could produce more factual support, the allegation is not material to the matter at hand: New Chrysler's assumption of certain liabilities and non-assumption of other liabilities under the Sale Order. New Chrysler may spend its financial and legal resources as it chooses; this Court only enforces those promises that New Chrysler made in connection with the Sale Order as part of the value it offered in exchange for Old Carco's assets. Classification of claims and equal treatment of claims within a class is only relevant when Mr. Wolff seeks repayment from Old Carco under the confirmed plan.

[5] Ordinarily the Court applies the choice of law standards of its forum state, New York, unless the protection of a federal policy or interest requires the application of federal common law. *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 606 (2d Cir. 2001). New York ordinarily applies the law of the jurisdiction having the greatest interest in the litigation. *Id.* at 607. The Settlement Agreement cites the California Civil Code and would resolve a California state court lawsuit. Mr. Wolff is a California resident. Interpretation of the Settlement Agreement would most logically be governed by California law. In any case, the Complaint does not allege any need to interpret the Settlement Agreement or any impact that choice of law would have on Mr. Wolff's claims. For the purposes of this Motion only, the Court assumes that the Settlement Agreement is a valid and enforceable contract between Old Carco and Mr. Wolff under any applicable law.

[6] *See* n. 5, *supra*. The Master Transaction Agreement is governed by New York law according to its terms, and the Sale Order was issued by this Court in a federal bankruptcy case in New York. New York law would most logically govern interpretation of those documents except to the extent that it is necessary to apply federal law to protect the consistency and finality of bankruptcy law. In any case, the Complaint does not allege any impact that choice of law would have on Mr. Wolff's claims related to the Sale Order and the Master Transaction Agreement. In the absence of any alternative claim in the pleadings, the Court will interpret the Sale Order and the Master Transaction Agreement based on New York law and federal law.

*Interpretation of the Sale Order*

A court has special expertise regarding the meaning of its own order, and therefore its interpretation is entitled to deference. *See Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2204, n. 4 (2009). Furthermore, "[i]f it is black-letter law that the terms of an unambiguous private contract must be enforced irrespective of the parties' subjective intent,...it is all the clearer that a court should enforce a court order, a public governmental act, according to its unambiguous terms." *Id.*

In a contract context, a court has the power to determine whether language is ambiguous as a matter of law. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86 (2d Cir. 1998). The Second Circuit has summarized the ambiguity standard for purposes of contract interpretation:

> In the past, we have defined ambiguous language as that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Conversely, language is not ambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion." The language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning." [citations omitted].
> *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992).

Although this ambiguity standard originates in the contract context, it draws on general interpretive conventions that apply with equal force to the interpretation of an order authorizing the parties to enter a contract. *See generally Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63 (2d Cir. 2002). The Sale Order controls the major terms of the Master Transaction Agreement and is a prerequisite to the effectiveness of that contract. The ambiguity or clarity of

the Sale Order with respect to New Chrysler's assumption of Lemon Law liabilities is fundamental to Mr. Wolff's claims against New Chrysler.

If the Court finds as a matter of law that New Chrysler did not assume a contract with Mr. Wolff under the plain meaning of the Sale Order, Mr. Wolff's breach of contract claim must be dismissed, regardless of any factual allegations regarding the intent of the parties or New Chrysler's payment of other claims. The Court need not consider extrinsic evidence to interpret an unambiguous order. *See Alexander & Alexander*, 136 F.3d at 86. On the other hand, if the Sale Order were ambiguous with respect to New Chrysler's assumption of Lemon Law liabilities to Mr. Wolff, the Court might require further proceedings for the parties to present evidence in order for the Court to resolve their dispute. *See Colonial Auto Ctr. v. Tomlin (in re Tomlin)*, 105 F.3d 933, 940-41 (4th Cir. 1997), *First Union Nat'l Bank v. Pictet Overseas Trust Corp.*, 477 F.3d 616, 620 (8th Cir. 2007). For the reasons set forth below, the Court finds that the Sale Order unambiguously bars Mr. Wolff's claims.

*Assumption of Lemon Law Liabilities under the Paragraph 19 of the Sale Order*

Mr. Wolff interprets the Sale Order in light of the Agreement on Changes. This reliance is correct only to the extent that the Agreement on Changes directly affected the language of the final Sale Order, which has legal effect based on its plain meaning, regardless of the intention of the parties or course of negotiations. The Ad Hoc Committee achieved the consent of Old Carco and New Chrysler to three changes to the Sale Order: inclusion of partial refunds, inclusion of settled cases, and inclusion of Magnuson Moss claims in conjunction with state breach of warranty claims. These changes protected the rights of certain Lemon Law claimants and led the Ad Hoc Committee to withdraw its objection. The changes clearly show that New Chrysler

assumed certain liabilities under the Sale Order similar in some respects to Mr. Wolff's settlement. However, the changes did not modify or create an ambiguity about the phrase, "[comma] on vehicles manufactured by the Debtors in the five years prior to the closing." This time limit is one example of the discretion exercised by New Chrysler to assume certain liabilities and exclude others based on its business judgment, in accord with the limitations of the Bankruptcy Code.

Mr. Wolff focuses on the addition of the clause, "including but not limited to cases resolved prepetition," which he interprets as an inclusion of all resolved cases in the assumed liabilities without regard for the time limit. The inclusion clause must be interpreted in the context of the full sentence, not merely as a stand-alone provision. The clause removes any ambiguity about assumption of otherwise-qualified claims by individuals who had already agreed to settlements with Old Carco. However, the clause does not affect the later time limit, which existed before the Agreement on Changes, was not modified or rendered ambiguous, and remained intact in the Sale Order. The key sentence of paragraph 19 has only one object: "liabilities under Lemon Laws." All other clauses clarify *which* liabilities New Chrysler assumes. Grammatically and logically, the time limit must relate back to the sole object of the sentence and govern all assumption of liabilities.

The determinant of whether New Chrysler assumed a Lemon Law settlement with Mr. Wolff is the consistently punctuated time limit in paragraph 19 of the Sale Order. Perhaps because "or in the future" comes immediately before "[comma] on vehicles manufactured by the Debtors in the five years prior to the Closing," Mr. Wolff argues that the time limit only applies to obligations arising in the future and not already settled obligations. At first glance, it might appear that one could justify this reading by the "rule of the last antecedent, according to which a

limiting clause or phrase. . . should ordinarily be read as modifying only the noun or phrase which it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 27-28 (2003). However, the rule of last antecedent does not control interpretation of this clause; a frequently cited grammatical corollary to the rule of last antecedent is that "use of a comma to set off a modifying phrase from other clauses indicates that the qualifying language is to be applied to all of the previous phrases and not merely the immediately preceding phrase." *United States v. Weisser*, 417 F.3d 336, 348 (2d Cir. 2005) (quoting *Elliot Coal Mining Co. v. Director, Office of Workers' Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994). The comma setting off "on vehicles manufactured by the Debtors in the five years prior to the Closing" unambiguously applies the time limit to all liabilities assumed earlier in the sentence.

A Sale Order with the effect Mr. Wolff seeks would use different language. For instance, if the Sale Order instead stated that New Chrysler would assume "liabilities for repairs, cases resolved prepetition[,] and [other] regulatory obligations arising in the future on vehicles manufactured by the Debtor in five years prior to the Closing,"[7] Mr. Wolff would have at least a plausible argument under *Barnhart* and similar cases. 540 U.S. at 27-28, *see also In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 319 (S.D.N.Y. 2008) (interpreting the phrase "all indebtedness of [Enron] . . . evidenced by debentures, notes, bonds or other securities sold by [Enron]" to mean that "sold by Enron" only modified "other securities"). The District Court found that a condition included in the last item in a list, without additional punctuation, applied only to limit that item, and not the earlier list items. However, the District Court also noted that the rule of last antecedent only applies "where no contrary intention appears." *Id.* Regarding the Sale Order, paragraph 19 clearly expresses a contrary intention, according to the grammatical

---

[7] The bracketed words in the hypothetical are optional and might give rise to unrelated interpretive issues. The point of emphasis is the list structure and the scope of the final phrase.

corollary to the rule of last antecedent. *Weisser*, 417 F.3d at 348. Paragraph 19 always concluded its list of assumed liabilities with the separate phrase, "[comma] on vehicles manufactured by the Debtors in the five years prior to the Closing," which applies a time limit to the assumption of Lemon Law liabilities. According to Mr. Wolff's allegations, no one ever sought or agreed to different language or punctuation in *this* portion of paragraph 19. The insertion of additional language earlier in the sentence ought not to cloud a clear condition that pre-dated that addition and was not modified by it.

Mr. Wolff's factual allegations, including those raised subsequent to the Complaint, are insufficient to overcome the plain meaning of paragraph 19 of the Sale Order. At the hearing on the Motion, Mr. Wolff asked the Court to add the comma between "prepetition" and "or in the future," which was included in the Agreement on Changes but not contained in the Sale Order. Mr. Wolff argues that the Ad Hoc Committee's withdrawal of its objection required the exact language of the Agreement on Changes, including the comma. Mr. Wolff further argues that the comma separation could narrow the five-year limit to "[regulatory obligations under such Lemon Laws arising] in the future," distinguishing those obligations from "regulatory obligations under such Lemon Laws arising now, including . . . cases resolved prepetition," which would have no time limit. The absence of the comma before "or in the future" may be a clerical error, but it is unnecessary to determine whether a clerical error correction is warranted, because the comma is not material to the Complaint's allegations. Additional commas in the sentence would not create the distinction that Mr. Wolff asks the Court to find in the Sale Order, because commas do not have the effect of periods or semicolons. The structure of the sentence unambiguously applies the time limit to the assumption of any Lemon Law liability, regardless of the inclusion of the variant comma.

In further support of an interpretation of paragraph 19 under which New Chrysler assumed a Lemon Law liability to him, Mr. Wolff has supplied a declaration from Amy Benecoff, counsel for the Ad Hoc Committee. She understands that counsels for the Ad Hoc Committee, Old Carco, and New Chrysler "intended . . . that New Chrysler . . . would recognize, honor any [sic] pay all cases resolved prepetition regardless of the age of the vehicle, and that the five-year cut-off applied only to new lemon law claims brought after the petition date and cases that were unresolved prior to the petition date." Pl.'s Opp., Ex. C, ¶4. This declaration aligns with the Complaint's assertion that "it is clear from the exchange among the attorneys attached hereto as Exhibit 3 that the parties intended that THE DEBTORS assume and honor all the settlements in all cases resolved prepetition." Compl. ¶ 21. While the Complaint mistakenly refers to "THE DEBTORS" rather than New Chrysler, the Court understands from the context of the pleadings that Mr. Wolff alleges that the parties intended for New Chrysler to assume such settlements. However, the alleged intent of the parties is not material to interpretation of this unambiguous court order.

Even if the Court were to consider extrinsic evidence as alleged in search of ambiguity, none of Mr. Wolff's allegations would result in the Court finding any ambiguity in the Sale Order. In contrast to the detailed Sale Order, the emails among the Ad Hoc Committee, Old Carco, and New Chrysler are brief and simply demonstrate intent to agree to the language that became part of the Sale Order, while the Declaration of Amy Benecoff expresses a conclusory legal opinion unsupported by specific reference to the language of the Sale Order. One way to achieve the Ad Hoc Committee's alleged intention would have been to write separate sentences about the treatment of settled claims and unsettled claims. Another choice would have been to add language within the sentence explicitly stating that New Chrysler's obligations included

settled cases regardless of date of manufacture, but excluded unsettled obligations on vehicles manufactured in the last five years. The Sale Order did not include these terms, yet now counsel for the Ad Hoc Committee, who had the opportunity to suggest different language, and Mr. Wolff, who did not participate in the negotiations although he was on notice that Old Carco had filed a bankruptcy petition, assert that all parties intended for a time limit to apply to the assumption of some liabilities but not others. Such assertion is made without any grammatical theory regarding the structure of the sentence at issue and does not render the Sale Order ambiguous.

New Chrysler assumed only specific Lemon Law liabilities from Old Carco under the Sale Order, and Mr. Wolff's claim falls outside the specified time limit. A ruling that the time limit only related to some preceding clauses in the same sentence would upset standard commercial expectations based on standard English grammar. The length of the sentence, the variant comma before "or in the future," and the intention of certain parties to the negotiation do not create ambiguity or override the plain meaning of the Sale Order. New Chrysler did not assume a contract with Mr. Wolff under paragraph 19 of the Sale Order and, therefore, could not have breached such a contract.

*Assumption of Incentive Programs under the Master Transaction Agreement*

Mr. Wolff further alleges that the settlement agreement was an incentive program that New Chrysler assumed as an executory contract under the Master Transaction Agreement as authorized by the Sale Order. Even within the Master Transaction Agreement, this allegation is incompatible with the plain meaning of "incentive program." The phrase Mr. Wolff relies on from the Master Transaction Agreement, "incentive programs offered to dealers and consumers,"

clearly describes car manufacturer programs that encourage transactions between dealers and customers by offering cash bonuses or attractive financing terms on car purchases. *See generally Chrysler Credit Corp. v. J. Truett Payne, Inc.*, 607 F.2d 1133 (5th Cir. 1979) (discussing such a program in an unrelated matter). Incentive programs are designed to incentivize new sales, not to resolve issues that arise based on past sales. The plain meaning of the language opposes Mr. Wolff's interpretation, which is a bare assertion of a legal conclusion unsupported by plausible factual allegations.

Additionally, there is no need to define New Chrysler's assumption of Lemon Law liabilities based on the Master Transaction Agreement's incentive program provision when the Sale Order treats Lemon Law liabilities. The Supreme Court has stated, "a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 63 (1995). The Sale Order incorporates the Master Transaction Agreement, "subject to the terms and conditions of this Sale Order to the extent of any express conflict herewith." Sale Order ¶4. The Sale Order provides specifically for Lemon Law liabilities, with a limit based on date of manufacture. The Master Transaction Agreement provides generally for incentive program liabilities, without a limit based on date of manufacture. "[I]t is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (quoting Restatement (Second) of Contracts § 203(c) (1981)). No reasonable interpreter of the Sale Order and Master Transaction Agreement would stretch the definition of "incentive program" to describe Lemon Law settlements already addressed more specifically in the Sale Order and render irrelevant the time limit in the more specific and authoritative provision. The provisions have independent and non-contradictory effects only if

20

one separates incentive programs from Lemon Law liabilities; the language of the Sale Order unambiguously provides these distinct treatments, and this Court must enforce them.

*Due Process and Challenges to the Sale Order*

Mr. Wolff alleges in the alternative, if the Court does not find that New Chrysler assumed an obligation to him under the Sale Order, that New Chrysler *should have* assumed an obligation to him.[8] He bases his request on the Bankruptcy Code (Compl. ¶ 30) and due process (Compl. ¶ 28), arguing that New Chrysler "is required to assume" a liability to him or that a Sale Order under which New Chrysler does not assume a liability to him is fundamentally unfair. Putting aside the issue of the timeliness of such assertions, these arguments are without merit; the Complaint's factual allegations do not support a legal claim that the Sale Order was unfair or otherwise must be modified. Instead, the Complaint asserts objections to the Sale Order that are similar to those that this Court overruled in the opinion accompanying the Sale Order. *See Chrysler*, 405 B.R. at 111. For purposes of clarity and completeness, the Court will summarize the reasons that such objections were overruled at that time and still must be overruled on this Complaint.

Mr. Wolff requests modification of the Sale Order based on due process concerns possibly related to the speed of the sale, but his legal argument would not have prevailed even had he made a timely objection before entry of the Sale Order. Other parties filed conceptually similar objections to the Sale Order, many of which Old Carco and New Chrysler resolved through negotiations, including the Ad Hoc Committee's Objection. This Court overruled all other objections because the sale complied with applicable law and provided the best available

---

[8] Mr. Wolff's initial complaint emphasized this allegation, while the amended Complaint places less emphasis on it but still makes related allegations. *See* Compl. ¶ 19, 28-31, 46-47, 55.

prospect of recoveries for creditors of Old Carco. *See generally Chrysler*, 405 B.R. 84.

Adequate notice of the bankruptcy and the sale and opportunity to be heard were provided to

claimants. *Id.* at 109-12. The circumstances of the bankruptcy necessitated the form of the sale;

Old Carco could not meet all of its obligations and was rapidly losing value, New Chrysler was

the only bidder for Old Carco's assets, and New Chrysler would not make its value-adding bid if

it was required to assume all of Old Carco's liabilities. *Id.* at 96-98. The sale was a justifiable

business decision by the Debtors with authorization from the Court. *Id.* at 96. The sale was not

a plan of reorganization, did not implicate plan requirements such as section 1123, and complied

with bankruptcy sale requirements including section 363. *Id.* at 94-96. The purpose of the sale

was not to effect a plan of reorganization and set distributions to classes of claimants, but to

maximize the value of the estate and support the best possible recoveries under a separately

confirmed plan. *Id.* The sale did not discharge any liabilities; instead, it left some liabilities as

obligations of Old Carco for resolution under a plan.

 Although Mr. Wolff has not specified which sections of the Bankruptcy Code he believes

the Sale Order or New Chrysler's actions violated, his counsel argued at the hearing on the

Motion, "these claimants that are in the same class cannot be treated differently for the

bankruptcy to be fair and reasonable under the Bankruptcy Code." This argument does not apply

correct legal principles. Mr. Wolff is not seeking relief as a claimant or a class member against

Debtor Old Carco in this proceeding; the Complaint seeks payment in satisfaction of a contract

that New Chrysler allegedly should have assumed under the Sale Order. This allegation must be

dismissed because Mr. Wolff has not formed a legal argument that New Chrysler was obliged to

assume *any* Lemon Law liabilities, that any correction to the Sale Order is necessary under

Federal Rule of Civil Procedure 60(a), or that he has grounds for relief from the Sale Order under Federal Rule of Civil Procedure 60(b).

The history of this bankruptcy and the pleadings indicate no legal theory under which New Chrysler could be a successor to Old Carco or be bound to assume all of Old Carco's liabilities. Mr. Wolff challenges the sale process on a general level, but absent New Chrysler's involvement in this case, Old Carco would have been in no better position to pay Mr. Wolff's claim than it is now. *See Chrysler*, 405 B.R. at 97 (noting that a liquidation of Old Carco rather than a sale would have generated less value and there were no competing offers for Old Carco's assets). Within certain limitations not relevant to this case, New Chrysler was free to apply its business judgment to assume certain liabilities and not others. *See id.* at 99, n. 18 ("New Chrysler has determined that, to effectively carry on its business, it should take over certain other of the Debtors' obligations. Any such assumption of liability reflects the purchaser's business judgment, the effect of which does not constitute a *sub rosa* plan because the obligation is negotiated directly with the counterparty."). On notice and hearing, after extensive negotiations, the Sale Order provided for a sale free and clear of liabilities other than those New Chrysler had agreed to assume. New Chrysler paid fair consideration for Old Carco assets and assumed certain liabilities, including Lemon Law liabilities only on vehicles manufactured by Old Carco within five years of the Closing. There exists no legal basis for this Court to compel New Chrysler to assume liability to Mr. Wolff.

*Promissory Estoppel Claim*

New York law applies the promissory estoppel standard of section 90 of the Restatement of Contracts: "[t]he elements of a claim for promissory estoppel are 'a clear and unambiguous

promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and an injury sustained by the party asserting the estoppel by reason of his reliance.'" *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 264 (2d Cir. 1984) (citing *Ripple's of Clearview, Inc. v. LeHavre Assoc.*, 452 N.Y.S.2d 447, 449 (N.Y. App. Div. 1982).[9] Promissory estoppel creates a binding promise under circumstances in which the parties did not agree to a standard contract with a bargained exchange of consideration, but justice still demands the enforcement of a promise. *See Merex A.G. v. Fairchild Weston Sys.*, 29 F.3d 821, 824 (2d Cir. 1994).

Mr. Wolff's promissory estoppel claim is functionally identical to his breach of contract claim; the performance he rendered and the performance he seeks are the same that the Settlement Agreement requires and he does not allege any independent promises by New Chrysler. As a result, promissory estoppel does not apply and the proper treatment of this case is under the standard contract theory discussed above. *See Merex*, 29 F.3d at 824. If New Chrysler had promised to pay Mr. Wolff, New Chrysler's promise would have been given in exchange for Mr. Wolff's promise to dismiss his lawsuit, creating a standard contract.

Even if the Court were to treat Mr. Wolff's factual allegations under a promissory estoppel theory, those allegations are legally insufficient for the same reasons that they were legally insufficient under a breach of contract theory. Prior to Mr. Wolff's withdrawal of his California lawsuit, New Chrysler declined on multiple occasions to assume or create any obligation to Mr. Wolff because his vehicle was manufactured more than five years prior to the Closing. Since New Chrysler did not assume Old Carco's contract with Mr. Wolff under the Sale

---

[9] The Court does not make a determination of choice of law at this time because there is no request in the pleadings for a particular choice of law and the deficiencies of Mr. Wolff's promissory estoppel claim are fundamental under the law of any state. The standard does not differ significantly under California law. *See Rosal v. First Federal Bank of California*, 671 F. Supp. 2d 1111, 1130 (N.D. Cal. 2009) (stating the same set of factors, but treating reliance as a separate factor from reasonability and foreseeability).

Order and Mr. Wolff makes no further allegations of a New Chrysler promise to him, it is clear that New Chrysler did not promise to pay Mr. Wolff to settle his case against Old Carco.

Furthermore, after New Chrysler clearly had not promised to pay Mr. Wolff, his alleged reliance on the existence of such a promise was not reasonable and foreseeable. The Proudfoot Letter and the Lemon Law Notice correctly quote and apply the Sale Order to state that the option to assert his Old Carco claim against New Chrysler is not available to Mr. Wolff. After receipt of this information, there was no reason for Mr. Wolff to dismiss his suit against Old Carco with the expectation that New Chrysler would pay him. Regardless of Mr. Wolff's view as to New Chrysler's contractual obligation to him under the Sale Order and the Settlement Agreement, he was notified that New Chrysler did not promise to pay him. Mr. Wolff has acted according to a different interpretation of the Sale Order from New Chrysler's interpretation, not in reasonable and foreseeable reliance on a clear promise by New Chrysler. If he had any remedy, it would be in breach of contract, not promissory estoppel.

## CONCLUSION

The Court finds that Mr. Wolff's Complaint fails to state a claim upon which relief can be granted. The Court has no alternative but to enforce the Sale Order as unambiguously written to exclude any liability from New Chrysler to Mr. Wolff. Mr. Wolff's allegations concerning the intent of the parties and promises Old Carco made to him do not suffice to state claims against New Chrysler. The breach of contract claim must be dismissed because Mr. Wolff's allegation that New Chrysler assumed a contract with him is a legal conclusion unsupported by his factual allegations and the unambiguous plain meaning of the Sale Order. The promissory estoppel claim must be dismissed because Mr. Wolff's allegation that New Chrysler promised to pay him

and he reasonably relied on such a promise is a legal conclusion unsupported by his factual allegations and the unambiguous plain meaning of the Sale Order.

For the reasons stated above, the motion to dismiss filed by New Chrysler is granted in its entirety. New Chrysler is directed to settle an order consistent with this opinion.

Dated: New York, New York
     July 30, 2010

                           **s/Arthur J. Gonzalez**
                           CHIEF UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 8

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the District of Arizona.

**The completed cover sheet must be printed directly to PDF and filed as an attachment to the Complaint or Notice of Removal.**

**Plaintiff**(s):   **Mark Myers ; Jenni Myers**

County of Residence: Maricopa

County Where Claim For Relief Arose: Maricopa

Plaintiff's Atty(s):

**G. Lynn Shumway**
**Shumway Law PLLC**
**4647 N. 32nd Street, Suite 125**
**Phoenix, Arizona  85018**
**602-795-3720**

**E. Todd Tracy**
**The Tracy Law Firm**
**4701 Bengal Avenue**
**Dallas, Texas  75235**
**214-324-9000**

**Andrew G. Counts**
**The Tracy Law Firm**
**4701 Bengal Street**
**Dallas, Texas  75235**
**214-324-9000**

**Defendant**(s): **FCA US LLC, a Delaware limited liability company**

County of Residence: Outside the State of Arizona

Defendant's Atty(s):

**Curtis J. Busby**
**Bowman and Brooke LLP**
**2901 North Central Avenue, Suite 1600**
**Phoenix, Arizona  85012**
**602-643-2300**

**Daniel B. Goldman**
**Bowman and Brooke LLP**
**2901 North Central Avenue, Suite 1600**
**Phoenix, Arizona  85012**
**602-643-2300**

---

### REMOVAL FROM MARICOPA COUNTY, CASE #CV2020-000674

<u>II. Basis of Jurisdiction</u>:                **4. Diversity (complete item III)**

<u>III. Citizenship of Principal Parties</u>
**(Diversity Cases Only)**
                                   Plaintiff:- **1 Citizen of This State**
                                   Defendant:- **2 Citizen of Another State**

<u>IV. Origin</u> :                        **2. Removed From State Court**

<u>V. Nature of Suit</u>:                    **355 Motor Vehicle Product Liability**

<u>VI.Cause of Action</u>:                   **Removal is made on the basis of diversity of citizenship, pursuant to 28 U.S.C. § 1332(a) and is, therefore, an action that may be removed pursuant to 28 U.S.C. § 1441(a).**

<u>VII. Requested in Complaint</u>
                            Class Action: **No**
                            Dollar Demand:
                            Jury Demand: **Yes**

<u>VIII. This case</u> **is not related** to another case.

---

**Signature:  /s/Curtis J. Busby**

**Date:**  02/13/2020

**If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, save this form as a PDF and include it as an attachment to your case opening documents.**

Revised: 01/2014

# EXHIBIT 9

# SUPPLEMENTAL CIVIL COVER SHEET
# FOR CASES REMOVED FROM ANOTHER JURISDICTION

This form must be attached to the Civil Cover Sheet at the time
the case is filed in the United States District Clerk's Office

Additional sheets may be used as necessary.

1. **Style of the Case:**
   Please include all Plaintiff(s), Defendant(s), Intervenor(s), Counterclaimant(s), Crossclaimant(s) and Third Party Claimant(s) still remaining in the case and indicate their party type. Also, please list the attorney(s) of record for each party named and include their bar number, firm name, correct mailing address, and phone number (including area code).

| Party | Party Type | Attorney(s) |
|---|---|---|
| Mark Myers and Jenni Myers | Plaintiffs | G. Lynn Shumway (011714)<br>Shumway Law PLLC<br>4647 N. 32nd Street, Suite 125<br>Phoenix, Arizona 85018<br>Tel: 602-795-3720<br>Email: shumway@carsafetylaw.com |
| FCA US LLC, a Delaware limited liability company | Defendant | Curtis J. Busby (019415)<br>Daniel B. Goldman (033570)<br>Bowman and Brooke LLP<br>2901 N. Central Avenue, Suite 1600<br>Phoenix, Arizona 85012<br>Tel: 602-643-2300<br>Email: curtis.busby@bowmanandbrooke.com<br>daniel.goldman@bowmanandbrooke.com |
| Joe Price, individually and doing business as Price Car Company | Defendant | Joe Price<br>1809 N. Sundial<br>Mesa, Arizona 85205<br>Tel: 602-809-7200<br>(Pro Per) |

2. **Jury Demand:**
   Was a Jury Demand made in another jurisdiction?   Yes ⬤   No ◯
   If "Yes," by which party and on what date?

   Plaintiffs Mark Myers and Jenni Myers                                       01/10/2020

3. **Answer:**
   Was an Answer made in another jurisdiction?   Yes ⬤   No ◯
   If "Yes," by which party and on what date?

   Defendant Joe Price, individually and doing business as Price Car Company      02/03/2020

**4.    Served Parties:**

The following parties have been served at the time this case was removed:

| Party | Date Served | Method of Service |
|---|---|---|
| Joe Price, individually and doing business as Price Car Company | 01/13/2020 | Service of Process |
| FCA US LLC | 01/14/2020 | Service of Process |
| | | |

**5.    Unserved Parties:**

The following parties have not been served at the time this case was removed:

| Party | Reason Not Served |
|---|---|
| | |
| | |
| | |

**6.    Nonsuited, Dismissed or Terminated Parties:**

Please indicate changes from the style of the papers from another jurisdiction and the reason for the change:

| Party | Reason for Change |
|---|---|
| | |
| | |
| | |

**7.    Claims of the Parties:**

The filing party submits the following summary of the remaining claims of each party in this litigation:

| Party | Claims |
|---|---|
| Plaintiffs Mark Myers and Jenni Myers | Negligence and Product Liability; Negligence |
| | |
| | |

**Pursuant to 28 USC § 1446(a) a copy of all process, pleadings, and orders served in another jurisdiction (State Court) shall be filed with this removal.**

# EXHIBIT 10

**In the Superior Court of the State of Arizona**

**In and For the County of** Maricopa

( 

# CV2020-000674

**CIVIL COVER SHEET- NEW FILING ONLY**
(Please Type or Print)

Plaintiff's Attorney G. Lynn Shumway

Attorney Bar Number 011714

Is Interpreter Needed? ☐ Yes ☐ No

If yes, what language(s):

CLERK OF THE SUPERIOR COURT
FILED
JAN 1 0 2020   3:46pm
R. Marino, Deputy

Plaintiff's Name(s): (List all)    Plaintiff's Address:    Phone #:    Email Address:

Mark Myers and Jenni Myers c/o Shumway Law PLLC, 4647 N. 32nd St, Ste 125, Phoenix, AZ 85018 (602) 795-3720

shumway@carsafetylaw.com

(List additional Plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s): (List All)

FCA US, LLC, Arizona Fleet Services, Joe Price and Joe Price d/b/a Price Car Company

(List additional Defendants on page two and/or attach a separate sheet)

## RULE 26.2 DISCOVERY TIER OR MONETARY RELIEF CLAIMED:

**IMPORTANT: Any case category that has an asterisk (\*) MUST have a dollar amount claimed or Tier selected.** State the monetary amount in controversy or place an "X" next to the discovery tier to which the pleadings allege the case would belong under Rule 26.2.

☒ Amount Claimed $ over $300,000      ☐ Tier 1   ☐ Tier 2   ☒ Tier 3

## NATURE OF ACTION

Place an "X" next to the **one** case category that most accurately describes your primary case. **Any case category that has an asterisk (\*) MUST have a dollar amount claimed or Tier selected as indicated above.**

## 100 TORT MOTOR VEHICLE:

☐ 101 Non-Death/Personal Injury\*

☐ 102 Property Damage\*

☐ 103 Wrongful Death\*

## 110 TORT NON-MOTOR VEHICLE:

- [ ] 111 Negligence*
- [ ] 112 Product Liability – Asbestos*
- [ ] 112 Product Liability – Tobacco*
- [x] 112 Product Liability – Toxic/Other*
- [ ] 113 Intentional Tort*
- [ ] 114 Property Damage*
- [ ] 115 Legal Malpractice*
- [ ] 115 Malpractice – Other professional*
- [ ] 117 Premises Liability*
- [ ] 118 Slander/Libel/Defamation*
- [ ] 116 Other (Specify) _____ *

## 120 MEDICAL MALPRACTICE:

- [ ] 121 Physician M.D.*
- [ ] 122 Physician D.O*
- [ ] 123 Hospital*
- [ ] 124 Other*

## 130 & 197 CONTRACTS:

- [ ] 131 Account (Open or Stated)*
- [ ] 132 Promissory Note*
- [ ] 133 Foreclosure*
- [ ] 138 Buyer-Plaintiff*
- [ ] 139 Fraud*
- [ ] 134 Other Contract (i.e. Breach of Contract)*
- [ ] 135 Excess Proceeds-Sale*
- [ ] Construction Defects (Residential/Commercial)*
  - [ ] 136 Six to Nineteen Structures*
  - [ ] 137 Twenty or More Structures*
- [ ] 197 Credit Card Debt (Maricopa County Only)*

## 150-199 OTHER CIVIL CASE TYPES:

- [ ] 156 Eminent Domain/Condemnation*
- [ ] 151 Eviction Actions (Forcible and Special Detainers)*
- [ ] 152 Change of Name
- [ ] 153 Transcript of Judgment
- [ ] 154 Foreign Judgment

- [ ] 158 Quiet Title*
- [ ] 160 Forfeiture*
- [ ] 175 Election Challenge
- [ ] 179 NCC-Employer Sanction Action (A.R.S. §23-212)
- [ ] 180 Injunction against Workplace Harassment
- [ ] 181 Injunction against Harassment
- [ ] 182 Civil Penalty
- [ ] 186 Water Rights (Not General Stream Adjudication)*
- [ ] 187 Real Property *
- [ ] Special Action against Lower Courts
  (See Lower Court Appeal cover sheet in Maricopa)
- [ ] 194 Immigration Enforcement Challenge
  (A.R.S. §§1-501, 1-502, 11-1051)

## 150-199 UNCLASSIFIED CIVIL:

- [ ] Administrative Review
  (See Lower Court Appeal cover sheet in Maricopa)
- [ ] 150 Tax Appeal
  (All other tax matters must be filed in the AZ Tax Court)
- [ ] 155 Declaratory Judgment
- [ ] 157 Habeas Corpus
- [ ] 184 Landlord Tenant Dispute – Other*
- [ ] 190 Declaration of Factual Innocence (A.R.S. §12-771)
- [ ] 191 Declaration of Factual Improper Party Status
- [ ] 193 Vulnerable Adult (A.R.S. §46-451)*
- [ ] 165 Tribal Judgment
- [ ] 167 Structured Settlement (A.R.S. §12-2901)
- [ ] 169 Attorney Conservatorships (State Bar)
- [ ] 170 Unauthorized Practice of Law (State Bar)
- [ ] 171 Out-of-State Deposition for Foreign Jurisdiction
- [ ] 172 Secure Attendance of Prisoner
- [ ] 173 Assurance of Discontinuance
- [ ] 174 In-State Deposition for Foreign Jurisdiction
- [ ] 176 Eminent Domain-- Light Rail Only*
- [ ] 177 Interpleader-- Automobile Only*
- [ ] 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- [ ] 183 Employment Dispute- Discrimination*

☐ 185 Employment Dispute-Other*                    ☐ 163 Other*

☐ 196 Verified Rule 45.2 Petition                  _____

☐ 195(a) Amendment of Marriage License                         (Specify)

☐ 195(b) Amendment of Birth Certificate


## EMERGENCY ORDER SOUGHT

☐ Temporary Restraining Order    ☐ Provisional Remedy    ☐ OSC    ☐ Election Challenge

☐ Employer Sanction    ☐ Other (Specify)_____


## COMMERCIAL COURT (Maricopa County Only)

☐ This case is eligible for the Commercial Court under Rule 8.1, and Plaintiff requests assignment of this case to the Commercial Court. More information on the Commercial Court, including the most recent forms, are available on the Court's website at:

https://www.superiorcourt.maricopa.gov/commercial-court/.


**Additional Plaintiff(s):**

_____

_____


**Additional Defendant(s):**

_____

_____


© Superior Court of Arizona in Maricopa County       Page 3 of 3       CV10f - 010119
ALL RIGHTS RESERVED

COPY



JAN 1 0 2020

CLERK OF THE SUPERIOR COURT
R. MERINO
DEPUTY CLERK

1   G. Lynn Shumway (011714)
    shumway@carsafetylaw.com
2   SHUMWAY LAW PLLC
    4647 N. 32nd Street, Suite 125
3   Phoenix, Arizona 85018
    Telephone : 602.795.3720
4   Facsimile : 602.795.3728

5

6   E. Todd Tracy, Texas SBN 20178650 *(Pro Hav Vice pending)*
    Andrew G. Counts, Texas SBN 24036408 *(Pro Hac Vice pending)*
7   THE TRACY LAW FIRM
    4701 Bengal Street
8   Dallas, Texas 75235
    (214) 324-9000
9   Fax: (972) 387-2205
    etoddtracy@vehiclesafetyfirm.com
10  acounts@vehiclesafetyfirm.com

11  *Attorneys for Plaintiff*

12

13          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

14              IN AND FOR THE COUNTY OF MARICOPA

15  MARK MYERS AND JENNI MYERS,

16              Plaintiff,                     No. CV2020-000674

17
        vs.
18
19  FCA US LLC,  a Delaware limited liability        **PLAINTIFFS' DEMAND**
    company;                                          **FOR JURY TRIAL**
20  ARIZONA FLEET SERVICES, a domestic
    corporation; JOE PRICE, individually, and
21  JOE PRICE d/b/a PRICE CAR COMPANY
    a domestic corporation,
22
23              Defendants.

24

25          Pursuant to Rule 38(b), Arizona Rules of Civil Procedure, Plaintiffs, by and through

26  counsel undersigned, hereby demands a trial by jury in this matter.

27  ///

28  ///

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

1

DATED this 10 day of January, 2020.

SHUMWAY LAW PLLC

G. Lynn Shumway
4647 N. 32nd Street
Suite 125
Phoenix, Arizona 85018

and

E. Todd Tracy, Texas SBN 20178650
*(Pro Hav Vice pending)*
Andrew G. Counts, Texas SBN 24036408
*(Pro Hac Vice pending)*
**THE TRACY LAW FIRM**

*Attorneys for Plaintiffs*

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

1  G. Lynn Shumway (011714)
   shumway@carsafetylaw.com
2  SHUMWAY LAW PLLC
   4647 N. 32nd Street, Suite 125
3  Phoenix, Arizona 85018
   Telephone : 602.795.3720
4  Facsimile : 602.795.3728

5
   E. Todd Tracy, Texas SBN 20178650 *(Pro Hav Vice pending)*
6  Andrew G. Counts, Texas SBN 24036408 *(Pro Hac Vice pending)*
7  THE TRACY LAW FIRM
   4701 Bengal Street
8  Dallas, Texas 75235
   (214) 324-9000
9  Fax: (972) 387-2205
   etoddtracy@vehiclesafetyfirm.com
10 acounts@vehiclesafetyfirm.com

11 *Attorneys for Plaintiff*

12

13          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

14             IN AND FOR THE COUNTY OF MARICOPA

15 MARK MYERS AND JENNI MYERS,

16              Plaintiff,                    CV2020-000674

17                                    No. _____
18     vs.

19 FCA US LLC, a Delaware limited liability
   company;                                  CERTIFICATE OF
20 ARIZONA FLEET SERVICES, a domestic    COMPULSORY ARBITRATION
   corporation; JOE PRICE, individually, and
21 JOE PRICE d/b/a PRICE CAR COMPANY
   a domestic corporation,
22
23              Defendants.

24
25
26          Plaintiffs, by and through counsel undersigned, certify this action is <u>not</u> subject to

27 compulsory arbitration pursuant to Arizona Rule of Civil Procedure 72(b), in that this case

28 exceeds the limit by local rule for compulsory arbitration.

                                        1

DATED this 10 day of January, 2020.

SHUMWAY LAW PLLC

G. Lynn Shumway
4647 N. 32nd Street
Suite 125
Phoenix, Arizona 85018

and

E. Todd Tracy, Texas SBN 20178650
*(Pro Hav Vice pending)*
Andrew G. Counts, Texas SBN 24036408
*(Pro Hac Vice pending)*
**THE TRACY LAW FIRM**

*Attorneys for Plaintiffs*

1  G. Lynn Shumway (011714)
   shumway@carsafetylaw.com
2  SHUMWAY LAW PLLC
3  4647 N. 32nd Street, Suite 125
   Phoenix, Arizona 85018
4  Telephone : 602.795.3720
   Facsimile : 602.795.3728
5
6  E. Todd Tracy, Texas SBN 20178650 *(Pro Hav Vice pending)*
   Andrew G. Counts, Texas SBN 24036408 *(Pro Hac Vice pending)*
7  THE TRACY LAW FIRM
   4701 Bengal Street
8  Dallas, Texas 75235
   (214) 324-9000
9  Fax: (972) 387-2205
   etoddtracy@vehiclesafetyfirm.com
10 acounts@vehiclesafetyfirm.com

11 *Attorneys for Plaintiff*

12

13                IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

14                   IN AND FOR THE COUNTY OF MARICOPA

15 MARK MYERS AND JENNI MYERS,

16                   Plaintiff,                    CV2020-000674

17                                        No. _____
   vs.
18

19 FCA US LLC, a Delaware limited liability         **COMPLAINT**
   company;
20 ARIZONA FLEET SERVICES, a domestic
   corporation; JOE PRICE, individually, and     (Tort: Products Liability)
21 JOE PRICE d/b/a PRICE CAR COMPANY
22 a domestic corporation,                            Tier 3

23                   Defendants.

24

25      Plaintiffs, Mark Myers and Jenni Myers, for his complaint, allege the following:

26
27      1.      Plaintiffs Mark Myers and Jenni Myers are married. They reside in and are citizens

28 of Keller, Texas.

COPY

JAN 1 0 2020
CLERK OF THE SUPERIOR COURT
R. MERINO
DEPUTY CLERK

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

1

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

2.    Defendant FCA US LLC is an entity formerly known as Chrysler Group LLC, incorporated in Delaware, with its principal place of business in Auburn Hills, Michigan. Defendant's sole member is FCA North American Holdings, LLC, an entity incorporated in Delaware with its principal place of business in New York. FCA North America Holding LLC's sole member is Fiat Chrysler Automobiles N.V., a publicly traded company incorporated in the Netherlands with it principal place of business in London. Service of process upon this Defendant may be had by serving its registered agent for service, CT Corporation System, at 3800 N. Central Avenue, Suite 460, Phoenix, Arizona 85012.

3.    Defendant Arizona Fleet Services is a domestic corporation doing business in Arizona and service of process upon this Defendant may be had by serving its registered agent for service, Austin Oliver at 7059 West Festival Way, Tucson, AZ 85755.

4.    Defendant Joe Price is an individual who resides in and is a citizen of the state of Arizona, and service or process may be had by serving him at his residence, 1809 N. Sundial, Mesa, AZ 85205, or wherever he may be found.

5.    Defendant Joe Price d/b/a Price Car Company is a domestic corporation doing business in Arizona and service of process upon this Defendant may be had by serving its Owner, Joe Price at 1809 N. Sundial, Mesa, AZ 85205, or wherever he may be found.

## ASSUMED AND COMMON NAMES

6.    Plaintiffs hereby give notice that all defendants are being sued in all of their business or common names regardless of whether such businesses are partnerships, unincorporated associations, individuals, entities, or private corporations.

2

7. On or about January 12, 2018, Mark Myers was a driving a 2002 Jeep Wrangler (VIN#1J4FA39SX2P748885) ("subject vehicle") traveling eastbound on SH105, near CR 2305 in Liberty County, Texas, when another vehicle collided head-on with Plaintiff Mark Myers.

8. The subject vehicle was designed by Defendant FCA or its predecessor.

9. The subject vehicle was manufactured by Defendant FCA or its predecessor.

10. The subject vehicle was also assembled and tested by Defendant FCA or its predecessor.

11. Even if Defendant FCA did not design, manufacture, assemble, or test the subject vehicle, Defendant FCA has agreed to assume all such liabilities.

12. Prior to the subject accident, the other Defendants performed certain repairs/maintenance/inspection to or of the subject vehicle.

13. It is an imprudent and negligent act for someone to place cars on the market for sale if the vehicle's safety systems are not all properly functional.

14. The Defendants either knew or should have known this.

15. Defendants were negligent in many ways, including in the inspection of the subject vehicle. Defendants were also negligent in failing to advise the Plaintiffs that the subject vehicle had suffered extensive damage.

16. Defendants' negligence was the cause of Plaintiff Mark Myers' injuries and Plaintiffs' damages.

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

3

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

17.   The negligence of Defendants was inherently undiscoverable until an accident occurred, and Plaintiffs had no objective knowledge of any actionable conduct until after the accident.

18.   The negligence was essentially undetectable, inherently dormant, characterized by prolonged latency, and no immediate injury manifested itself to alert Plaintiffs until after the accident.

19.   At the time of the accident, Mark Myers was properly seated and properly wearing the available seat belt.

20.   However, despite being properly seated and properly wearing the available seat belt, Mark Myers sustained serious injuries when the vehicle failed to protect him because it violated several crashworthiness principles.

21.   There are five (5) recognized crashworthiness principles in the automobile industry/throughout the world.  They are as follows:

    1.    Maintain survival space;

    2.    Provide proper restraint throughout the entire accident;

    3.    Prevent ejection;

    4.    Distribute and channel energy; and

    5.    Prevent post-crash fires.

22.   When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design,

4

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

construction, or performance of motor vehicles and is also protected against unreasonable risk of death or injury in the event crashes do occur."

23.   The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

24.   Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails. For example, in a rollover, if the roof collapses such that no survival space is left, it does not matter what kind of restraint system, glass, fuel system, or energy absorbing system is used, because these systems have been rendered moot.

25.   Vehicle manufacturers have known for decades and have admitted under oath that there is a distinction between the cause of the accident versus the cause of an injury.

26.   Indeed, vehicle manufacturers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death following an accident through the use of a vehicle's various safety systems.

27.   Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

28.   General Motors has stated in the past that, "The rich don't deserve to be safe. . . . Isn't it time we realized safety is not just for the pampered and the privileged?  Safety is for all."

5

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602-795-3720 ◆ 602-795-3728 Fax

1   29.   Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle

2   by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero

3   injuries and fatalities are basically known today – it is a matter of how to apply, finance,

4   distribute and activate."

5

6   30.   Because every American has the right to a safe vehicle, because safety is for all, and

7   because technologies for meeting the goal of zero injuries and fatalities are basically known

8   today, it is incumbent upon auto manufacturers to investigate and find out what other

9   automakers are doing with regards to safety and to apply those same methods or technology

10  to their own vehicle.

11

12  31.   Furthermore, an automaker cannot choose to use safer technology in Europe,

13  Australia, Japan, or some other country and refuse or fail to offer that same safety technology

14  to consumers in America.

15

16  32.   While there are minimum performance standards which an automaker is supposed

17  to meet before selling a vehicle in the United States (the FMVSS), these minimum

18  performance standards to not adequately protect the public.

19

20                                    **COUNT I**

21                      **NEGLIGENCE AND PRODUCT LIABILTIY**

22  33.   It was entirely foreseeable to and well-known by Defendant FCA that accidents and

23  incidents involving its vehicles, such as occurred herein, would on occasion take place

24  during the normal and ordinary use of said vehicle.

25

26  34.   The injuries complained of occurred because the vehicle in question was not

27  reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable,

28

6

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ◆ 602.795.3728 Fax

1   accidents. The vehicle in question was unreasonably dangerous in the event it should be

2   involved in an incident such as occurred herein.

3
4       35.   Defendant FCA, either alone or in conjunction with some other individual(s) and/or

5   entity(ies), designed, manufactured, marketed, assembled, and/or tested said vehicle in

6   question.

7       36.   As detailed herein, the vehicle contains and/or Defendant has committed either

8   design, manufacturing, marketing, assembling, and/or testing defects.

9
10      37.   Defendant either knew or should have known of at least one safer alternative design

11  which would have prevented the serious injuries to the Plaintiff.

12      38.   In addition to the foregoing, Defendant, either alone or in conjunction with some

13  other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or

14
15  tested said vehicle in question to be unreasonably dangerous and defective within the

16  meaning of Section 402(A) Restatement (Second) Torts, in that the vehicle was unreasonably

17  dangerous as designed, manufactured, assembled, marketed, and/or tested because

18
    Defendant knew and/or should have known of the following, non-exhaustive list of defects:
19
20          a.   The vehicle failed to provide reasonable protection;
            b.   The vehicle failed to provide reasonable occupant safety;
21          c.   Other manufacturers refused to utilize the passive shoulder belt with
                 manual lap belt design;
22          d.   Research dating back into the 1960's revealed that belts without a lap
23               belt would cause head and neck injuries;
            e.   Research dating back into the 1960's revealed that belts without a lap
24               belt would cause submarining injuries;
25          f.   Research revealed that belts without lap belts would cause intra-
                 abdominal overload;
26          g.   The vehicle was not properly subjected to finite element modeling,
27               finite element analysis and other computer aided accident scenarios;
                 and/or
28

7

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

h.   The defects and negligence were the producing, direct, substantial and proximate cause of the injuries and damages in question.

39.   Defendant also failed to conduct proper testing and engineering analysis during the design, development and testing of the vehicle.

40.   Defendant were negligent in the manufacture, assembly, marketing, and/or testing of the vehicle in question.

41.   In designing a vehicle, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death;

42.   Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

43.   If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

44.   If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

45.   A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent.

46.   Based upon information and/or belief, Defendant either used or knew about advanced safety features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

47.   Defendant's occupant protection philosophy and design philosophy are utilized in various model vehicles, including ones sold overseas in other markets.

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

48. When Defendant designed the subject vehicle, it did not reinvent the wheel. Defendant used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior vehicles. This knowledge would have been utilized in different aspects of the various designs of the subject vehicle.

49. Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the vehicle in question. Defendant is also in possession of what, if any, engineering analysis it performed.

50. However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

51. Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendants knew, when they knew it, and about what was utilized or not utilized as well as the reasons why.

52. The foregoing acts and/or omissions, design defects and negligence of Defendants were the producing, direct, proximate and legal cause of the Plaintiff's serious injuries and damages.

## COUNT II

## NEGLIGENCE

53. Plaintiffs' claims against the other Defendants include all of what has previously been mentioned.

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

54.  Additionally, Plaintiffs file this claim due to Defendants' negligent acts and/or omissions which include, but which are not necessarily limited to, one of more of the following:

    a.   Defendants were negligent for making representations and/or failing to inform (failure to warn) Plaintiffs regarding the vehicle;

    b.   Defendants were negligent in repair;

    c.   Defendant were negligent in modifications;

    d.   Defendants were negligent in supervision;

    e.   Defendants were negligent in quality control;

    f.   Defendants were negligent in maintenance;

    g.   Defendants were negligent in service;

    h.   Defendants failed to properly inspect the safety of the vehicle;

    i.   Defendants failed to properly inspect for, repair, and/or report safety hazards;

    j.   Defendants failed to properly inspect the safety systems on the vehicle; and/or

    k.   Plaintiffs did not discover the negligent acts of the Defendants until an accident caused severe injuries to Plaintiff.

55.  After materials are produced in discovery and after Defendants and others have been deposed, additional allegations may come to light, and Plaintiffs reserve the right to amend their pleadings.

## REQUEST FOR RELIEF

56.  As a direct and/or proximate result of the above-referenced acts and/or omissions of one or more of the Defendants, Plaintiff Mark Myers has suffered past, present, and/or future:  extreme emotional distress, pain and suffering, mental anguish, disfigurement, physical impairment, loss of income, loss of earning capacity, loss of enjoyment of life, loss of consortium, and interference with his daily activities.

57.  As a result of the acts and/or omissions of one or more of the Defendants, Mark Myers has become obligated to pay extensive medical expenses as a result of his injuries.

58.  As a result of the act and/or omissions of one or more of the Defendants, Mark

Myers has suffered lost wages in the past and in all likelihood will into the future as result of his injuries.

59.   As a direct and/or proximate result of the above-referenced acts and/or omissions of one or more of the Defendants, and because her husband suffered his severe injuries, Plaintiff Jenni Myers has suffered past, present, and/or future loss of consortium, and past, present, and/or future loss of care, maintenance, support, services, advice, counsel, reasonable contributions of pecuniary value, and loss of companionship and society.

60.   By reason of the nature and severity of Plaintiff's injuries, Plaintiffs have been caused to incur medical charges and expenses in the past, and it is anticipated that Plaintiffs will continue to incur medical expenses in the future, for the proper care and treatment of injuries

61.   The above and foregoing acts and/or omissions of one or more of the Defendants, resulting in the serious injuries to Mark Myers, have caused actual damages to Plaintiffs in excess of the minimum jurisdictional limits of this Court.

62.   For the reasons presented herein, Plaintiffs pray that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiffs recovers judgment against Defendants for:

    a.  actual damages;
    b.  prejudgment and post-judgment interest beginning January 12, 2018;
    c.  costs of suit; and
    d.  all other relief, general and special, to which Plaintiffs are entitled to at law
       and/or in equity, and/or which the Court deems proper.

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

DATED this 10 day of January, 2020.

SHUMWAY LAW PLLC

G. Lynn Shumway
4647 N. 32nd Street
Suite 125
Phoenix, Arizona 85018

and

E. Todd Tracy, Texas SBN 20178650
*(Pro Hav Vice pending)*
Andrew G. Counts, Texas SBN 24036408
*(Pro Hac Vice pending)*
**THE TRACY LAW FIRM**

*Attorneys for Plaintiffs*

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

1   G. Lynn Shumway (011714)
    shumway@carsafetylaw.com
2   SHUMWAY LAW PLLC
    4647 N. 32ⁿᵈ Street, Suite 125
3   Phoenix, Arizona 85018
    Telephone : 602.795.3720
4   Facsimile  : 602.795.3728

5
    E. Todd Tracy, Texas SBN 20178650 *(Pro Hav Vice pending)*
6   Andrew G. Counts, Texas SBN 24036408 *(Pro Hac Vice pending)*
7   THE TRACY LAW FIRM
    4701 Bengal Street
8   Dallas, Texas 75235
    (214) 324-9000
9   Fax: (972) 387-2205
    etoddtracy@vehiclesafetyfirm.com
10  acounts@vehiclesafetyfirm.com

11  *Attorneys for Plaintiff*

12

13                  IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

14                    IN AND FOR THE COUNTY OF MARICOPA

15  MARK MYERS AND JENNI MYERS,

16                  Plaintiff,                      CV2020-000674

17                                          No. _____
    vs.
18
                                                    **SUMMONS**
19  FCA US LLC, a Delaware limited liability
    company;                                If you would like legal advice from a lawyer,
20  ARIZONA FLEET SERVICES, a domestic      contact the Lawyer Referral Service at
    corporation; JOE PRICE, individually, and          602-257-4434
21  JOE PRICE d/b/a PRICE CAR COMPANY                      or
    a domestic corporation,                     www.maricopalawyers.org
22                                                  Sponsored by the
                                            Maricopa County Bar Association
23                  Defendants.

24
    **State of Arizona to Defendant:**
25
                              **JOE PRICE**
26                   **d/b/a PRICE CAR COMPANY**
                        **1809 N. Sundial**
27                     **Mesa, Arizona 85205**

28

                                    1

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795-3720 ♦ 602.795.3728 Fax

1    YOU ARE HEREBY SUMMONED and required to appear and defend, within the time applicable, in this action in this Court. If served within Arizona, you shall appear and
2    defend within 20 days after the service of the Summons and Complaint upon you, exclusive of the day of service.  If served out of the State of Arizona--whether by direct service, by
3    registered or certified mail, or by publication--you shall appear and defend within 30 days
4    after the service of the Summons and Complaint upon you is complete, exclusive of the day of service.  Where process is served upon the Arizona Director of Insurance as an insurer's
5    attorney to receive service of legal process against it in this state, the insurer shall not be
6    required to appear, answer or plead until expiration of 40 days after date of such service upon the Director.  Service by registered or certified mail without the State of Arizona is
7    complete 30 days after the date of filing the receipt and affidavit of service with the Court.
8    Service by publication is complete 30 days after the date of first publication.  Direct service is complete with made.  Service upon the Arizona Motor Vehicle Superintendent is complete
9    30 days after filing the Affidavit of Compliance and return receipt or Officer's Return.  RCP
10   4; A.R.S. §§ 20-222, 28-502, 28-503.

11   YOU ARE HEREBY NOTIFIED that in case of your failure to appear and defend
12   within the time applicable, judgment by default may be rendered against you for the relief demanded in the Complaint.
13
14   YOU ARE CAUTIONED that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this Court, accompanied by the necessary
15   filing fee, within the time required, and you are required to serve, a copy of any Answer or response upon the Plaintiff's attorney.  RCP 10(D); A.R.S § 12-311; RCP 5.
16
     (1) REQUESTS FOR REASONABLE ACCOMODATION FOR PERSONS
17   MADE TO THIS DIVISION ASSIGNED TO THE CASE BY THE PARTY NEEDING
     ACCOMODATION OR HIS/HER COUNSEL AT LEAST THREE (3) JUDICIAL DAYS
18   IN ADVANCE OF A SCHEDULED PROCEEDING.   (2)   REQUESTS FOR AN
     INTERPRETER FOR PERSONS WITH LIMITED ENGLISH PROFICIENCY MUST BE
19   MADE TO THE DIVISION ASSIGNED TO THE CASE BY THE PARTY NEEDING
     THE INTERPRETER AND/OR TRANSLATOR OR HIS/HER COUNSEL AT LEAST
20   TEN (10) JUDICIAL DAYS IN ADVANCE OF A SCHEDULED COURT
21   PROCEEDING.

22   / / /

23   / / /

24   / / /

25   / / /

26

27   / / /

28   / /

2

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

The names and addresses of Plaintiffs' attorneys are:

**G. Lynn Shumway**
**SHUMWAY LAW PLLC**
**4647 North 32nd Street, Suite 125**
**Phoenix, Arizona 85018-3345**

SIGNED AND SEALED this date: _____ JAN 1 0 2020 _____

JEFF FINE, CLERK

_____
Clerk

By _____
Deputy Clerk



R. Merino
Deputy Clerk

3

1    G. Lynn Shumway (011714)
     shumway@carsafetylaw.com
2    **SHUMWAY LAW PLLC**
     4647 N. 32nd Street, Suite 125
3    Phoenix, Arizona 85018
     Telephone : 602.795.3720
4    Facsimile : 602.795.3728

5

6    E. Todd Tracy, Texas SBN 20178650 *(Pro Hav Vice pending)*
     Andrew G. Counts, Texas SBN 24036408 *(Pro Hac Vice pending)*
7    **THE TRACY LAW FIRM**
     4701 Bengal Street
8    Dallas, Texas 75235
     (214) 324-9000
9    Fax: (972) 387-2205
     etoddtracy@vehiclesafetyfirm.com
10   acounts@vehiclesafetyfirm.com

11   *Attorneys for Plaintiff*

12

13          **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

14             **IN AND FOR THE COUNTY OF MARICOPA**

15   MARK MYERS AND JENNI MYERS,

16           Plaintiff,         No. CV2020-000674

17

18    vs.

19   FCA US LLC, a Delaware limited liability
     company;              **SUMMONS**

20   ARIZONA FLEET SERVICES, a domestic    If you would like legal advice from a lawyer,
     corporation; JOE PRICE, individually, and    contact the Lawyer Referral Service at
21   JOE PRICE d/b/a PRICE CAR COMPANY         602-257-4434
22   a domestic corporation,             or
                            www.maricopalawyers.org
23          Defendants.        Sponsored by the
                         Maricopa County Bar Association

24

25   **State of Arizona to Defendant:**

26               **FCA USA LLC**
              **c/o CT Corporation System**
27          **3800 N. Central Avenue, Suite 460**
           **Phoenix, Arizona 85012**

28

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

1

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

1     YOU ARE HEREBY SUMMONED and required to appear and defend, within the time applicable, in this action in this Court. If served within Arizona, you shall appear and

2  defend within 20 days after the service of the Summons and Complaint upon you, exclusive

3  of the day of service. If served out of the State of Arizona--whether by direct service, by registered or certified mail, or by publication--you shall appear and defend within 30 days

4  after the service of the Summons and Complaint upon you is complete, exclusive of the day

5  of service. Where process is served upon the Arizona Director of Insurance as an insurer's attorney to receive service of legal process against it in this state, the insurer shall not be

6  required to appear, answer or plead until expiration of 40 days after date of such service

7  upon the Director. Service by registered or certified mail without the State of Arizona is complete 30 days after the date of filing the receipt and affidavit of service with the Court.

8  Service by publication is complete 30 days after the date of first publication. Direct service is complete with made. Service upon the Arizona Motor Vehicle Superintendent is complete

9  30 days after filing the Affidavit of Compliance and return receipt or Officer's Return. RCP

10  4; A.R.S. §§ 20-222, 28-502, 28-503.

11     YOU ARE HEREBY NOTIFIED that in case of your failure to appear and defend within the time applicable, judgment by default may be rendered against you for the relief

12  demanded in the Complaint.

13

14     YOU ARE CAUTIONED that in order to appear and defend, you must file an Answer or proper response in writing with the Clerk of this Court, accompanied by the necessary

15  filing fee, within the time required, and you are required to serve, a copy of any Answer or response upon the Plaintiff's attorney. RCP 10(D); A.R.S § 12-311; RCP 5.

16

17     (1) REQUESTS FOR REASONABLE ACCOMODATION FOR PERSONS MADE TO THIS DIVISION ASSIGNED TO THE CASE BY THE PARTY NEEDING

18  ACCOMODATION OR HIS/HER COUNSEL AT LEAST THREE (3) JUDICIAL DAYS IN ADVANCE OF A SCHEDULED PROCEEDING. (2) REQUESTS FOR AN

19  INTERPRETER FOR PERSONS WITH LIMITED ENGLISH PROFICIENCY MUST BE MADE TO THE DIVISION ASSIGNED TO THE CASE BY THE PARTY NEEDING

20  THE INTERPRETER AND/OR TRANSLATOR OR HIS/HER COUNSEL AT LEAST TEN (10) JUDICIAL DAYS IN ADVANCE OF A SCHEDULED COURT

21  PROCEEDING.

22  ///

23  ///

24  ///

25

26  ///

27  ///

28  //

2

The names and addresses of Plaintiffs' attorneys are:

**G. Lynn Shumway**
**SHUMWAY LAW PLLC**
**4647 North 32nd Street, Suite 125**
**Phoenix, Arizona 85018-3345**

SIGNED AND SEALED this date: _____

_____
Clerk

By _____
Deputy Clerk

COPY

JAN 1 0 2020

CLERK OF THE SUPERIOR COURT
R. MERINO
DEPUTY CLERK

SHUMWAY LAW PLLC
4647 N. 32nd St., Suite 230
Phoenix, Arizona 85018-3345
602.795.3720 ♦ 602.795.3728 Fax

3

Shumway Law Office
4647 N 32nd St #230
Phoenix, AZ 85018
(602) 795-3720

CLERK OF THE SUPERIOR COURT
FILED
JAN 15 2020  4:00pm
R. Merino, Deputy

### IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
### IN AND FOR THE COUNTY OF MARICOPA

**MARK MYERS and JENNI MYERS**

Plaintiff,

Case Number: CV2020-000674

**AFFIDAVIT OF SERVICE**

vs.

**FCA US LLC et al.**

Defendant.

Received by HOT SHOT DELIVERY INC. on the **13th day of January, 2020 at 3:11 pm** to be served on **Joe Price, dba Price Car Conpany, 1809 N Sundial, Mesa, AZ 85205.**

I, Christopher Turnage Badge no. MC-8160, being duly sworn, depose and say that on the **13th day of January, 2020 at 6:26 pm, I:**

**INDIVIDUALLY/PERSONALLY** served by delivering a true copy of the **Summons, Complaint, Certificate of Compulsory Arbitration, Demand for Jury Trial** to: **Joe Price** at the address: **1809 N Sundial, Mesa, AZ 85205** with the date and hour of service endorsed thereon by me, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 70, Sex: M, Race/Skin Color: Cauc, Height: 6-0, Weight: 230, Hair: Gry, Glasses: N

I certify that I am over the age of 21, have no interest in the above action, and am a Licensed Process Server, within the county of Maricopa, State of ARIZONA, in good standing and am fully qualified to serve process in this cause.

"I Declare under Penalty of Perjury that the foregoing is true and correct".

Subscribed and Sworn to before me on the 14th day
of January, 2020 by the affiant who is
personally known to me.

NOTARY PUBLIC

KATRINA PRENTICE
Notary Public - State of Arizona
MARICOPA COUNTY
My Commission # 559437
Expires February 26, 2023

Christopher Turnage Badge no. MC-8160
Licensed Process Server

**HOT SHOT DELIVERY INC.**
**236 East Pima Street**
**Suite 106**
**Phoenix, AZ 85004**
**(602) 277-4747**

Our Job Serial Number: DEK-2020000100
Ref: Myers

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.0n



Clerk of the Superior Court
*** Electronically Filed ***
M. King, Deputy
1/21/2020 9:43:00 AM
Filing ID 11293651

Shumway Law Office
4647 N 32nd St #230
Phoenix, AZ 85018
(602) 795-3720



IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF MARICOPA

JAN 15 2020

CLERK OF THE SUPERIOR COURT
R. MERINO
DEPUTY CLERK

MARK MYERS and JENNI MYERS

                              Plaintiff,

vs.

FCA US LLC et al.

                              Defendant.

Case Number: CV2020-000874

AFFIDAVIT OF SERVICE

Received by HOT SHOT DELIVERY INC. on the 13th day of January, 2020 at 3:11 pm to be served on FCA USA LLC, c/o CT Corporation System, Statutory Agent, 3800 N Central Ave #460, Phoenix, AZ 85012.

I, Jorge Juarez, MC-8911, being duly sworn, depose and say that on the 14th day of January, 2020 at 10:14 am, I:

**PERSONALLY:** served by delivering a true copy of the Summons, Complaint, Certificate of Compulsory Arbitration, Demand for Jury Trial with the date and hour of service endorsed thereon by me to: Krikor Kalaydjian as Clerk for CT Corporation, Statutory Agent for FCA USA LLC at the address of: 3800 N Central Ave Suite 460, Phoenix, Az 85012 and informed said person of the contents therein in compliance with state statutes and stating to me at the time of service that he/she is authorized to accept service of process.

Description of Person Served: Age: 40, Sex: M, Race/Skin Color: White, Height: 6'0", Weight: 180, Hair: Black, Glasses: N

I certify that I am over the age of 21, have no interest in the above action, and am a Licensed Process Server, within the county of Maricopa, State of ARIZONA, in good standing and am fully qualified to serve process in this cause.

"I Declare under Penalty of Perjury that the foregoing is true and correct".

Subscribed and Sworn to before me on the 14 day of January, 2020 by the affiant who is personally known to me.

NOTARY PUBLIC

CHRIS TURNAGE
Notary Public - State of Arizona
MARICOPA COUNTY
Commission #557819
Expires January 25, 2023

Jorge Juarez, MC-8911
Licensed Process Server

HOT SHOT DELIVERY INC.
236 East Pima Street
Suite 106
Phoenix, AZ 85004
(602) 277-4747

Our Job Serial Number: DEK-2020000101
Ref: Myers

Copyright © 1992-2020 Database Services, Inc. - Process Server's Toolbox V8.0n

**JOE PRICE, an individual, and dba Price car Company**
**1809 N. Sundial**
**Mesa, Arizona 85205**
**Phone: (602) 809-7200**

**DEFENDANTS IN Pro Se**

JEFF FINE
Clerk of the Superior Court
By Michelle Messmer, Deputy
Date 02/03/2020 Time 12:58:55
Description                    Amount
------- CASE# CV2020-000674 -------
CIVIL SEPARATE ANS          245.00
-----------------------------------
TOTAL AMOUNT                245.00
         Receipt# 27630689

## SUPERIOR COURT – STATE OF ARIZONA

## COUNTY OF MARICOPA

| | |
|---|---|
| MARK MEYERS AND JENNI MEYERS )<br><br>　　　Plaintiffs, )<br><br>　　vs. )<br><br>FCA US LLC, a Delaware limited liability )<br>company; ARIZONA FLEET SERVICES, a)<br>domestic corporation, JOE PRICE, an )<br>individual, Answer and Affirmative )<br>Defenses and Joe Price, dba Price Car )<br>company, )<br><br>　　　Defendants. | Case No.: CV2020-000674<br><br>**ANSWER AND AFFIRMATIVE**<br>**DEFENSES** |

For his Answer to Plaintiffs MARK MEYERS AND JENNI MEYERS, (hereinafter "Plaintiffs MEYERS"), Defendant, JOE PRICE (herein after "Defendant Price"), an individual, and for Price Car Company, a non-existent business, by himself and Pro Se, answers and alleges as follows:

　　1. Defendant Joe Price, DBA Price Car Company makes this response to solely to object to jurisdiction, as Price Car Company which is no longer doing business and has not done business for years and therefore makes no further statement until jurisdiction is established.

　　2. In response to allegations 1 – 3 Defendant Joe Price (hereinafter "Defendant Price") is without sufficient knowledge and information upon which to form a belief and therefore denies the allegations.

1

3. Defendant Price admits the allegation in paragraph 4.

4. Defendant Price denies the allegations in paragraph 5.

5. Defendant Price denies the allegations in paragraph 6.

6. In response to allegations 7-11 Defendant Price is without sufficient knowledge and information upon which to form a belief and therefore denies the allegations.

7. Defendant Price denies the allegations in paragraph 12.

8. Defendant Price objects to allegation 13 as vague, ambiguous and without any specific allegation against Defendant Price and therefore denies the allegation in paragraph 13.

9. Defendant Price objects to allegation 14 as vague, ambiguous and without any specific allegation against Defendant Price and therefore denies the allegation in paragraph 14.

10. Defendant Price denies the allegations in paragraphs 15, 16, 17 and 18.

11. In response to allegations 19, 20, 21, 22, 23, 24 and 25 Defendant Price is without sufficient knowledge and information upon which to form a belief and furthermore that these allegations are vague, ambiguous and without any specific allegation against Defendant Price that therefore denies the allegations.

12. Defendant Price objects to allegations 26, 27, 28, 29, 30, 31 and 32 as vague, ambiguous and without any specific allegation against Defendant Price who is without sufficient knowledge and information upon which to form a belief and therefore denies the allegations.

13. In response to allegations in 33 Defendant Price is without sufficient knowledge and information upon which to form a belief and furthermore

that these allegations are vague, ambiguous and without any specific
allegation against Defendant Price that therefore denies the allegations.

14. Defendant Price denies the allegations in paragraph 34

15. Defendant Price objects to allegations in paragraph 35, 36, 37, 38, 39 and
40 as vague, ambiguous, without any specific allegation against Defendant
Price, and is without sufficient knowledge and information upon which to
form a belief and therefore denies the allegations.

16. Defendant Price denies the allegations in paragraphs 41, 42, 43, 44, 45,
46, 47, 48, 49, 50, 51, and 52 insofar as they may allege specific
knowledge or actions against Defendant Price and, as they regard the
knowledge or actions of others, is without sufficient knowledge or
information upon which to form a belief and therefor denies all allegations.

17. Defendant Price denies the allegations in paragraph 53 insofar as it
incorporates by reference all previous allegations.

18. Defendant Price denies the allegations in paragraph 54 and 55 and is
without knowledge or information upon which to form a belief about the
speculative allegations and therefore denies the allegations.

## AFFIRMATIVE DEFENSES

19. Plaintiffs have failed to state a claim upon which relief can be granted. All
allegations brought forth therein fails to state a claim upon which relief can
be granted. Plaintiffs fail to state any specific facts or information relating to
Defendant Price being negligent or product liability.

20. Defendant objects to jurisdiction in Arizona for this claim. Plaintiffs allege
all of the nucleus of operative facts that may relate to Plaintiff Price
occurred in Texas.

21. Defendant asserts that the statute of limitations has expired for Defendant
Price in this action and therefore the court has no jurisdiction.

22. Defendant alleges that Plaintiffs come to the court with unclean hands. Defendant Price alleges Plaintiffs have not performed the standard and required maintenance for the vehicle that is alleged to have caused their injuries.

Wherefore, Defendant Price prays that Plaintiff's claims be dismissed, that Plaintiffs take nothing and the Defendant Price have judgment against the Plaintiffs and recover the costs of the suit herein, and such other relief as the court deems just and proper.

Dated: _February 3, 2020_ _____

Defendant, Joe Price, an individual and DBA Price Car Company

## DECLARATION

I, Joe Price, am Defendant in the above captioned action. These defenses are asserted to the best of my personal knowledge, information and belief. I would be competent to testify to their truth if I were called as a witness. I declare under penalty of perjury that to the best of my knowledge and belief the foregoing declaration is true and correct.

Dated: _02-03-2020_

Joe Price – an individual, Pro Se

# EXHIBIT 11

Paul G. Cereghini (009641)
Curtis J. Busby (019415)
Daniel B. Goldman (033570)
**BOWMAN AND BROOKE LLP**
2901 North Central Avenue, Suite 1600
Phoenix, Arizona 85012-2736
Telephone: (602) 643-2300
Facsimile: (602) 248-0947
paul.cereghini@bowmanandbrooke.com
curtis.busby@bowmanandbrooke.com
daniel.goldman@bowmanandbrooke.com

Attorneys for Defendant FCA US LLC

# UNITED STATE DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Mark Myers and Jenni Myers,<br><br>                    Plaintiffs,<br><br>v.<br><br>FCA US LLC, a Delaware limited liability company; Arizona Fleet Services, a domestic corporation; Joe Price, individually, and Joe Price d/b/a Price Car Company, a domestic corporation,<br><br>                    Defendants. | Case No.<br><br>**VERIFICATION PURSUANT TO LOCAL RULE 3.6(b)** |

I hereby verify that Exhibit 11 contains true and complete copies of all pleadings and other documents that were previously filed with the state court as of the date of this filing.

DATED this 13th day of February, 2020.

**BOWMAN AND BROOKE LLP**


By:/s/Curtis J. Busby_____
        Paul G. Cereghini
        Curtis J. Busby
        Daniel B. Goldman

        Attorneys for Defendant FCA US LLC

CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2020, I electronically transmitted the attached document: **CERTIFICATION PURSUANT TO LOCAL RULE 3.6(b)** to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

G. Lynn Shumway
SHUMWAY LAW PLLC
4647 N. 32nd Street, Suite 125
Phoenix, AZ 85018
shumway@carsafetylaw.com
pam@carsafetylaw.com

E. Todd Tracy (Pro Hac Vice Pending)
Andrew G. Counts (Pro Hac Vice Pending)
THE TRACY LAW FIRM
4701 Bengal Street
Dallas, TX 75235
etoddtracy@vehiclesafetyfirm.com
acounts@vehiclesafetyfirm.com

Attorneys for Plaintiffs

Joe Price, individually, and d/b/a Price Car Company
1809 N. Sundial
Mesa, AZ 85205
Defendant Pro Per

s/Jeannette Felix